UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

SLATE CRAFT GOODS, INC.

                Plaintiff,

      v.

HORSESHOE BEVERAGE COMPANY, LLC
and TRILLIANT FOOD AND NUTRITION,
LLC

                Defendants.

Case No. 24-cv-1292

## COMPLAINT

Plaintiff Slate Craft Goods, Inc. ("Slate") is the company behind the delicious and healthy "Slate" protein-packed and lactose-free ultrafiltered milk shake and iced coffee beverages that are sold nationwide. To meet demand, Slate—like many beverage companies—uses co-manufacturers/co-packers to manufacture, package, and distribute its products. One of Slate's co-manufacturers/co-packers is Defendant Horseshoe Beverage Company, LLC ("Horseshoe").

About a year into their co-manufacturing relationship, Slate approached Horseshoe with an exciting new, but confidential, business opportunity: to manufacture a new product Slate was developing to be sold to one of Slate's large customers, which is a major player in the "club channel." Believing that Horseshoe was a trusted partner to co-manufacture this new product, and given the protections of the parties' written co-manufacturing agreement, Slate shared its confidential, proprietary, and trade secret information about this new product and its go-to-market-strategy with Horseshoe—solely for Horseshoe to assist Slate with this new

product/opportunity.

Unbeknownst to Slate, Horseshoe lulled Slate into providing its confidential technical and business information and its trade secrets about that new product so that Horseshoe could improperly share it with Horseshoe's sister company, Defendant Trilliant Food and Nutrition, LLC ("Trilliant"). Then, Defendants—who (upon information and belief) have no prior experience with ultrafiltered milk-based and/or lactose-free beverages before working with Slate—clandestinely used Slate's secret information to create, manufacture, and launch a copycat new product, which they named Nurri. Horseshoe did so *at the same time* it was supposedly attempting, at Slate's direction and in accordance with Slate's instructions, to manufacture Slate's confidential new product.

Defendants did not stop there. They ripped-off the business plan that Slate had shared with Horseshoe and used it as a roadmap to sell Nurri to the *very same customer* that Slate told Horseshoe was the target customer for Slate's new product. Recently, Trilliant entered into an "exclusive" arrangement with Slate's target customer to sell it large volumes of Nurri, which Horseshoe is manufacturing on Trilliant's behalf. Even worse, to ensure Nurri's success and to beat Slate to market, Horseshoe knowingly and intentionally slowed—and botched—its attempts to manufacture Slate's new product in order to delay Slate's go-to-market strategy.

The scale and scope of Horseshoe's deception and Defendants' improper actions is shocking, but their multi-faceted scheme worked; Defendants' sale of Nurri to Slate's customer has locked Slate out from selling its new product to that customer (at least for now). Slate therefore brings this action seeking damages and injunctive relief due to Defendants' misappropriation of Slate's confidential information, proprietary, and/or trade secrets in violation of, among other things, the federal Defend Trade Secrets Act and Wisconsin law;

interference with prospective contractual relations; conspiracy to harm Slate's business; breach of contract; and other state law claims.

Slate also asserts a breach of contract claim against Horseshoe as a result of Horseshoe's breach of the parties' co-manufacturing agreement by having knowingly manufactured, packaged, and distributed defective products for Slate. When Slate discovered widespread defects with the Horseshoe-manufactured Slate products, it promptly asked Horseshoe to fix its issues (Slate not knowing, at that time, that Defendants were on the eve of launching Nurri). Horseshoe refused, sought to shift blame to Slate, and even had the temerity to seek payment for the manufacture of those defective Slate products. Slate therefore also seeks a declaratory judgment that it should not have to pay Horseshoe's outstanding invoices (Slate has put the net amount of the disputed payments into a separate bank account, pending resolution of this dispute) and that Slate had a right to terminate its co-manufacturing agreement with Horseshoe for cause.

Defendants' actions appear to fit a troubling pattern. This is not the first time they have been accused of entering into agreements with a beverage brand, stealing that brand's confidential and proprietary information, and selling illicit product to a large customer of that brand (at the expense of the brand). Nor is it the first time Defendants have been accused of undertaking these improper actions while—at the same time—manufacturing, packaging, and selling defective and substandard product for the brand (and stonewalling the brand's concerns).

To begin to redress Defendants' unlawful conduct, Slate seeks injunctive relief to prevent Defendants from continuing to use Slate's confidential, proprietary, and trade secret information, including stopping them from manufacturing and selling Nurri (and any other product using Slate's information). Slate also seeks all exemplary and/or punitive damages to

which it is entitled, as well as attorneys' fees and costs in order to right the wrongs wrought by Defendants, to deter future conduct, and to begin to make Slate whole. Slate's request for a declaratory judgment is to seek relief against Horseshoe's inevitable attempts to distract and excuse Defendants' brazenly improper actions.

## THE PARTIES

1.      Plaintiff Slate Craft Goods, Inc. is a Delaware corporation with its principal place of business located at 237 Strasser Avenue, Westwood, Massachusetts 02090.

2.      Upon information and belief, Defendant Horseshoe Beverage Company, LLC is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and with its registered agent as Registered Agent Solutions, Inc., 100 Wildburn Road, Suite 100, Sun Prairie, Wisconsin 53590.

3.      Upon information and belief, Defendant Trilliant Food and Beverage, LLC is a Wisconsin limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and with its registered agent as Registered Agent Solutions, Inc., 100 Wildburn Road, Suite 100, Sun Prairie, Wisconsin 53590.

## JURISDICTION AND VENUE

4.      This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq*.) and the Wisconsin Uniform Trade Secrets Act (Wis. Stat. § 134.90), for breaches of contract, for interference with prospective contractual relations, for other state statutory and common law causes of action, and for declaratory judgment.

5.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and the Declaratory Judgment Act. This Court has supplemental jurisdiction over the asserted state and common law claims pursuant to 28 U.S.C.

§ 1367.[1]

6.      This Court has personal jurisdiction over Defendants because they each have their principal places of business and are "at home" in Wisconsin (and this district).  This Court also has personal jurisdiction over Trilliant because it is a Wisconsin limited liability company. Additionally, several of the claims in this action arise out of or relate to the Manufacturing Agreement which states, in pertinent part, that Horseshoe (and Slate) consent to jurisdiction in this Court.

7.      This Court also has personal jurisdiction over Defendants because, directly or through intermediaries, each has transacted business, contracted to supply services, caused tortious injury, regularly done business, derived substantial revenue from services rendered, and committed acts within Wisconsin (and this district) which give rise to this action.  This action arises out of Defendants' contacts with Wisconsin (and this district).  Defendants have availed themselves of the privilege of doing business in Wisconsin.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are residents of this district and a substantial part of the events, acts, or omissions giving rise to Slate's claims occurred in this district, and because the Manufacturing Agreement provides that Slate and Horseshoe agree that disputes "arising out of or relating to" the Manufacturing Agreement may be "heard and determined" in this district.

9.      Every allegation contained in the following paragraphs is incorporated herein.

_____

[1] The current identity and citizenship of Defendants' respective members is not publicly available.  Upon information and belief, this Court also may have diversity jurisdiction pursuant to 28 U.S.C. § 1332.  For example, Trilliant sued a Delaware-corporation in Wisconsin state court in 2022.  That Delaware-corporate defendant removed that action to this district and Trilliant did not seek remand to Wisconsin state court.  *See generally Trilliant Food & Nutrition LLC v. Reas, et al.*, Case No. 22-CV-315 (E.D. Wis. filed March 11, 2022).  Discovery of Defendants' current memberships may confirm this additional basis for subject matter jurisdiction.

## FACTUAL BACKGROUND

### Slate and its Business

10.     Slate was founded by Manny Lubin and Josh Belinsky in 2018, after the two graduated from Northeastern University.  The pair's love of chocolate milk, as well as their lactose intolerance, gave them the idea to give chocolate milk a "clean slate" and create a healthy adult version of a childhood favorite that consumers could drink every day.  After a successful Kickstarter campaign, an appearance on ABC's "Shark Tank," and many iterations of testing, Slate began selling products to customers in late 2019.  Slate's product offerings evolved into what can now be described as protein drinks, which include milk shakes and iced coffees.

11.     To produce its delicious, but healthy products, Slate uses ultrafiltered milk as its primary ingredient.  The use of ultrafiltered milk allows Slate's products to contain less sugar but more protein than other milk-based drinks.  Slate then blends its ultrafiltered milk with natural ingredients, including allulose, stevia, and monk fruit, to create delicious and healthy protein drinks.

12.     Today, Slate's primary product line is its collection of protein drinks:  four milk shake flavors (Classic Chocolate, Dark Chocolate, French Vanilla, and Classic Strawberry) and four iced coffees (Mocha Latte, Vanilla Latte, Caramel Latte, and Sweet Cream Latte) – all of which contain 20g protein, 1g sugar, have 0g added sugar, and are lactose free.



*See* Slate Milk, https://slatemilk.com/ (last visited on Oct. 10, 2024)

13.     Slate's products are sold throughout the United States through a variety of distribution channels and are in over ten thousand national and regional retail doors across the country, as well as direct to consumer on Slate's website.  To date, Slate has sold about 25 million cans of its protein drink products, including in Wisconsin and in this district.

14.     The popularity of Slate's high-protein, low-sugar, and lactose-free products has garnered it several endorsements from high profile professional and amateur athletes.  Slate's unique products have also allowed Slate to enter into several partnerships (including with professional sports leagues).

**Slate's Relationship With Horseshoe**

15.     On or about January 1, 2023, Slate and Horseshoe signed the Manufacturing Agreement, which (among other things) appoints Horseshoe, on a non-exclusive basis, to

produce and package certain of Slate's protein drink products, including certain of its ultrafiltered milk shakes.  In the parlance of the beverage industry, Horseshoe is one of Slate's co-manufacturers (called a "co-man") that Slate hired to mix ultrafiltered milk with other ingredients.  To do so, Horseshoe follows Slate's formulations and recipes, but on a commercial scale.  Once the products are mixed, the Manufacturing Agreement also appoints Horseshoe, again on a non-exclusive basis, as Slate's contract packer (called a "co-packer"); Horseshoe packages the beverages in aluminum cans (in accordance with Slate's specifications), pasteurizes the products, and delivers the products to wholesalers, retailers, and consumers.

16.    The Manufacturing Agreement provides that Slate owns "in its entirety" any formulas and formulations that it provides to Horseshoe.  The Manufacturing Agreement also requires Horseshoe to provide R&D resources to create updated versions of formulations to qualify for commercial production and to improve Horseshoe's batching times.

17.    The Manufacturing Agreement also contains confidentiality provisions.  Both Horseshoe and Slate agreed that Slate's confidential information includes, among other things: formulas, formulations, technical specifications, and recipes that Slate provides to Horseshoe; Slate's business plans; Slate's know-how as to how to produce its products; financial information about Slate's business; Slate's research and consumer insights on Slate's products; Slate's marketing plans, pricing strategies, customer (including distributors and retailers) information; and Slate's arrangements with vendors and suppliers.

18.    Under the Manufacturing Agreement, Horseshoe agreed to use confidential information it obtains from Slate *solely* to perform Horseshoe's obligations under the Manufacturing Agreement.  Further, Horseshoe agreed, in the Manufacturing Agreement, that it would only provide its employees and agents Slate's confidential information on a need-to-know

basis and that Horseshoe would be responsible for any breach of the confidentiality provisions by any of its employees or agents.

19.     Upon information and belief, before its relationship with Slate, Horseshoe had never produced a lactose-free and/or an ultrafiltered-milk-based beverage, nor did it have any experience formulating beverages with ultrafiltered milk.  Further, upon information and belief, before Slate, Horseshoe did not have experience ensuring milk products were lactose-free, nor did it have equipment to do so.  Consequently, Slate provided Horseshoe with all the knowledge, know-how, and methodologies necessary to manufacture Slate's protein drink products.  All of this information falls within the definition of "Confidential Information" under the terms of the Manufacturing Agreement.  Further, Slate considers certain of this information to be its trade secrets and has taken steps to protect the confidentiality of such information.

20.     For example and without limitation, Slate provided Horseshoe with instructions and know-how as to the timing and volumes of adding certain ingredients to Slate's ultrafiltered milk.  If certain ingredients are added at the wrong time or with the incorrect volume, the finished product can "clump" or "separate."  Another example is that Slate taught Horseshoe how to ensure that lactase enzymes work in ultrafiltered milk in order to ensure that Slate's milk products are lactose free.  Because Horseshoe, upon information and belief, had no prior experience in lactose-free milk products, Slate even bought a piece of equipment for Horseshoe to use that allows it to test the amount of lactose in a beverage, with the agreement that Horseshoe is to use it ***only*** in connection with its obligations under the Manufacturing Agreement (and for no other purpose).  That piece of equipment was located at Horseshoe's facilities in Wisconsin during the relevant time period (and, upon information and belief, is still there).  Another example is know-how that Slate provided Horseshoe to prevent "foaming" of

ultrafiltered milk during the manufacturing of Slate's protein drink products. Yet another example is the "sweetener systems" used in Slate's protein drinks (*i.e.,* combinations of ingredients that sweeten the beverages without adding any grams of sugar). Due to the high-intensity sweetness that comes with each of these ingredients, a small increase or decrease to the volume used will result in a significant flavor impact. Slate's co-founders (Messrs. Lubin and Belinsky) and Slate's operations department, along with Slate's outside R&D teams, spent many months determining the proper "ratio" of these ingredients, which Slate provided to Horseshoe.

21.     Slate's know-how, instructions, methodologies, and other information that it provided to Horseshoe (which were developed during Slate's lengthy testing and product development processes) are part of the competitive advantage that Slate has for its products. Slate considers all of this information to be confidential and proprietary and certain of this information to be its trade secrets. Slate provided such information to Horseshoe for use in Horseshoe's facilities in Wisconsin and solely in connection with the Manufacturing Agreement. Horseshoe could not have manufactured Slate's protein drink products without all such confidential information and knowledge that Slate provided under the Manufacturing Agreement.

22.     The reasonable measures that Slate took (and takes) to keep all of its confidential, proprietary, and trade secret information, in fact, confidential, proprietary, and trade secret include but are not limited to: (a) storing all such information on Slate's password protected computer systems, which are only accessible by Slate employees who were (and are) under a duty of confidentiality; (b) storing certain of such information in encrypted files/software that have additional password protections; (c) limiting knowledge and dissemination of such information on a need-to-know basis within Slate; (d) requiring all of its employees to sign

confidentiality agreements and maintaining an employee handbook with a requirement to protect Slate's confidential, proprietary, and trade secret information; and (e) entering into agreements with confidentiality provisions (such as the Manufacturing Agreement) with third parties (*e.g.*, co-manufacturers, co-packers, R&D formulators, independent contractors, ingredient suppliers, etc.) when such confidential information is shared.

**Slate's New Product and Business Strategy**

23.     In July 2022, a representative from a major player in the "club channel" (the "Club") reached out to Slate to ask for samples of Slate's ultrafiltered protein drinks that Slate was already selling nationwide.  The Club representative mentioned that two of the primary reasons it was interested in Slate's products were because the protein source in Slate's products is ultrafiltered milk (rather than protein powder), and because Slate's products are packaged in aluminum cans.  Slate was elated, because, on a per-store basis, the "club channel" is the largest distribution channel of the "protein drink" category in which Slate's products compete.  The Club agreeing to sell Slate's protein beverage product(s) would result in substantial revenue for Slate.

24.     Between August 2022 and June 2023, Slate had several conversations with representatives from the Club, including phone calls and meetings, to discuss the specifics and details of a partnership.  During these exchanges, the Club's representatives told Slate that, although they remained interested in offering Slate's existing products with 20g protein, they requested that Slate create a new ultrafiltered milk shake with 30g protein (the "New Slate Product") to meet the Club's unmet demand for that type of beverage.  Slate understood that one reason for the Club's interest in such a new product was that it wanted to grow its ultrafiltered milk protein drink offerings in its stores, and that Slate was the natural choice, given it was (and

is) the second largest player in the ultrafiltered milk-based protein drink market.

25.     The Club's request for the New Slate Product represented a new, significant business opportunity for Slate.

26.     In June 2023, the Club emailed Slate with the first of several purchase order commitments for Slate's ultrafiltered milk shake with 20g protein.  All the products that the Club bought from Slate were manufactured, packaged, and shipped by Horseshoe to the Club under the Manufacturing Agreement.

27.     In August 2023, Slate (relying on the Club's request) began development of the New Slate Product, including engaging an R&D formulator (not Horseshoe) to formulate it confidentially.  In addition to increasing the amount of protein—from 20g to 30g—and making certain flavor changes (both of which the Club requested), Slate also decided that the New Slate Product would focus on nutrition by including increased quantities of several vitamins and minerals.

28.     By early-November 2023, Slate finished R&D for the New Slate Product.  Slate had achieved the desired flavor for the New Slate Product (chocolate) by leveraging its existing intellectual property and know-how, as well as other non-public information that Slate acquired over several years during the development of its current products.

29.     In late-November 2023, members of the Horseshoe team (including Matt Knox) met with Slate (including Mr. Lubin and Mr. Belinsky) to discuss partnership opportunities, including Slate possibly increasing production with Horseshoe.  During that meeting, which was covered by the confidentiality provisions of the Manufacturing Agreement, Slate informed the Horseshoe team of its confidential plans to produce the New Slate Product for the Club, and that this new product would contain 30g of protein, focus on nutrition, and include added vitamins

and minerals. Slate also told Horseshoe of the immense upside of the potential opportunity to sell such a product to the Club. Slate provided the Horseshoe employees with confidential samples of the New Slate Product (chocolate), which the Horseshoe employees enjoyed drinking.

30. Within a day or so after that meeting, Mr. Knox reached out to Slate to say that Horseshoe's "owner," Mr. Upchurch, was interested in "work[ing] toward alignment" on a partnership to include Horseshoe manufacturing the New Slate Product and supporting Slate's confidential business plans with respect to the Club.

31. In the beginning of December 2023, Messrs. Knox and Upchurch met with Messrs. Lubin and Belinsky. During that meeting, Slate shared additional confidential information about its business plans to create the New Slate Product for the Club. Messrs. Knox and Upchurch again told Slate that Horseshoe would welcome the opportunity to support the New Slate Product and Slate's confidential business plans with respect to the Club.

32. In the weeks and months following that meeting, Slate sent Horseshoe additional confidential information about the New Slate Product and Slate's business plan, including, among other things, the cost and suppliers of Slate's key ingredients. All the confidential, proprietary, and trade secret information that Slate gave Horseshoe, including relating to the New Slate Product, was under confidentiality provisions of the Manufacturing Agreement, and solely in furtherance of that Agreement.

33. In addition to the confidentiality provisions of the Manufacturing Agreement, Slate has taken (and is currently taking) other reasonable measures to protect the confidentiality of all the confidential, proprietary, and trade secret information about Slate's existing products and the New Slate Product including the measures discussed above (at Paragraph 22).

34. In February 2024, Slate met, virtually, with representatives of the Club to discuss

their partnership. During the meeting, the Club reiterated, even more passionately than previous conversations, its prior request for Slate to bring the New Slate Product to market because of the significant demand the Club was experiencing for ultrafiltered milk-based protein shakes with a higher protein content.

### Development of Slate's New Product

35.     By early November 2023, Slate and its R&D formulators had completed further development of a confidential formula for the New Slate Product and created sample batches (chocolate) that met Slate's requirements. At all relevant times, Slate's R&D formulators and any third party who received any of Slate's confidential, proprietary, or trade secret information relating to the New Slate Product understood the need to treat such information accordingly.

36.     As a result of successful R&D trials at an outside facility (not Horseshoe), Slate told Mr. Knox (at Horseshoe) that it was ready for Horseshoe to attempt to manufacture the New Slate Product at commercial scale, which first requires Horseshoe's product development team to perform a trial of the product. In an email, Mr. Lubin told Gayl Kerbs, Horseshoe's Director of Product Development, that Slate had "created a SLATE NUTRITION SHAKE which will have an increased protein content with 30g protein/11oz." Mr. Lubin added that "we have completed our SLATE NUTRITION CHOCOLATE formula… ."

37.     In late January 2024, Horseshoe told Slate that it was ready to move forward with the New Slate Product and requested that Slate send it additional confidential information, including the formulation/recipe. Slate did so. Around this time, Slate also told Horseshoe its confidential timeline for launching its new product with the Club, namely that Slate wanted to provide samples to the Club in the first quarter of 2024 and launch in the summer of 2024.

38.     In February and March 2024, Horseshoe performed a series of trials to attempt to

produce the New Slate Product. Despite Slate providing Horseshoe with its confidential formulation and the know-how to manufacture the New Slate Product, Horseshoe's prior manufacture of Slate's other protein drink products, and Slate's own successful R&D trials, the trial samples of the New Slate Product that Horseshoe sent to Slate did not meet Slate's flavor or viscosity requirements.

39.     In analyzing Horseshoe's trial samples of the New Slate Product, Slate, to its surprise, learned that various samples from what Horseshoe claimed were from a single "batch" differed from each other in terms of flavor, sweetness, and viscosity. Given the way batches are created—mixed as one and then poured into individual packages—Slate could not understand these differences across samples from the same alleged batch. In fact, it was the first time Slate's team had ever experienced such stark differences across (as Horseshoe claimed) a single batch. Slate was so surprised that it sent the Horseshoe samples to its outside R&D formulators, which confirmed Slate's conclusions (and shared Slate's surprise) that the samples from the single batch differed from one another.

40.     Despite these unexplainable results, Slate took Horseshoe at its word that the problem was with Slate's formulation for the New Slate Product. Slate spent additional time and resources to consult its ingredient suppliers and tweak the formulation for the New Slate Product. Slate again worked with its R&D formulators (not Horseshoe) to produce the New Slate Product—which again met Slate's standards.

41.     In June 2024, Slate sent its revised confidential formulation of the New Slate Product to Horseshoe in Wisconsin. Horseshoe tried, once again, to manufacture the New Slate Product. Once again, the trials failed; the flavor and viscosity of Horseshoe's trial samples (even using Slate's new formulation) remained inexplicably inconsistent across samples (allegedly

from the same batch), as compared to the batch Slate's R&D formulator made. Slate became extremely frustrated with Horseshoe's apparent inability, over the span of many months, to produce quality (or consistent) samples of the New Slate Product despite Slate's repeated attempts to work with Horseshoe.

42.     Around this time, given the lack of clarity as to why Horseshoe was (allegedly) experiencing problems and the associated delay in getting the New Slate Product into the Club's hands, Slate took its confidential formulation of the New Slate Product to another of its co-manufacturing partners (who was, at all relevant times, also bound by confidentiality obligations to Slate) to see if it could produce it. The confidential formulation and information Slate provided to that co-manufacturer was identical to what Slate provided to Horseshoe. It only took that co-manufacturer about one month—and only one attempt—to provide Slate with samples that matched the samples from Slate's R&D formulator and otherwise met Slate's quality standards. In other words, that trial was an instant success.

43.     Soon after (in early September 2024)—but approximately six months behind the schedule Slate had laid out for Horseshoe—Slate met with the Club to present it with samples of the New Slate Product that were manufactured by the second co-manufacturer. Slate also informed the Club that the New Slate Product would retail for less than the current market leader. The New Slate Product was well received by the Club employees at the meeting.

44.     During that meeting, however, Slate learned—to its surprise—that the Club had discovered a new, similar high protein ultrafiltered milk-based product that would compete with the New Slate Product. This was particularly surprising, given that Slate is attuned to the market for competitive intelligence and had heard nothing about the launch of any similar product to compete with the New Slate Product. The Club also told Slate that the new product's proposed

price was less than Slate's proposed price for the New Slate Product. Such a revelation was surprising, given Slate had pegged its proposed price for the New Slate Product to be less expensive than the current market leader (which is what Slate believed the Club wanted).

**Defendants' Nurri Product**

45.     On or about September 12, 2024, about one week after Slate's meeting with the Club, Slate was shocked to learn, through a press release, that a new, and previously unheard of, high protein ultrafiltered milk-based product, called "Nurri," had snatched Slate's spot with the Club. In the press release, Slate discovered, to its great dismay, that Horseshoe—Slate's trusted partner—manufactures Nurri. The press release quotes Tommy Lehocky who, upon information and belief, is a Vice President for Trilliant as stating "…we saw a unique opportunity to bring something fresh and different to [the Club], its shoppers, and the broader category."

46.     Upon information and belief, Nurri is a new brand of Trilliant's. *See, e.g.*, https://www.dairyprocessing.com/articles/2734-nurri-launches-ultrafiltered-milk-shakes (quoting multiple Trilliant employees about the "kick-off" of its brand, Nurri). According to the label on Nurri's packaging, Horseshoe manufactures the product, presumably on Trilliant's behalf.

47.     Although Horseshoe and Trilliant appear (on paper) to be separate entities, they are closely related and/or affiliated. The two companies share senior executive(s), ultimate owner(s), and employee(s). They both list their principal place of business at the same address (in Little Chute, Wisconsin). The Manufacturing Agreement states that all notices to Horseshoe under that Agreement should be sent to Horseshoe's Chief Financial Officer via a "@trilliantfoods.com" email address.

48.     Upon information and belief, Mr. Upchurch is Horseshoe's Chief Executive Officer and is also an ultimate owner (and used to be the sole member) of Horseshoe. Mr.

Upchurch was also introduced to Slate as "the owner" of Horseshoe and has been referred to as

Horseshoe's "owner" by multiple Horseshoe and Trilliant employees. Upon information and

belief, Mr. Upchurch is also Trilliant's Chief Executive Officer and is also an ultimate owner of

Trilliant. Upon information and belief, Peter Sawin is (or was) a senior executive at both

Horseshoe and Trilliant. Slate believes that discovery will demonstrate additional, and

substantial, connections between Horseshoe and Trilliant.

49. The packaging and the label information of Nurri is strikingly similar (and in

some cases identical) to the formulation and product information of the New Slate Product. Such

packaging reveals that Horseshoe manufactures Nurri.



*See* Instagram, DrinkNurri

(https://www.instagram.com/reel/DAMDkjfuhIs/?igsh=cmY4d2tibTJqaHN4) (posted

September 21, 2024) (red outline added).

50. Nurri prominently advertises itself as a "classic milk shake," is made with

ultrafiltered milk, is lactose-free, and has 30g of protein, 10 "essential vitamins and minerals," 0g of added sugar, 1g natural sugar, and 150 calories. The formulations of the New Slate Product that Slate provided to Horseshoe were the same, namely ultrafiltered milk that is lactose-free, 30g of protein, 0g of added sugar, 1g natural sugar, and 150 calories. Currently, Nurri is only available in chocolate and is in an 11 fl. oz. aluminum can. The confidential New Slate Product formulations and samples Slate provided to Horseshoe were also chocolate flavor and Slate told Horseshoe it wanted to package that product in 11 fl. oz. aluminum cans.

51.     Upon information and belief, Nurri is not only Trilliant's first ultrafiltered milk-based product and its first lactose-free milk-based product, but it is also its first milk-based product marketed as "high protein" or as a "milk shake." In fact, upon information and belief, all of Trilliant's other products are either coffee-related (bottled coffee, canned coffee, single serve cups, and bag coffee) or "drink mix sticks." Upon information and belief, Trilliant is using at least some of Slate's ingredient suppliers (which Horseshoe learned about via the Manufacturing Agreement) to make Nurri.

52.     According to the Nurri press release and information on www.drinknurri.com, Nurri launched nationwide exclusively at the Club; it is not currently available for purchase anywhere else.

53.     Nurri currently retails (at the Club) at a price that is less expensive than the price that Slate confidentially told Horseshoe it was targeting for the New Slate Product at the Club. Moreover, in or around December 2023, Horseshoe requested that Slate identify the prices charged by its ingredient suppliers, telling Slate that Horseshoe would help find Slate better pricing. Slate willingly did so, relying on the confidentiality protections in the Manufacturing Agreement that prohibited Horseshoe from misusing that information or using it for any purpose

outside of that Agreement.  However, upon information and belief, Horseshoe used that information to seek favorable pricing for Nurri.

54.     In the short time Nurri has been available on the market, consumers are already comparing it to Slate's chocolate milk shake product.  For example, after trying a can of Nurri, one consumer posted on a public message board that "the flavor reminds me of the slate [sic] protein shakes…"  Another consumer commented on a Nurri Instagram post "… I'd say it's a Slate Milk dupe."

55.     According to its public statements, Nurri is also working on additional flavors and iced coffees—which are also beverage categories that Slate offers.  For example, Nurri advertises that vanilla and strawberry flavors are "coming soon."  Indeed, upon information and belief, on or about June 26, 2024, Trilliant filed an application for a trademark for "Nurri" (stylized mark) with a field of use including, among other things, "strawberry milk; vanilla milk."  Upon information and belief, that application was filed as an "intent to use," which means that the mark was not, at the time of the application, in use in commerce, but that Trilliant intended to use it.  This June 2024 trademark filing is also indicative of when Trilliant (and Horseshoe) was intending to launch Nurri in the market (including, for example, attempting to sell it to the to the Club).

56.     Slate already sells its milk shake products in vanilla and strawberry flavor.  Horseshoe manufactured, packaged, and delivered one of them for Slate (vanilla).  Horseshoe has Slate's confidential information and/or trade secrets concerning Slate's vanilla-flavored milk shake (in addition to Slate's chocolate milk shake) and Slate's iced coffee products.  Upon information and belief, Defendants will use Slate's confidential and/or trade secret information to develop, manufacture, and package those new Nurri products (in addition to the current one).

Certainly, Horseshoe has access to Slate's confidential and/or trade secret information about such Slate products.

57.     Trilliant is not a party to the Manufacturing Agreement.  Slate never disclosed any of its confidential information and/or trade secrets (or, in fact, any information) to Trilliant, nor did it consent to any employee or agent of Horseshoe disclosing any confidential information and/or trade secrets to Trilliant.  Slate did not consent to allowing any employee or agent of Horseshoe to use any of Slate's confidential information and/or trade secrets for purposes outside the Manufacturing Agreement, much less in connection with the development of Nurri.  There is no legitimate reason why Trilliant would have in its possession any of Slate's confidential information and/or trade secrets, or why Horseshoe would use any of Slate's confidential information and/or trade secrets in connection with its work on Nurri (or for any other reason outside the Manufacturing Agreement).

58.     Upon information and belief, and as Slate believes discovery will demonstrate, Mr. Upchurch and/or other unnamed Horseshoe employees or agents provided Slate's confidential information and/or trade secrets acquired under the Manufacturing Agreement to Trilliant to assist Trilliant (and Horseshoe) in creating, manufacturing, packaging, and distributing Nurri.

59.     Upon information and belief, and as Slate believes discovery will demonstrate, Horseshoe knowingly and intentionally lied to Slate about Horseshoe's trials of the New Slate Product; knowingly and intentionally provided substandard samples of such product to Slate; knowingly and intentionally blamed Slate's R&D formulators for Horseshoe's alleged issues; and knowingly and intentionally extended such trials.  Upon information and belief, Horseshoe did all of this (and likely more) in an attempt (which was successful) to delay the development of

the New Slate Product, so that Horseshoe could make, and Trilliant could sell, Nurri to the Club before Slate could offer the New Slate Product to the Club. Upon information and belief, Horseshoe knew that, once the Club began selling Nurri, it would be difficult (if not impossible) for Slate to convince the Club to buy the New Slate Product, and that the Club might even stop purchasing other products from Slate (including because Nurri has announced plans to expand to compete with other products and product lines Slate already offers).

### Slate's Defect Problems With Horseshoe

60.     There is more. Horseshoe's theft and Defendants' misuse of Slate's confidential, proprietary, and trade secrets—while shocking—is not the extent of Horseshoe's improper conduct.

61.     The Manufacturing Agreement provides, among other things, that Horseshoe will monitor the production and packaging of Slate's products in accordance with the terms of that Agreement and that the products must be of merchantable quality and be consistently free from material defects. The Manufacturing Agreement also requires Horseshoe to respond promptly and in good faith to any defect issues Slate raises with products manufactured by Horseshoe.

62.     At the same time Horseshoe was working with Slate on the New Slate Product, Horseshoe also packaged and delivered Slate's ultrafiltered milk-based 20g protein drink products (which come in an 11 fl. oz. aluminum can).

63.     Slate now knows that Horseshoe's previous three production runs of Slate's products, in April, June, and July 2024, have been rife with problems.

64.     Among other things, the cans that Horseshoe produced (and filled with Slate's products) had significant damage, including silver streaks and black scarring across the entire design.

65.     The following photograph, which Slate shared with Horseshoe in August 2024, is representative of the damaged cans (the streaking and scarring appearing at the top of the cans) that Horseshoe packaged for delivery to Slate's customers:



66.     It is common in the industry for there to be a lag (sometimes lengthy) between a production run of a product and when it is actually distributed to Slate's customers; Horseshoe ran large production runs of Slate's product, but the product was only sent to Slate's customers when such customers actually requested/purchased it.

67.     Horseshoe produced damaged cans containing Slate's products (and for eventual delivery to Slate's customers), at a minimum, during the spring and summer of 2024. These production issues were during the time that Defendants were, upon information and belief, also secretly working on Nurri. It is also the same timeframe in which Trilliant filed its application

with the U.S. Patent & Trademark Office for its "Nurri" trademark.

68.     Slate was unaware of the Horseshoe-manufactured defective product at that time. Slate did not, and could not, know of the damage unless and until the products were in the market and the issues were brought to Slate's attention. That is because Slate had relied on the terms of the Manufacturing Agreement, which had quality assurance provisions to prevent situations like this from occurring. Furthermore, Slate had not previously seen nor experienced any quality issues with Horseshoe-manufactured product prior to its (later) discovery of defects in Horseshoe's April 2024 production run.

69.     Upon information and belief, Horseshoe knew that its production runs for Slate—in at least April, June, and July 2024—were plagued by defects, but nonetheless released defective product to the marketplace.

70.     During (at least) this time, Horseshoe hid the defects from Slate; all Horseshoe-manufactured samples from its April, June, and July 2024 production runs that Horseshoe sent Slate were defect-free.

71.     Slate only learned of the defects when the products were delivered to Slate's distributers, retailers, and end customers—who informed Slate of such issues. This delay slowed Slate's understanding of the existence, let alone the nature and extent, of Horseshoe's defect issues.

72.     Beginning in or about May 2024, Slate started receiving scattered reports from the market about defective Horseshoe-manufactured Slate products. These reports slowly, but steadily, increased in the spring of 2024.

73.     Then, in July 2024, Horseshoe belatedly disclosed to Slate—for the first time— that it had disposed of 35% of the Horseshoe-manufactured Slate products from its July 2024

production run due to the same defect issues that Slate had been observing in the market. Horseshoe's disposal of this large amount of Slate's product meant that Horseshoe failed to meet its obligations to produce agreed-upon amounts of Slate's products in that July 2024 production run. Horseshoe released the remaining 65% of July 2024 production run for sale to Slate's customers. However, as Slate learned over the ensuing months as this product hit the market, many cans had the same defect issues Slate had been observing. In other words, Horseshoe failed to fix its defect issues.

74. Horseshoe's July 2024 disclosure was the first time it told Slate about, let alone discussed, any defects or problems with Horseshoe's production runs.

75. In July 2024, when Slate finally understood that Horseshoe's defects were systemic, it promptly asked Horseshoe that it find a solution.[2] That was followed by weeks of emails and phone calls between operational teams from Slate and Horseshoe, in which Slate provided substantial evidence of defects with Horseshoe's production runs. Not only did Horseshoe refuse to address these issues, but it also denied responsibility.

76. Rather than work with Slate to resolve the defect problems, Horseshoe stonewalled and demanded payment of its June and July 2024 production runs for Slate—which was during the heart of Horseshoe's production defect issues.

77. On August 30, 2024 (before Slate learned of Defendants' launch of Nurri), Slate sent Horseshoe a letter with a supplemental notice of breach under the Manufacturing Agreement. That letter identified various breaches of that Agreement by Horseshoe, including

---

[2] Slate's investigation into the nature, extent, and timing of Horseshoe packaging and delivering defective Slate products is ongoing, but the problems are (and were) widespread and have impacted a large number of cans that are (and have been) in the market over the course of many months. To date, Slate employees have discovered defective products that were packaged by Horseshoe at dozens of stores and at a variety of retail customer partners, throughout multiple regions across the country. The true extent is currently unknown, including because Horseshoe has not been forthcoming about the nature and extent of its defect issues.

breaches for Horseshoe's failures to produce beverages for Slate that are free of defects, failure to monitor production and packaging in compliance with agreed-upon quality assurance standards, failure to produce sufficient quantities of products (because, among other reasons, Horseshoe had disposed of large quantities of products due to defects), and failure to respond promptly and in good faith to such quality issues. That letter also notified Horseshoe of Slate's intention to terminate the Manufacturing Agreement for cause unless Horseshoe remedied its breaches of that Agreement.

78. In response to Slate's August 30, 2024 letter, Horseshoe again refused to acknowledge its production issues, blamed Slate (and other parties) for any defective products, and claimed that Slate waited too long to raise defect issues and to dispute certain of the unpaid invoices. This last point flies in the face of reality; Slate did not (and, because of the production and distribution process could not) reasonably discover Horseshoe's defect issues unless and until Slate's customers received the substandard product and brought those issues to Slate's attention. Moreover, Horseshoe hid the defects from Slate by providing it with defect-free samples.

79. Horseshoe's delivery of Slate products that had defects meant that Slate's customers received substandard products. In addition, Horseshoe's production issues meant that, in or around July 2024, Horseshoe failed to produce and deliver the agreed-upon quantities of Slate's product to the market. All of this damaged Slate's reputation with its distributers, retailers, and end customers. It also harmed Slate's ability to present and achieve growth opportunities for its products.

80. Upon information and belief, despite knowing about the defect issues for some time, Horseshoe knowingly released defective and substandard product into the market.

81.     Due to Horseshoe's pervasive and persistent defect issues, its failure to address

(or even acknowledge) them, its failure to provide Slate with a plan to remedy them, and Slate's

recent discovery of Horseshoe's theft of Slate's confidential information and trade secrets, Slate

has stopped using Horseshoe for any production runs.  In accordance with the August 30, 2024

letter, and in light of Horseshoe's failure to cure its breaches (no such cure is possible, as a

practical matter, because Horseshoe continues to place products into the market which suffer

from the same defects raised by Slate in its August 30th letter) and tortious conduct in launching

the Nurri knockoff (which has irreparably damaged the parties' relationship and rendered any

potential cure impossible), Slate has terminated the Manufacturing Agreement for cause.

Although Slate disputes the unpaid invoices from Horseshoe, it has put the net amount of the

disputed amount into a separate bank account, where it will remain pending the resolution of this

dispute.

### COUNT I
**Misappropriation of Trade Secrets Under Federal Defend Trade Secrets Act
(18 U.S.C. § 1836, *et seq*.) (All Defendants)**

82.     Slate repeats and realleges the allegations set forth in each of the preceding

paragraphs, as though fully set forth herein.

83.     Slate's trade secrets include some of the information that it provided to Horseshoe

in connection with the Manufacturing Agreement.  This information includes, but is not limited

to:  (a) the know-how, processes, and methodologies to combine ultrafiltered milk with other

ingredients and sweetener systems; (b) the know-how, processes, and methodologies to make

Slate's products lactose free; (c) the know-how, processes, and methodologies to prevent

"foaming" of the ultrafiltered milk during the manufacture of Slate's products; (d) the know-

how, processes, and methodologies to ensure that the resulting product would not "clump" or

"separate" during manufacture; (e) Slate's development, formulation, manufacturing, and testing, of the New Slate Product; (f) Slate's plan to make the New Slate Product focused on nutrition, including adding vitamins and minerals to it; (g) information about Slate's business plans including the potential business opportunity Slate had with the Club with respect to the New Slate Product; (h) information about Slate's pricing strategies for the New Slate Product at the Club; (i) Slate's interactions with the Club about the New Slate Product; (j) Slate's anticipated schedule for selling the New Slate Product to Club; and (k) the names and contact information of Slate's suppliers and vendors for its current products (and the New Slate Product). Slate believes that discovery will reveal other and additional specific trade secret information that it provided Horseshoe, and which Defendants misappropriated. All the foregoing information is, individually and collectively, referred to as "Slate Trade Secrets" herein.

84.     The Slate Trade Secrets comprise information that qualifies as trade secrets under the Defend Trade Secrets Act (the "DTSA"). Specifically, (a) Slate has taken reasonable measures to keep such information secret (e.g., via the Manufacturing Agreement and the other above-described measures to keep information confidential); and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information. Further, the Slate Trade Secrets relate to Slate products, and potential products, which are used in, and are intended for use in, interstate commerce.

85.     As set forth above, Defendants have misappropriated and used the Slate Trade Secrets since at least on or about January 2023, when Slate and Horseshoe entered into the Manufacturing Agreement. Defendants are therefore subject to liability under the DTSA.

86.     Accordingly, Slate is entitled to damages and injunctive relief, as provided by the DTSA.  Because Defendants willfully and maliciously misappropriated the Slate Trade Secrets, Slate is entitled to an award of exemplary damages in an amount up to two times the amount of damages awarded and to an award of reasonable attorney's fees.

**<u>COUNT II</u>**
**Misappropriation of Trade Secrets Under Wisconsin Uniform Trade Secrets Act**
**(Wis. Stat. § 134.90) (All Defendants)**

87.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

88.     The Slate Trade Secrets comprise information that:  (a) derives independent economic value, actual and potential, from not being generally known, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts to maintain the secrecy that are reasonable under the circumstances.  Accordingly, the Slate Trade Secrets constitute "trade secrets" under Wisconsin's Uniform Trade Secrets Act, Section 134.90 of the Wisconsin Statutes.

89.     Horseshoe misappropriated the Slate Trade Secrets after acquiring them via the Manufacturing Agreement.  Horseshoe used or disclosed the Slate Trade Secrets without the consent of Slate and for use and purposes outside the obligations under the Manufacturing Agreement.  Among other things, Horseshoe used and/or disclosed the Slate Trade Secrets to Trilliant and in connection with the manufacturing production, packaging, and sale of Nurri to the Club.  Horseshoe also misappropriated the Slate Trade Secrets by using them to manufacture Trilliant's Nurri product.

90.     Trilliant misappropriated the Slate Trade Secrets by acquiring them from Horseshoe by means which it knew or had reason to know constitute improper means and by

using or disclosing the Slate Trade Secrets without the consent of Slate after having acquired them by improper means. Slate never provided, or authorized Horseshoe or any other person or entity, to provide the Slate Trade Secrets to Trilliant (or to any other third party).

91.     Slate is entitled to recover from Defendants the damages provided for by law, including, without limitation, the actual loss caused by the violation and the unjust enrichment caused by the violation that is not taken into account in computing actual loss.

92.     Slate is entitled to an injunction restraining Horseshoe and Trilliant, and each of their respective officers, agents, employees, owners, directors, and all persons acting in concert with them, from engaging in further such unlawful conduct and from reaping any additional commercial advantage from their misappropriation of the Slate Trade Secrets.

93.     Defendants' acts of misappropriation were willful and malicious, and therefore Slate is entitled to recover punitive or exemplary damages in an amount up to twice the award of damages.

94.     Further, because Defendants' acts of misappropriation were willful and deliberate, Slate should be awarded its reasonable attorneys' fees.

## COUNT III
### Breach of Contract—Confidentiality (Horseshoe only)

95.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

96.     As set forth above, Slate and Horseshoe entered into the Manufacturing Agreement. The Manufacturing Agreement is a valid and binding contract, and Slate performed its obligations under such Agreement in all material respects.

97.     Under the Manufacturing Agreement, Horseshoe was obligated to: (a) keep all of Slate's "Confidential Information" (as defined in that Agreement) confidential and only to reveal

it to Horseshoe employees and agents who are actively and directly participating in meeting Horseshoe's obligations under the Manufacturing Agreement, and for no other purpose; and (b) establish, implement, and maintain procedures to prevent the disclosure of Slate's "Confidential Information" to any other person. The Manufacturing Agreement also states that Horseshoe shall be responsible for the breach of the Agreement by any of its employee or agents. The language of the Manufacturing Agreement establishes other obligations for Horseshoe—and protections for Slate—with respect to Slate's confidential information.

98. Horseshoe breached the Manufacturing Agreement by using, disseminating, and misappropriating Slate's "Confidential Information" (as defined by the Manufacturing Agreement), which includes, but is not limited to, the Slate Trade Secrets, in connection with Horseshoe's and Trilliant's manufacture, packaging, distribution, and sale of Nurri.

99. Slate has suffered harm as a result of Horseshoe's breaches and is entitled to recover all damages permitted by law.

<u>**COUNT IV**</u>
**Breach of Contract—Defect Issues (Horseshoe only)**

100. Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

101. As set forth above, Slate and Horseshoe entered into the Manufacturing Agreement. The Manufacturing Agreement is a valid and binding contract, and Slate performed its obligations under such Agreement in all material respects, and has deposited the net amount of money Horseshoe claims it is owed under such Agreement for unpaid invoices into a separate bank account, where it will remain pending the resolution of this dispute.

102. Generally speaking, under the Manufacturing Agreement, Horseshoe had several obligations with respect to manufacturing, packaging, and distributing Slate's beverages to be of

merchantable quality and free of defects.  Horseshoe breached those obligations by failing to do what it undertook to do.  Such defects include, but are not limited to, significant damage to the aluminum cans packaged with Slate's products, including silver streaks and black scarring across the entire design, and Horseshoe's failure to produce agreed-upon quantities of product.

103.    As explained above, Slate has suffered harm as a result of Horseshoe's breaches and is entitled to recover all damages permitted by law.

**COUNT V**
**Breach of Covenant of Good Faith and Fair Dealing (Horseshoe only)**

104.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

105.    In the Manufacturing Agreement, Horseshoe made certain express promises to Slate to: (a) protect and limit the use and disclosure of Slate's confidential and proprietary information and/or the Slate Trade Secrets; (b) work with Slate in a timely manner on new product and use its best efforts to do so; and (c) ensure that the product is manufactured, packaged, and distributed on Slate's behalf were of merchantable quality and free of defects.

106.    Horseshoe owed Slate a duty of good faith and fair dealing implied from the Manufacturing Agreement.  The implied covenant of good faith and fair dealing contained in the Manufacturing Agreement prohibited Horseshoe from:  (a) engaging in the misappropriation and misuse of Slate's confidential and proprietary information and/or the Slate Trade Secrets; (b) intentionally delaying the trials of the New Slate Product while it was working with Trilliant to develop the same product with Slate's confidential and proprietary information and/or the Slate Trade Secrets; and (c) failing to disclose the defect issues with Horseshoe's production runs of Slate's existing products.

107.    Slate has done all of the things required of it under the Manufacturing Agreement,

and has deposited the net amount of money Horseshoe claims it is owed under such Agreement for unpaid invoices into a separate bank account, where it will remain pending the resolution of this dispute.

108.    Through the intentional and deceitful conduct alleged above, Horseshoe breached the covenants of good faith and fair dealing implied in the Manufacturing Agreement.

109.    Horseshoe's conduct, at a minimum, violated the spirit of the Manufacturing Agreement by accomplishing exactly what the Manufacturing Agreement sought to prevent: Horseshoe being able to use Slate's confidential and proprietary information and/or the Slate Trade Secrets to develop a product in competition with Horseshoe's trusting business partner.

110.    Slate has incurred substantial damages as a direct and proximate cause of Horseshoe's willful and material breaches of the implied covenants of good faith and fair dealing, and is entitled to recover all damages permitted by law.

## COUNT VI
**Tortious Interference With Potential Prospective Contractual Relations (All Defendants)**

111.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

112.    Slate had a prospective contractual relationship with the Club as it relates to the New Slate Product.  Among other things:  (a) Slate had an existing relationship with the Club for the sale of Slate's 20g protein drink; (b) the Club requested, multiple times, that Slate create the New Slate Product for sale at the Club's stores, and the Club has already purchased significant quantities of Slate's products; and (c) based on numerous conversations with representatives of the Club, Slate reasonably believed that, once Slate launched the New Slate Product and offered it to sale to the Club, that the Club would enter into purchase orders and purchase significant quantities of the New Slate Product for sale in its stores.

113.    Defendants knew or should have known that Slate anticipated receiving purchase orders for the New Slate Product from the Club because, among other reasons, Slate provided Horseshoe with Slate's confidential and proprietary information and/or the Slate Trade Secrets, including information about the prospect of such sales and the timing of such sales to the Club (and, upon information and belief, Horseshoe, through Mr. Upchurch and others, provided Trilliant with such information).

114.    Defendants knowingly and intentionally interfered with Slate's prospective contractual relationship with the Club when they induced the Club not to purchase the New Slate Product through at least one of more of the following means:  (a) using Slate's confidential and proprietary information and/or the Slate Trade Secrets to understand that there was a potential for sale of such a product to the Club; (b) using Slate's non-public strategy regarding its target pricing for sales of the New Slate Product to the Club in order to undercut Slate; and (c) using Slate's non-public information about timing—coupled with Horseshoe's intentional and knowing delay of the trials of the New Slate Product—to "beat" Slate to the opportunity to sell the New Slate Product to the Club.  As to timing, being the "first mover" in this space is/was a significant advantage for Horseshoe (and thus lost opportunity for Slate) because of the substantial unmet demand by the Club's customers for ultrafiltered milk-based protein drinks and for canned (rather than plastic) packaging.

115.    Defendants intentionally interfered with Slate's prospective contractual relations with the Club for the New Slate Product, and Defendants' primary purpose was to cause such interference as a result of their conduct, or at minimum they knew or should have known that such interference was substantially certain.

116.    Defendants had no justification or privilege to interfere in these potential

34

contracts.

117.    Defendants' wrongful interference damaged Slate in the form of lost profits in an amount to be proven at trial.

118.    In addition to Slate's lost profits, it has lost an opportunity to sell the New Slate Product to the Club for a substantial time due to the buying cycle for the Club and the "stickiness" of Club customers to Nurri at the expense of the New Slate Product. Even if Slate were to sell the New Slate Product to the Club, it would have to do so at a reduced price (from its target price, which Slate reasonably believed the Club would have agreed to). And, given Defendants' public plans to sell additional flavors of Nurri—flavors that Slate sells and anticipates selling—the damage to Slate is further magnified. These additional damages are in an amount to be proven at trial.

119.    Defendants' conduct was a substantial factor and/or was a substantial influence in producing Slate's claimed damages.

## COUNT VII
### Conversion (All Defendants)

120.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

121.    Slate is the owner of its confidential information, which was wrongfully used and obtained by Defendants.

122.    Horseshoe willfully engaged in the act of conversion when it provided Slate's confidential and proprietary information to Trilliant, and when it used such information to develop, manufacture, package, and distribute Nurri for Trilliant.

123.    Trilliant willfully engaged in the act of conversion when it received Slate's confidential and proprietary information from Horseshoe, when it used such information to

35

develop Nurri, and when it learned that Horseshoe was using such information for Trilliant's benefit, rather than Slate's. This conduct constitutes conversion because Defendants took Slate's confidential information without Slate's consent and without lawful authority, which resulted in serious interference with Slate's rights to possess that property.

124.    As a result of the conversion by Defendants of Slate's property, Slate has been and will continue to be injured, while Defendants will continue to be unjustly enriched.

125.    Defendants' conduct was intentional and malicious, entitling Slate to an award of exemplary and punitive damages.

<u>**COUNT VIII**</u>
**Unjust Enrichment (All Defendants)**

126.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

127.    Slate was, and is, entitled to the benefit of its confidential and proprietary information.

128.    With knowledge of Slate's rights, Defendants unjustly obtained (stole) the benefit of Slate's property, resulting in damage to Slate.

129.    At all relevant times, Defendants had knowledge of the benefit of Slate's confidential information that they stole from Slate. Slate, under the confidentiality protections of the Manufacturing Agreement, told Horseshoe, among other things, how to formulate the New Slate Product and that the Club sought to purchase such Product (and other details about Slate's business plans for the Club and the New Slate Product).

130.    Defendants have unjustly and wrongfully benefitted, and continue to benefit, from their misappropriation and use of the property of Slate, to the detriment of Slate and against fundamental principles of justice, equity, and good conscience. Under the circumstances

described above, it is inequitable for Defendants to accept or retain the benefits of Slate's confidential information.

131.    Defendants were, and continue to be, unjustly enriched and Slate was, and continues to be, damaged in an amount to be proven at trial.

<u>COUNT IX</u>
**Civil Conspiracy – Injury to Business**
**(Wis. Stat. § 134.01) (All Defendants)**

132.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

133.    Defendants unlawfully and maliciously acted (and are acting) together to injure Slate's business.

134.    Defendants acted together with a common purpose to injure Slate's business by, among other things:  (a) Horseshoe misappropriating Slate's non-public information about the New Slate Product and Slate's business plans and sharing that information with Trilliant; (b) Defendants' developing, manufacturing, and selling Nurri; (c) Horseshoe intentionally slowing Slate's ability to sell the New Slate Product to the Club; and (d) Defendants' offering Nurri to the Club (which the Club purchased).  Defendants did so in a successful bid to beat the New Slate Product to market (including offering such product to the Club), and to undercut Slate's projected pricing with the Club.

135.    Defendants' common and agreed-upon purpose was, among other things, to "beat" the New Slate Product market, to try to sell Nurri to the Club before Slate entered into any purchase order(s) with the Club for the New Slate Product, and to prevent Slate from being able to get the New Slate Product into the Club at all.  This common and agreed-upon purpose was undertaken to financially benefit Defendants, and intentionally at the expense of Slate's business.

136.    Defendants knew and intended their actions to injure Slate's business; they acted with intent to cause harm to Slate and with malice against Slate.  Through their actions, Defendants knowingly and intentionally ripped-off the New Slate Product and Slate's confidential business/product strategy; Defendants' creation of Nurri and their business plan for Nurri was (and is) squarely and intentionally aimed to cause Slate harm (and to benefit Defendants), in violation of the Manufacturing Agreement and in deliberate disregard for Slate's property rights.

137.    Defendants' improper actions financially harmed Slate, including (but not necessarily limited to) by causing Slate to lose foreseeable purchase orders from the Club for the New Slate Product; depriving Slate of control over its non-public information about the New Slate Product, Slate's business plans, and go-to-market strategy; and causing Slate to waste time and resources dealing with Horseshoe's alleged difficulties manufacturing the New Slate Product.

<u>**COUNT X**</u>
**Declaratory Judgment—Unpaid Invoices and Termination For Cause (Horseshoe only)**

138.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

139.    As described in greater detail above, and in correspondence between Slate and Horseshoe, on or about September 4, 2024, Horseshoe sent Slate a letter demanding immediate payment of unpaid invoices.  In that letter, Horseshoe also denied that it breached the Manufacturing Agreement with respect to the aforementioned defect issues, and stated that Horseshoe intended to enforce the Manufacturing Agreement, which, upon information and belief, includes payment of the disputed invoices.

140.    As explained above, those disputed invoices were for Horseshoe's production

runs of Slate's products that had the aforementioned defect issues, and Slate therefore disputes that it is required to pay Horseshoe, in whole or in part, for these disputed invoices.

141.    In addition, as explained above, Slate told Horseshoe, including in its August 30, 2024 letter, that it intended to terminate the Manufacturing Agreement for cause, at least for the reasons stated in that letter.[3]  In its September 4, 2024 letter, Horseshoe denied that it breached the Manufacturing Agreement, stated that there is no basis for Slate to terminate the Manufacturing Agreement (for cause or for no cause), and informed Slate that Horseshoe intended to enforce that Agreement.

142.    Slate is entitled to declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, because there is an actual and justiciable controversy over whether, given the defect and intentional delay issues associated with the production runs for the disputed invoices, Slate must pay Horseshoe for those invoices; and there is an actual and justiciable controversy over whether Horseshoe's actions and inactions with respect to such issues, and with respect to Nurri entitle Slate to terminate the Manufacturing Agreement for cause.

143.    As explained above, Slate has put the net amount at issue with the disputed invoices into a separate account, pending the resolution of this dispute.

144.    Slate is entitled to a declaration that:  (a) Horseshoe is not entitled to payment on the disputed invoices, in whole or in part; and (b) Slate was entitled to terminate the Manufacturing Agreement for cause.


## **JURY DEMAND**

---

[3] Subsequently, Slate learned of Horseshoe's additional breaches of the Manufacturing Agreement relating to Slate's confidential information, which provides another basis to terminate the Manufacturing Agreement for cause.

Pursuant to Fed. R. Civ. P. 38(b), Slate demands a jury trial on all claims herein so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Slate prays for judgment in its favor and against Defendants providing the following relief:

A.      Award Slate damages in an amount to be proven at trial;

B.      Award Slate exemplary and/or punitive damages;

C.      Award Slate the costs, expenses, and disbursements of this action, including attorneys' and experts' fees;

D.      Award Slate permanent injunctive relief prohibiting Defendants, and anyone acting on their behalf and/or in concert with them, from continuing to violate Slate's rights through the misappropriation of Slate's confidential information and/or the Slate Trade Secrets and for any of the other improper actions set forth in this Complaint;

E.      Award Slate its reasonable attorneys' fees in bringing this action as provided by the Manufacturing Agreement and as otherwise allowed by law;

F.      Award Slate prejudgment and post-judgment interest in the maximum amount allowed by law; and

G.      Award Slate other relief as this Court deems just and proper.

Dated this 10th day of October, 2024

GODFREY & KAHN, S.C.

 s/ *Jonathan T. Smies*
Jonathan T. Smies
State Bar No. 1045422
**GODFREY & KAHN, S.C.**
200 South Washington Street, Suite 100
Green Bay, WI 54301
Telephone: (920)-432-3900
E-mail: jsmies@gklaw.com

Allison W. Reimann
State Bar No. 1107864
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Telephone: (608) 257-3911
E-mail: areimann@gklaw.com

Benjamin Stern
(*application for admission forthcoming)*
Michael Leard
(*application for admission forthcoming*)
**NUTTER MCCLENNEN & FISH, LLP**
Seaport West, 155 Seaport Blvd.
Boston, MA 02210
Telephone: (617) 439-2000
Facsimile: (617) 310-9000
Email: bstern@nutter.com
          mleard@nutter.com

*Attorneys for Slate Craft Goods, Inc.*

31927492

41