# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

| | |
|---|---|
| SLATE CRAFT GOODS, INC. <br><br> Plaintiff, <br><br> v. <br><br> HORSESHOE BEVERAGE COMPANY, LLC and TRILLIANT FOOD AND NUTRITION, LLC, <br><br> Defendants. | Case No. 24-cv-1292 <br><br> [PUBLIC VERSION - UNREDACTED VERSION FILED UNDER RESTRICTION] |

## DEFENDANTS HORSESHOE BEVERAGE COMPANY, LLC AND TRILLIANT FOOD AND NUTRITION, LLC'S ANSWER AND COUNTERCLAIMS

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Defendants Horseshoe Beverage Company, LLC ("Horseshoe") and Trilliant Food and Nutrition, LLC ("Trilliant") (together, "Defendants") hereby answer and assert affirmative defenses to Plaintiff Slate Craft Goods, Inc.'s ("Slate" or "Plaintiff") Complaint, and in doing so deny the allegations set forth in the Complaint, except as specifically stated below:

### PRELIMINARY STATEMENT

Trilliant has been a pioneer in the U.S. beverage market since 1979, when it was founded as Victor Allen's Coffee. Horseshoe was founded as part of the Trilliant family of companies in 2017 to expand beverage production capabilities, with a focus on ready-to-drink liquid beverages and nutrition products. Defendants produce an expansive portfolio of beverage and nutrition products at their state-of-the-art, vertically integrated manufacturing facilities in Wisconsin.

Defendants develop, produce, and sells their own brands, such as Nurri milk shakes; private label, customizable products for its customers; and products for other brands through co-manufacturing relationships. Over the course of the past 45 years, Defendants have made significant advances in and improvements to their capabilities, services, and products to meet consumer demand, including by employing in-house expert research and development staff with advanced degrees in food chemistry to create innovative beverage and nutrition products that match national brand targets. Because of these capabilities, Defendants' customers and co-manufacturers include some of the largest retailers and brands in the world.

Nurri, one of Defendants' product lines, offers high protein ultrafiltered milk-based beverages that are sold at Costco locations throughout the United States. Nurri milk shakes are made with ultrafiltered milk, are lactose-free, and contain 30 grams of protein and 1 gram of sugar. Defendant developed Nurri, at Costco's direct request, in response to rising market demand and supply constraints for shelf-stable high protein ultrafiltered milk beverages. Costco specifically requested that Defendants develop a product comparable to the national leading brand's beverage, which also is made with ultrafiltered milk, is lactose-free and low sugar, and contains 30 grams of protein.

Nurri epitomizes Defendants' expertise and innovative technical approach to developing new beverage applications. There is a well-known hurdle in the beverage industry to the production of thermal processed, ultrafiltered milk-based beverages with more than 24g of protein. Specifically, ultrafiltered milk-based beverages with 24g or more of protein are susceptible to viscosity characteristics at higher or lower temperatures that negatively impact the product consistency, in which the beverage tends to thicken into a substance that is more like a pudding, rather than a liquid beverage. Prior to Defendants' breakthrough with Nurri, to Defendants'

knowledge, only one other beverage company (the leading national brand for which Costco asked Defendants to develop an alternative) had offered a shelf-stable 30g protein ultrafiltered milk-based product.[1]  Defendants deployed their research and development experts and invested significant resources to create an innovative approach to formulating high protein milk-based beverages that retain a smooth and creamy texture at refrigerated temperatures.  Because Defendants believe the approach they developed is a breakthrough not known or used by others in the beverage industry, Trilliant filed a provisional patent application detailing its unique method. Defendants came up with this unique approach through their own considerable research and development efforts—not confidential information obtained from any other entity—to independently develop and manufacture its Nurri line of 30g protein ultrafiltered milk shakes.

Slate, by contrast, is a relative newcomer in the beverage industry, founded in 2018 by two recent college graduates who, to Defendants' knowledge, had no background in beverage development.  Slate does not develop or manufacture its own products, but rather outsources to third parties everything required to bring a product to market, including its research, development, manufacturing, distribution and marketing.  In 2019, Slate began selling ultrafiltered and lactose-free milk-based products containing 20g of protein.  To Defendants' knowledge, Slate has not introduced any ultrafiltered milk-based beverage with 30g of protein, or any beverage containing more than 20g of protein, to the retail market.

Slate entered into a Manufacturing Agreement with Horseshoe in early 2023 to co-manufacture protein drink products; specifically, protein milk shakes containing 20g of protein. The Manufacturing Agreement does not require Horseshoe to assist Slate with research and development of any of Slate's formulations, which are Slate's responsibility to supply under the

---

[1] Other companies, including Trilliant, had successfully developed 30g protein beverages that were *not* milk-based.

contract, but rather limits Horseshoe's development support to adjusting formulations for production at its facility and permits Slate the option (which Slate did not take) of paying an additional fee for further research and development services.

The Manufacturing Agreement does, however, require Slate to commit to a minimum volume of product at the contracted-for price for each year through 2025 or pay Horseshoe for the equivalent of its minimum order commitment per year. The Manufacturing Agreement assigned Slate responsibility for (1) procurement of materials and ingredients for manufacturing; (2) quality management and assurance of the materials, ingredients, manufacturing instructions, and product specifications; and (3) delivery of the finished products from Horseshoe's warehouses via Slate's chosen carriers. In addition, the Manufacturing Agreement provides for a mechanism for Slate to inspect products and raise any manufacturing issues by providing written notice and samples of any non-conforming products within 30 days of receipt of the products; products are otherwise deemed accepted. The Manufacturing Agreement further provides that Slate waives the right to dispute any invoices or portion thereof if Slate does not raise a dispute within 30 days of the invoice date. The Manufacturing Agreement also limits Horseshoe's aggregate liability to Slate, if any, and prohibits any party from collecting indirect, consequential, incidental, special, punitive or exemplary damages.

Slate wrote to Horseshoe in early 2024 about a potential new 30g protein product that Slate, which to date has only sold products with no more than 20g of protein, hoped to develop. But Slate provided multiple preliminary and incomplete formulations with varying levels of protein (between 30g and 32g) and ingredients. Slate did not provide any technical details about the process for creating a finished product, including direction on batching, blending, homogenization,

or thermal processing of product. Each of the formula iterations Slate asked Horseshoe to trial for a potential 30-32g protein product failed.

During these exploratory conversations with Slate about formula iterations for a potential 30-32g protein product, Horseshoe continued to produce Slate's 20g protein products under the Manufacturing Agreement. Slate's production orders for its 20g protein product abruptly decreased after January 2024, and it became apparent that Slate would likely not hit its annualized contract volume in 2024 unless its production orders experienced a significant increase in the latter half of the year. Notwithstanding Defendants' efforts to help Slate increase its production order volumes, by July 2024, there remained a significant number of cases remaining under Slate's minimum order commitment. On July 29, 2024, Horseshoe inquired with Slate about the payment of certain overdue invoices. In response, Slate claimed for the first time that certain cans it provided to Horseshoe for the 20g protein beverage had packaging defects purportedly as far back as May 2024, and withheld payment for full invoices on that basis. Though Slate had already accepted the product and apparently was aware of the alleged packaging defects for months, Slate nonetheless failed to raise any alleged issue until past the contractual 30-day inspection period for those earlier shipments.

In September 2024, Slate issued a Notice of Termination to Horseshoe, seeking to terminate the Manufacturing Agreement and withhold payment for the outstanding invoices. Rather than simply paying what it owed to Horseshoe, Slate then concocted a meritless narrative to avoid its payment obligations under the agreement. Slate filed the instant suit against both Horseshoe and Trilliant, notwithstanding (a) Defendants' wholly independent creation of Nurri at Costco's request, (b) Defendants' innovative approach for creating Nurri, for which Trilliant has a patent application, (c) the fact that Slate beverages differ fundamentally from Nurri, including

-5-

because they have 33% less protein, are not Grade A dairy products, and do not use the same innovative approach Defendants use to manufacture Nurri; (d) the fact that Slate never successfully trialed a 30g protein beverage with Horseshoe, and (e) the fact that Slate has no product containing over 20g of protein on the retail market. As detailed below, Slate's claims are without merit and cannot be used as a mechanism to escape its payment obligations to Horseshoe.

## ANSWER

Defendants deny all allegations contained in the headings and all unnumbered paragraphs in the Complaint, except for such allegations as are explicitly and specifically admitted below. In response to the allegations in the specific numbered paragraphs in the Complaint, Defendants answer the Complaint as follows:

## THE PARTIES

1.      Plaintiff Slate Craft Goods, Inc. is a Delaware corporation with its principal place of business located at 237 Strasser Avenue, Westwood, Massachusetts 02090.

**ANSWER**: Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 1.

2.      Upon information and belief, Defendant Horseshoe Beverage Company, LLC is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and with its registered agent as Registered Agent Solutions, Inc., 100 Wildburn Road, Suite 100, Sun Prairie, Wisconsin 53590.

**ANSWER**: Defendants admit that Horseshoe is a Wisconsin limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and that its registered agent is Registered Agent Solutions, Inc. Registered Agent Solutions, Inc. is located at 100 Wilburn Road, Suite 100, Sun Prairie, Wisconsin 53590. Defendants deny the remainder of the allegations in Paragraph 2.

-6-

3.     Upon information and belief, Defendant Trilliant Food and Beverage, LLC is a Wisconsin limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and with its registered agent as Registered Agent Solutions, Inc., 100 Wildburn Road, Suite 100, Sun Prairie, Wisconsin 53590.

**ANSWER**: Defendants admit that Trilliant is a Wisconsin limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140 and that its registered agent is Registered Agent Solutions, Inc. Registered Agent Solutions, Inc. is located at 100 Wilburn Road, Suite 100, Sun Prairie, Wisconsin 53590.   Defendants deny the remainder of the allegations in Paragraph 3.

## JURISDICTION AND VENUE

4.     This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) and the Wisconsin Uniform Trade Secrets Act (Wis. Stat. § 134.90), for breaches of contract, for interference with prospective contractual relations, for other state statutory and common law causes of action, and for declaratory judgment.

**ANSWER**: Paragraph 4 contains legal conclusions that require no response.  To the extent that Paragraph 4 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

5.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States and the Declaratory Judgment Act.  This Court has supplemental jurisdiction over the asserted state and common law claims pursuant to 28 U.S.C. § 1367.

**ANSWER:** The allegations in Paragraph 5 and Footnote 1 are legal conclusions that do not require a response.  To the extent that Paragraph 5 or Footnote 1 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

6. This Court has personal jurisdiction over Defendants because they each have their principal places of business and are "at home" in Wisconsin (and this district). This Court also has personal jurisdiction over Trilliant because it is a Wisconsin limited liability company. Additionally, several of the claims in this action arise out of or relate to the Manufacturing Agreement which states, in pertinent part, that Horseshoe (and Slate) consent to jurisdiction in this Court.

**ANSWER:** Defendants admit that Horseshoe's and Trilliant's operations are located in Wisconsin and that the Manufacturing Agreement states, in pertinent part, that Horseshoe and Slate consent to jurisdiction in this Court. The remaining allegations in Paragraph 6 are legal conclusions that do not require a response, but to the extent that the remainder of Paragraph 6 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

7. This Court also has personal jurisdiction over Defendants because, directly or through intermediaries, each has transacted business, contracted to supply services, caused tortious injury, regularly done business, derived substantial revenue from services rendered, and committed acts within Wisconsin (and this district) which give rise to this action. This action arises out of Defendants' contacts with Wisconsin (and this district). Defendants have availed themselves of the privilege of doing business in Wisconsin.

**ANSWER:** Defendants admit that Horseshoe's and Trilliant's operations are located in Wisconsin and that the Manufacturing Agreement states, in pertinent part, that Horseshoe and Slate consent to jurisdiction in this Court. The remaining allegations in Paragraph 7 are legal conclusions that do not require a response, but to the extent that the remainder of Paragraph 7 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

-8-

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are residents of this district and a substantial part of the events, acts, or omissions giving rise to Slate's claims occurred in this district, and because the Manufacturing Agreement provides that Slate and Horseshoe agree that disputes "arising out of or relating to" the Manufacturing Agreement may be "heard and determined" in this district.

**ANSWER**:  Defendants admit that Horseshoe's and Trilliant's operations are located in Wisconsin and that the Manufacturing Agreement states, in pertinent part, that Horseshoe and Slate consent to jurisdiction in this Court.  The remaining allegations in Paragraph 8 are legal conclusions that do not require a response, but to the extent that the remainder of Paragraph 8 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

9.     Every allegation contained in the following paragraphs is incorporated herein.

**ANSWER:**  Defendants reallege and incorporate by reference herein their responses to the following paragraphs.

## FACTUAL BACKGROUND

### Slate and its Business

10.     Slate was founded by Manny Lubin and Josh Belinsky in 2018, after the two graduated from Northeastern University.  The pair's love of chocolate milk, as well as their lactose intolerance, gave them the idea to give chocolate milk a "clean slate" and create a healthy adult version of a childhood favorite that consumers could drink every day.  After a successful Kickstarter campaign, an appearance on ABC's "Shark Tank," and many iterations of testing, Slate began selling products to customers in late 2019.  Slate's product offerings evolved into what can now be described as protein drinks, which include milk shakes and iced coffees.

**ANSWER**: Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 10.

-9-

11.     To produce its delicious, but healthy products, Slate uses ultrafiltered milk as its primary ingredient.  The use of ultrafiltered milk allows Slate's products to contain less sugar but more protein than other milk-based drinks.  Slate then blends its ultrafiltered milk with natural ingredients, including allulose, stevia, and monk fruit, to create delicious and healthy protein drinks.

**ANSWER**: Defendants admit that Slate products use ultrafiltered milk.  Defendant admits certain Slate products blend ultrafiltered milk with allulose, stevia, and monk fruit.  Defendants lack the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 11.

12.     Today, Slate's primary product line is its collection of protein drinks:  four milk shake flavors (Classic Chocolate, Dark Chocolate, French Vanilla, and Classic Strawberry) and four iced coffees (Mocha Latte, Vanilla Latte, Caramel Latte, and Sweet Cream Latte) – all of which contain 20g protein, 1g sugar, have 0g added sugar, and are lactose-free.



*See* Slate Milk, https://slatemilk.com/ (last visited on Oct. 10, 2024)

**ANSWER:** Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12.

13.     Slate's products are sold throughout the United States through a variety of distribution channels and are in over ten thousand national and regional retail doors across the country, as well as direct to consumer on Slate's website. To date, Slate has sold about 25 million cans of its protein drink products, including in Wisconsin and in this district.

**ANSWER:** Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 13.

14.     The popularity of Slate's high-protein, low-sugar, and lactose-free products has garnered it several endorsements from high profile professional and amateur athletes. Slate's unique products have also allowed Slate to enter into several partnerships (including with professional sports leagues).

**ANSWER**: Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 14.

**Slate's Relationship With Horseshoe**

15.     On or about January 1, 2023, Slate and Horseshoe signed the Manufacturing Agreement, which (among other things) appoints Horseshoe, on a non-exclusive basis, to produce and package certain of Slate's protein drink products, including certain of its ultrafiltered milk shakes.  In the parlance of the beverage industry, Horseshoe is one of Slate's co-manufacturers (called a "co-man") that Slate hired to mix ultrafiltered milk with other ingredients.  To do so, Horseshoe follows Slate's formulations and recipes, but on a commercial scale.  Once the products are mixed, the Manufacturing Agreement also appoints Horseshoe, again on a non-exclusive basis, as Slate's contract packer (called a "co-packer"); Horseshoe packages the beverages in aluminum cans (in accordance with Slate's specifications), pasteurizes the products, and delivers the products to wholesalers, retailers, and consumers.

**ANSWER:** Defendants admit that Slate and Horseshoe executed the Manufacturing Agreement on March 17, 2023 with an effective date of January 1, 2023, and refer to the Manufacturing Agreement for a complete and accurate depiction of its contents.  Defendants otherwise deny the allegations in Paragraph 15, including but not limited to allegations that Horseshoe pasteurizes products or delivers them to wholesalers, retailers, and consumers.

16.     The Manufacturing Agreement provides that Slate owns "in its entirety" any formulas and formulations that it provides to Horseshoe.  The Manufacturing Agreement also requires Horseshoe to provide R&D resources to create updated versions of formulations to qualify for commercial production and to improve Horseshoe's batching times.

-12-

**ANSWER:** Defendants refer to the Manufacturing Agreement for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 16.

17. The Manufacturing Agreement also contains confidentiality provisions. Both Horseshoe and Slate agreed that Slate's confidential information includes, among other things: formulas, formulations, technical specifications, and recipes that Slate provides to Horseshoe; Slate's business plans; Slate's know-how as to how to produce its products; financial information about Slate's business; Slate's research and consumer insights on Slate's products; Slate's marketing plans, pricing strategies, customer (including distributors and retailers) information; and Slate's arrangements with vendors and suppliers.

**ANSWER:** Defendants refer to the Manufacturing Agreement for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 17.

18. Under the Manufacturing Agreement, Horseshoe agreed to use confidential information it obtains from Slate ***solely*** to perform Horseshoe's obligations under the Manufacturing Agreement. Further, Horseshoe agreed, in the Manufacturing Agreement, that it would only provide its employees and agents Slate's confidential information on a need-to-know basis and that Horseshoe would be responsible for any breach of the confidentiality provisions by any of its employees or agents.

**ANSWER:** Defendants refer to the Manufacturing Agreement for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 18.

19. Upon information and belief, before its relationship with Slate, Horseshoe had never produced a lactose-free and/or an ultrafiltered-milk-based beverage, nor did it have any experience formulating beverages with ultrafiltered milk. Further, upon information and belief, before Slate, Horseshoe did not have experience ensuring milk products were lactose-free, nor did

it have equipment to do so. Consequently, Slate provided Horseshoe with all the knowledge, know-how, and methodologies necessary to manufacture Slate's protein drink products. All of this information falls within the definition of "Confidential Information" under the terms of the Manufacturing Agreement. Further, Slate considers certain of this information to be its trade secrets and has taken steps to protect the confidentiality of such information.

**ANSWER:** Defendants deny the allegations in Paragraph 19.

20.     For example and without limitation, Slate provided Horseshoe with instructions and know-how as to the timing and volumes of adding certain ingredients to Slate's ultrafiltered milk. If certain ingredients are added at the wrong time or with the incorrect volume, the finished product can "clump" or "separate." Another example is that Slate taught Horseshoe how to ensure that lactase enzymes work in ultrafiltered milk in order to ensure that Slate's milk products are lactose free. Because Horseshoe, upon information and belief, had no prior experience in lactose-free milk products, Slate even bought a piece of equipment for Horseshoe to use that allows it to test the amount of lactose in a beverage, with the agreement that Horseshoe is to use it ***only*** in connection with its obligations under the Manufacturing Agreement (and for no other purpose). That piece of equipment was located at Horseshoe's facilities in Wisconsin during the relevant time period (and, upon information and belief, is still there). Another example is know-how that Slate provided Horseshoe to prevent "foaming" of ultrafiltered milk during the manufacturing of Slate's protein drink products. Yet another example is the "sweetener systems" used in Slate's protein drinks (*i.e.,* combinations of ingredients that sweeten the beverages without adding any grams of sugar). Due to the high- intensity sweetness that comes with each of these ingredients, a small increase or decrease to the volume used will result in a significant flavor impact. Slate's co-founders (Messrs. Lubin and Belinsky) and Slate's operations department, along with Slate's

outside R&D teams, spent many months determining the proper "ratio" of these ingredients, which Slate provided to Horseshoe.

      **ANSWER**: Defendants admit that Slate brought to Horseshoe one type of commonly available lactose diagnostic testing kit, which is not used in connection with product development. Defendants otherwise deny the allegations in Paragraph 20.

      21.    Slate's know-how, instructions, methodologies, and other information that it provided to Horseshoe (which were developed during Slate's lengthy testing and product development processes) are part of the competitive advantage that Slate has for its products. Slate considers all of this information to be confidential and proprietary and certain of this information to be its trade secrets. Slate provided such information to Horseshoe for use in Horseshoe's facilities in Wisconsin and solely in connection with the Manufacturing Agreement. Horseshoe could not have manufactured Slate's protein drink products without all such confidential information and knowledge that Slate provided under the Manufacturing Agreement.

      **ANSWER**: Defendants deny the allegations in Paragraph 21.

      22.    The reasonable measures that Slate took (and takes) to keep all of its confidential, proprietary, and trade secret information, in fact, confidential, proprietary, and trade secret include but are not limited to: (a) storing all such information on Slate's password protected computer systems, which are only accessible by Slate employees who were (and are) under a duty of confidentiality; (b) storing certain of such information in encrypted files/software that have additional password protections; (c) limiting knowledge and dissemination of such information on a need-to-know basis within Slate; (d) requiring all of its employees to sign confidentiality agreements and maintaining an employee handbook with a requirement to protect Slate's confidential, proprietary, and trade secret information; and (e) entering into agreements with

confidentiality provisions (such as the Manufacturing Agreement) with third parties (*e.g.*, co-manufacturers, co-packers, R&D formulators, independent contractors, ingredient suppliers, etc.) when such confidential information is shared.

**ANSWER**: Defendants deny the allegations in Paragraph 22.

### Slate's New Product and Business Strategy

23.     In July 2022, a representative from a major player in the "club channel" (the "Club") reached out to Slate to ask for samples of Slate's ultrafiltered milk protein drinks that Slate was already selling nationwide. The Club representative mentioned that two of the primary reasons it was interested in Slate's products were because the protein source in Slate's products is ultrafiltered milk (rather than protein powder), and because Slate's products are packaged in aluminum cans. Slate was elated, because, on a per-store basis, the "club channel" is the largest distribution channel of the "protein drink" category in which Slate's products compete. The Club agreeing to sell Slate's protein beverage product(s) would result in substantial revenue for Slate.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23.

24.     Between August 2022 and June 2023, Slate had several conversations with representatives from the Club, including phone calls and meetings, to discuss the specifics and details of a partnership. During these exchanges, the Club's representatives told Slate that, although they remained interested in offering Slate's existing products with 20g protein, they requested that Slate create a new ultrafiltered milk shake with 30g protein (the "New Slate Product") to meet the Club's unmet demand for that type of beverage. Slate understood that one reason for the Club's interest in such a new product was that it wanted to grow its ultrafiltered milk

-16-

protein drink offerings in its stores, and that Slate was the natural choice, given it was (and is) the second largest player in the ultrafiltered milk-based protein drink market.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24.

25.     The Club's request for the New Slate Product represented a new, significant business opportunity for Slate.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25.

26.     In June 2023, the Club emailed Slate with the first of several purchase order commitments for Slate's ultrafiltered milk shake with 20g protein.  All the products that the Club bought from Slate were manufactured, packaged, and shipped by Horseshoe to the Club under the Manufacturing Agreement.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26.

27.     In August 2023, Slate (relying on the Club's request) began development of the New Slate Product, including engaging an R&D formulator (not Horseshoe) to formulate it confidentially.  In addition to increasing the amount of protein—from 20g to 30g—and making certain flavor changes (both of which the Club requested), Slate also decided that the New Slate Product would focus on nutrition by including increased quantities of several vitamins and minerals.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27.

28.     By early-November 2023, Slate finished R&D for the New Slate Product. Slate had achieved the desired flavor for the New Slate Product (chocolate) by leveraging its existing intellectual property and know-how, as well as other non-public information that Slate acquired over several years during the development of its current products.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of allegations regarding Slate's internal process for developing its products. Defendants otherwise deny the allegations in Paragraph 28.

29.     In late-November 2023, members of the Horseshoe team (including Matt Knox) met with Slate (including Mr. Lubin and Mr. Belinsky) to discuss partnership opportunities, including Slate possibly increasing production with Horseshoe. During that meeting, which was covered by the confidentiality provisions of the Manufacturing Agreement, Slate informed the Horseshoe team of its confidential plans to produce the New Slate Product for the Club, and that this new product would contain 30g of protein, focus on nutrition, and include added vitamins and minerals. Slate also told Horseshoe of the immense upside of the potential opportunity to sell such a product to the Club. Slate provided the Horseshoe employees with confidential samples of the New Slate Product (chocolate), which the Horseshoe employees enjoyed drinking.

**ANSWER**: Defendants admit that members of the Slate team met with Horseshoe employees in late November 2023 to discuss increasing Slate's production order volume under the Manufacturing Agreement between the parties. Defendants otherwise deny the allegations in Paragraph 29.

30.     Within a day or so after that meeting, Mr. Knox reached out to Slate to say that Horseshoe's "owner," Mr. Upchurch, was interested in "work[ing] toward alignment" on a

-18-

partnership to include Horseshoe manufacturing the New Slate Product and supporting Slate's confidential business plans with respect to the Club.

**ANSWER**: Defendants deny the allegations in Paragraph 30.

31.     In the beginning of December 2023, Messrs. Knox and Upchurch met with Messrs. Lubin and Belinsky.  During that meeting, Slate shared additional confidential information about its business plans to create the New Slate Product for the Club.  Messrs. Knox and Upchurch again told Slate that Horseshoe would welcome the opportunity to support the New Slate Product and Slate's confidential business plans with respect to the Club.

**ANSWER**: Defendants admit that members of the Slate team met with Horseshoe employees in the beginning of December 2023 to discuss increasing Slate's production order volume under the Manufacturing Agreement between the parties.  Defendants otherwise deny the allegations in Paragraph 31.

32.     In the weeks and months following that meeting, Slate sent Horseshoe additional confidential information about the New Slate Product and Slate's business plan, including, among other things, the cost and suppliers of Slate's key ingredients.  All the confidential, proprietary, and trade secret information that Slate gave Horseshoe, including relating to the New Slate Product, was under confidentiality provisions of the Manufacturing Agreement, and solely in furtherance of that Agreement.

**ANSWER**: Defendants deny the allegations in Paragraph 32.

33.     In addition to the confidentiality provisions of the Manufacturing Agreement, Slate has taken (and is currently taking) other reasonable measures to protect the confidentiality of all the confidential, proprietary, and trade secret information about Slate's existing products and the New Slate Product including the measures discussed above (at Paragraph 22).

**ANSWER**: Defendants deny the allegations in Paragraph 33.

34.　　In February 2024, Slate met, virtually, with representatives of the Club to discuss their partnership. During the meeting, the Club reiterated, even more passionately than previous conversations, its prior request for Slate to bring the New Slate Product to market because of the significant demand the Club was experiencing for ultrafiltered milk-based protein shakes with a higher protein content.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 34.

### Development of Slate's New Product

35.　　By early November 2023, Slate and its R&D formulators had completed further development of a confidential formula for the New Slate Product and created sample batches (chocolate) that met Slate's requirements. At all relevant times, Slate's R&D formulators and any third party who received any of Slate's confidential, proprietary, or trade secret information relating to the New Slate Product understood the need to treat such information accordingly.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35.

36.　　As a result of successful R&D trials at an outside facility (not Horseshoe), Slate told Mr. Knox (at Horseshoe) that it was ready for Horseshoe to attempt to manufacture the New Slate Product at commercial scale, which first requires Horseshoe's product development team to perform a trial of the product. In an email, Mr. Lubin told Gayl Kerbs, Horseshoe's Director of Product Development, that Slate had "created a SLATE NUTRITION SHAKE which will have an increased protein content with 30g protein/11oz." Mr. Lubin added that "we have completed our SLATE NUTRITION CHOCOLATE formula…."

**ANSWER:** Defendants admit that Paragraph 36 partially quotes from an e-mail communication between Mr. Lubin and Gayl Kerbs. Defendants refer to the e-mail communication for a complete and accurate depiction of its contents and the context of the partial quotation in Paragraph 36. Defendants otherwise deny the allegations in Paragraph 36.

37.     In late January 2024, Horseshoe told Slate that it was ready to move forward with the New Slate Product and requested that Slate send it additional confidential information, including the formulation/recipe. Slate did so. Around this time, Slate also told Horseshoe its confidential timeline for launching its new product with the Club, namely that Slate wanted to provide samples to the Club in the first quarter of 2024 and launch in the summer of 2024.

**ANSWER**: Defendants admit that in January 2024, Horseshoe informed Slate by email that its internal team was aligned to move forward and requested that Slate provide the formula for a 30g protein Slate product. Defendants refer to the e-mail communication for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 37.

38.     In February and March 2024, Horseshoe performed a series of trials to attempt to produce the New Slate Product. Despite Slate providing Horseshoe with its confidential formulation and the know-how to manufacture the New Slate Product, Horseshoe's prior manufacture of Slate's other protein drink products, and Slate's own successful R&D trials, the trial samples of the New Slate Product that Horseshoe sent to Slate did not meet Slate's flavor or viscosity requirements.

**ANSWER**: Defendants admit that Horseshoe created trial samples based on limited information from Slate. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation regarding Slate's own R&D samples. Defendants otherwise deny the allegations in Paragraph 38.

39. In analyzing Horseshoe's trial samples of the New Slate Product, Slate, to its surprise, learned that various samples from what Horseshoe claimed were from a single "batch" differed from each other in terms of flavor, sweetness, and viscosity. Given the way batches are created—mixed as one and then poured into individual packages—Slate could not understand these differences across samples from the same alleged batch. In fact, it was the first time Slate's team had ever experienced such stark differences across (as Horseshoe claimed) a single batch. Slate was so surprised that it sent the Horseshoe samples to its outside R&D formulators, which confirmed Slate's conclusions (and shared Slate's surprise) that the samples from the single batch differed from one another.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation that Slate sent trial samples of the Slate 30g product to its outside R&D formulators. Defendants otherwise deny the allegations in Paragraph 39.

40. Despite these unexplainable results, Slate took Horseshoe at its word that the problem was with Slate's formulation for the New Slate Product. Slate spent additional time and resources to consult its ingredient suppliers and tweak the formulation for the New Slate Product. Slate again worked with its R&D formulators (not Horseshoe) to produce the New Slate Product— which again met Slate's standards.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 40.

41. In June 2024, Slate sent its revised confidential formulation of the New Slate Product to Horseshoe in Wisconsin. Horseshoe tried, once again, to manufacture the New Slate Product. Once again, the trials failed; the flavor and viscosity of Horseshoe's trial samples (even using Slate's new formulation) remained inexplicably inconsistent across samples (allegedly from

the same batch), as compared to the batch Slate's R&D formulator made. Slate became extremely frustrated with Horseshoe's apparent inability, over the span of many months, to produce quality (or consistent) samples of the New Slate Product despite Slate's repeated attempts to work with Horseshoe.

**ANSWER**: Defendants admit that Horseshoe created trial samples based on limited information from Slate. Defendants otherwise deny the allegations in Paragraph 41.

42. Around this time, given the lack of clarity as to why Horseshoe was (allegedly) experiencing problems and the associated delay in getting the New Slate Product into the Club's hands, Slate took its confidential formulation of the New Slate Product to another of its co-manufacturing partners (who was, at all relevant times, also bound by confidentiality obligations to Slate) to see if it could produce it. The confidential formulation and information Slate provided to that co-manufacturer was identical to what Slate provided to Horseshoe. It only took that co-manufacturer about one month—and only one attempt—to provide Slate with samples that matched the samples from Slate's R&D formulator and otherwise met Slate's quality standards. In other words, that trial was an instant success.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42.

43. Soon after (in early September 2024)—but approximately six months behind the schedule Slate had laid out for Horseshoe—Slate met with the Club to present it with samples of the New Slate Product that were manufactured by the second co-manufacturer. Slate also informed the Club that the New Slate Product would retail for less than the current market leader. The New Slate Product was well received by the Club employees at the meeting.

**ANSWER:** Defendants deny that Horseshoe had agreed to any "schedule" with Slate to manufacture a potential 30g protein beverage. Defendants otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43.

44. During that meeting, however, Slate learned—to its surprise—that the Club had discovered a new, similar high protein ultrafiltered milk-based product that would compete with the New Slate Product. This was particularly surprising, given that Slate is attuned to the market for competitive intelligence and had heard nothing about the launch of any similar product to compete with the New Slate Product. The Club also told Slate that the new product's proposed price was less than Slate's proposed price for the New Slate Product. Such a revelation was surprising, given Slate had pegged its proposed price for the New Slate Product to be less expensive than the current market leader (which is what Slate believed the Club wanted).

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44.

### Defendants' Nurri Product

45. On or about September 12, 2024, about one week after Slate's meeting with the Club, Slate was shocked to learn, through a press release, that a new, and previously unheard of, high protein ultrafiltered milk-based product, called "Nurri," had snatched Slate's spot with the Club. In the press release, Slate discovered, to its great dismay, that Horseshoe—Slate's trusted partner—manufactures Nurri. The press release quotes Tommy Lehocky who, upon information and belief, is a Vice President for Trilliant as stating "…we saw a unique opportunity to bring something fresh and different to [the Club], its shoppers, and the broader category."

**ANSWER**: Defendants admit that Paragraph 45 partially quotes from a press release about Nurri and refer to the press release for a complete and accurate depiction of its contents and the

context of the partial quotation in Paragraph 45. Defendants admit that Tommy Lehocky is a Vice President of Sales at Trilliant. Defendants otherwise deny the allegations in Paragraph 45.

46. Upon information and belief, Nurri is a new brand of Trilliant's. *See, e.g.*, https://www.dairyprocessing.com/articles/2734-nurri-launches-ultrafiltered-milk-shakes (quoting multiple Trilliant employees about the "kick-off" of its brand, Nurri). According to the label on Nurri's packaging, Horseshoe manufactures the product, presumably on Trilliant's behalf.

**ANSWER**: Defendants admit that Nurri is a Trilliant brand and that Horseshoe manufactures the Nurri product. Defendants otherwise deny the allegations in Paragraph 46.

47. Although Horseshoe and Trilliant appear (on paper) to be separate entities, they are closely related and/or affiliated. The two companies share senior executive(s), ultimate owner(s), and employee(s). They both list their principal place of business at the same address (in Little Chute, Wisconsin). The Manufacturing Agreement states that all notices to Horseshoe under that Agreement should be sent to Horseshoe's Chief Financial Officer via a "@trilliantfoods.com" email address.

**ANSWER**: Defendants admit that Horseshoe and Trilliant are affiliate companies, share senior executives, ultimate owners, certain employees, the same address for their principal place of business, and that the Manufacturing Agreement's notice provision includes an email address with a trilliantfoods.com domain. Defendants otherwise deny the allegations in Paragraph 47.

48. Upon information and belief, Mr. Upchurch is Horseshoe's Chief Executive Officer and is also an ultimate owner (and used to be the sole member) of Horseshoe. Mr. Upchurch was also introduced to Slate as "the owner" of Horseshoe and has been referred to as Horseshoe's "owner" by multiple Horseshoe and Trilliant employees. Upon information and belief, Mr. Upchurch is also Trilliant's Chief Executive Officer and is also an ultimate owner of Trilliant.

Upon information and belief, Peter Sawin is (or was) a senior executive at both Horseshoe and Trilliant. Slate believes that discovery will demonstrate additional, and substantial, connections between Horseshoe and Trilliant.

**ANSWER**: Defendants admit that Michael Upchurch is the founder of Trilliant and Horseshoe, as well as ultimate partial owner of Trilliant and Horseshoe. Defendants admit that Peter Swain is a Director of Marketing at Horseshoe and Trilliant. Defendants otherwise deny the allegations in Paragraph 48.

49. The packaging and the label information of Nurri is strikingly similar (and in some cases identical) to the formulation and product information of the New Slate Product. Such packaging reveals that Horseshoe manufactures Nurri.



*See* Instagram, DrinkNurri [(https://www.instagram.com/reel/DAMDkjfuhIs/?igsh=cmY4d2tibTJqaHN4)](https://www.instagram.com/reel/DAMDkjfuhIs/?igsh=cmY4d2tibTJqaHN4) (posted September 21, 2024) (red outline added).

**ANSWER**: Defendants admit that Paragraph 49 purports to contain a screenshot of a post on the DrinkNurri Instagram account. Defendants otherwise deny the allegations in Paragraph 49.

50. Nurri prominently advertises itself as a "classic milk shake," is made with ultrafiltered milk, is lactose-free, and has 30g of protein, 10 "essential vitamins and minerals," 0g of added sugar, 1g natural sugar, and 150 calories. The formulations of the New Slate Product that Slate provided to Horseshoe were the same, namely ultrafiltered milk that is lactose-free, 30g of protein, 0g of added sugar, 1g natural sugar, and 150 calories. Currently, Nurri is only available in chocolate and is in an 11 fl. oz. aluminum can. The confidential New Slate Product formulations and samples Slate provided to Horseshoe were also chocolate flavor and Slate told Horseshoe it wanted to package that product in 11 fl. oz. aluminum cans.

**ANSWER**: Defendants admit that Nurri is made with ultrafiltered milk, is lactose-free, has 30g of protein, 1g sugar, and contains 150 calories. Defendants otherwise deny the allegations in Paragraph 50.

51. Upon information and belief, Nurri is not only Trilliant's first ultrafiltered milk-based product and its first lactose-free milk-based product, but it is also its first milk-based product marketed as "high protein" or as a "milk shake." In fact, upon information and belief, all of Trilliant's other products are either coffee-related (bottled coffee, canned coffee, single serve cups, and bag coffee) or "drink mix sticks." Upon information and belief, Trilliant is using at least some of Slate's ingredient suppliers (which Horseshoe learned about via the Manufacturing Agreement) to make Nurri.

**ANSWER**: Defendants deny the allegations in paragraph 51.

52.     According to the Nurri press release and information on www.drinknurri.com, Nurri launched nationwide exclusively at the Club; it is not currently available for purchase anywhere else.

**ANSWER**: Defendants admit that www.drinknurri.com states that Nurri originally launched exclusively at Costco, and refer to the press release for a complete and accurate depiction of its contents.

53.     Nurri currently retails (at the Club) at a price that is less expensive than the price that Slate confidentially told Horseshoe it was targeting for the New Slate Product at the Club. Moreover, in or around December 2023, Horseshoe requested that Slate identify the prices charged by its ingredient suppliers, telling Slate that Horseshoe would help find Slate better pricing. Slate willingly did so, relying on the confidentiality protections in the Manufacturing Agreement that prohibited Horseshoe from misusing that information or using it for any purpose outside of that Agreement. However, upon information and belief, Horseshoe used that information to seek favorable pricing for Nurri.

**ANSWER**: Defendants deny the allegations in Paragraph 53.

54.     In the short time Nurri has been available on the market, consumers are already comparing it to Slate's chocolate milk shake product. For example, after trying a can of Nurri, one consumer posted on a public message board that "the flavor reminds me of the slate [sic] protein shakes…" Another consumer commented on a Nurri Instagram post "… I'd say it's a Slate Milk dupe."

**ANSWER:** Defendants lack the knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54.

55.     According to its public statements, Nurri is also working on additional flavors and iced coffees—which are also beverage categories that Slate offers.  For example, Nurri advertises that vanilla and strawberry flavors are "coming soon."  Indeed, upon information and belief, on or about June 26, 2024, Trilliant filed an application for a trademark for "Nurri" (stylized mark) with a field of use including, among other things, "strawberry milk; vanilla milk."  Upon information and belief, that application was filed as an "intent to use," which means that the mark was not, at the time of the application, in use in commerce, but that Trilliant intended to use it.  This June 2024 trademark filing is also indicative of when Trilliant (and Horseshoe) was intending to launch Nurri in the market (including, for example, attempting to sell it to the to the Club).

**ANSWER**: Defendants admit that Defendants are considering additional products under the Nurri brand and that Trilliant filed a trademark application for "NURRI" on June 26, 2024. Defendants otherwise deny the allegations in Paragraph 55.

56.     Slate already sells its milk shake products in vanilla and strawberry flavor. Horseshoe manufactured, packaged, and delivered one of them for Slate (vanilla).  Horseshoe has Slate's confidential information and/or trade secrets concerning Slate's vanilla-flavored milk shake (in addition to Slate's chocolate milk shake) and Slate's iced coffee products.  Upon information and belief, Defendants will use Slate's confidential and/or trade secret information to develop, manufacture, and package those new Nurri products (in addition to the current one).  Certainly, Horseshoe has access to Slate's confidential and/or trade secret information about such Slate products.

**ANSWER**: Defendants admit that Horseshoe manufactured, packaged, and made Slate's vanilla flavor 20g protein product available for delivery by Slate's chosen carrier pursuant to

Section 8 and 8.2 of the Manufacturing Agreement. Defendants otherwise deny the allegations in Paragraph 56.

57. Trilliant is not a party to the Manufacturing Agreement. Slate never disclosed any of its confidential information and/or trade secrets (or, in fact, any information) to Trilliant, nor did it consent to any employee or agent of Horseshoe disclosing any confidential information and/or trade secrets to Trilliant. Slate did not consent to allowing any employee or agent of Horseshoe to use any of Slate's confidential information and/or trade secrets for purposes outside the Manufacturing Agreement, much less in connection with the development of Nurri. There is no legitimate reason why Trilliant would have in its possession any of Slate's confidential information and/or trade secrets, or why Horseshoe would use any of Slate's confidential information and/or trade secrets in connection with its work on Nurri (or for any other reason outside the Manufacturing Agreement).

**ANSWER**: Defendants admit that Trilliant is not a party to the Manufacturing Agreement. Defendants admit that Slate disclosed certain information to Horseshoe for purposes related to the Manufacturing Agreement. Defendants otherwise deny the allegations in Paragraph 57.

58. Upon information and belief, and as Slate believes discovery will demonstrate, Mr. Upchurch and/or other unnamed Horseshoe employees or agents provided Slate's confidential information and/or trade secrets acquired under the Manufacturing Agreement to Trilliant to assist Trilliant (and Horseshoe) in creating, manufacturing, packaging, and distributing Nurri.

**ANSWER**: Defendants deny the allegations in Paragraph 58.

59. Upon information and belief, and as Slate believes discovery will demonstrate, Horseshoe knowingly and intentionally lied to Slate about Horseshoe's trials of the New Slate Product; knowingly and intentionally provided substandard samples of such product to Slate;

knowingly and intentionally blamed Slate's R&D formulators for Horseshoe's alleged issues; and knowingly and intentionally extended such trials. Upon information and belief, Horseshoe did all of this (and likely more) in an attempt (which was successful) to delay the development of the New Slate Product, so that Horseshoe could make, and Trilliant could sell, Nurri to the Club before Slate could offer the New Slate Product to the Club. Upon information and belief, Horseshoe knew that, once the Club began selling Nurri, it would be difficult (if not impossible) for Slate to convince the Club to buy the New Slate Product, and that the Club might even stop purchasing other products from Slate (including because Nurri has announced plans to expand to compete with other products and product lines Slate already offers).

**ANSWER:** Defendants deny the allegations in Paragraph 59.

### Slate's Defect Problems With Horseshoe

60. There is more. Horseshoe's theft and Defendants' misuse of Slate's confidential, proprietary, and trade secrets—while shocking—is not the extent of Horseshoe's improper conduct.

**ANSWER**: Defendants deny the allegations in Paragraph 60.

61. The Manufacturing Agreement provides, among other things, that Horseshoe will monitor the production and packaging of Slate's products in accordance with the terms of that Agreement and that the products must be of merchantable quality and be consistently free from material defects. The Manufacturing Agreement also requires Horseshoe to respond promptly and in good faith to any defect issues Slate raises with products manufactured by Horseshoe.

**ANSWER:** Defendants refer to the Manufacturing Agreement for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 61.

-31-

62. At the same time Horseshoe was working with Slate on the New Slate Product, Horseshoe also packaged and delivered Slate's ultrafiltered milk-based 20g protein drink products (which come in an 11 fl. oz. aluminum can).

**ANSWER**: Defendants admit that Horseshoe packaged and made available for shipment Slate's ultrafiltered milk-based 20g protein drink products in 11 fl. oz. aluminum cans in 2023 and 2024, including during and after Slate's proposed development of a potential higher protein Slate product. Defendants otherwise deny the allegations in Paragraph 62.

63. Slate now knows that Horseshoe's previous three production runs of Slate's products, in April, June, and July 2024, have been rife with problems.

**ANSWER:** Defendants deny the allegations in Paragraph 63.

64. Among other things, the cans that Horseshoe produced (and filled with Slate's products) had significant damage, including silver streaks and black scarring across the entire design.

**ANSWER:** Defendants deny the allegations in paragraph 64.

65. The following photograph, which Slate shared with Horseshoe in August 2024, is representative of the damaged cans (the streaking and scarring appearing at the top of the cans) that Horseshoe packaged for delivery to Slate's customers:



**ANSWER:** Defendants admit that the photograph included in Paragraph 65 was shared with Horseshoe. Defendants otherwise deny the allegations in Paragraph 65.

66. It is common in the industry for there to be a lag (sometimes lengthy) between a production run of a product and when it is actually distributed to Slate's customers; Horseshoe ran large production runs of Slate's product, but the product was only sent to Slate's customers when such customers actually requested/purchased it.

**ANSWER:** Defendants admit that Horseshoe ran production runs of Slate's 20g products. Defendants otherwise deny the allegations in Paragraph 66.

67. Horseshoe produced damaged cans containing Slate's products (and for eventual delivery to Slate's customers), at a minimum, during the spring and summer of 2024. These production issues were during the time that Defendants were, upon information and belief, also

secretly working on Nurri. It is also the same timeframe in which Trilliant filed its application with the U.S. Patent & Trademark Office for its "Nurri" trademark.

**ANSWER**: Defendants deny the allegations in Paragraph 67.

68. Slate was unaware of the Horseshoe-manufactured defective product at that time. Slate did not, and could not, know of the damage unless and until the products were in the market and the issues were brought to Slate's attention. That is because Slate had relied on the terms of the Manufacturing Agreement, which had quality assurance provisions to prevent situations like this from occurring. Furthermore, Slate had not previously seen nor experienced any quality issues with Horseshoe-manufactured product prior to its (later) discovery of defects in Horseshoe's April 2024 production run.

**ANSWER**: Defendants deny the allegations in Paragraph 68.

69. Upon information and belief, Horseshoe knew that its production runs for Slate— in at least April, June, and July 2024—were plagued by defects, but nonetheless released defective product to the marketplace.

**ANSWER**: Defendants deny the allegations in Paragraph 69.

70. During (at least) this time, Horseshoe hid the defects from Slate; all Horseshoe-manufactured samples from its April, June, and July 2024 production runs that Horseshoe sent Slate were defect-free.

**ANSWER**: Defendants deny the allegations in Paragraph 70.

71. Slate only learned of the defects when the products were delivered to Slate's distributers, retailers, and end customers—who informed Slate of such issues. This delay slowed Slate's understanding of the existence, let alone the nature and extent, of Horseshoe's defect issues.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71.

72.     Beginning in or about May 2024, Slate started receiving scattered reports from the market about defective Horseshoe-manufactured Slate products. These reports slowly, but steadily, increased in the spring of 2024.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72.

73.     Then, in July 2024, Horseshoe belatedly disclosed to Slate—for the first time— that it had disposed of 35% of the Horseshoe-manufactured Slate products from its July 2024 production run due to the same defect issues that Slate had been observing in the market. Horseshoe's disposal of this large amount of Slate's product meant that Horseshoe failed to meet its obligations to produce agreed-upon amounts of Slate's products in that July 2024 production run. Horseshoe released the remaining 65% of July 2024 production run for sale to Slate's customers. However, as Slate learned over the ensuing months as this product hit the market, many cans had the same defect issues Slate had been observing. In other words, Horseshoe failed to fix its defect issues.

**ANSWER**: Defendants deny the allegations in Paragraph 73.

74.     Horseshoe's July 2024 disclosure was the first time it told Slate about, let alone discussed, any defects or problems with Horseshoe's production runs.

**ANSWER**: Defendants deny the allegations in Paragraph 74.

75.     In July 2024, when Slate finally understood that Horseshoe's defects were systemic, it promptly asked Horseshoe that it find a solution. That was followed by weeks of emails and phone calls between operational teams from Slate and Horseshoe, in which Slate provided

substantial evidence of defects with Horseshoe's production runs.  Not only did Horseshoe refuse to address these issues, but it also denied responsibility.

**ANSWER**: Defendants deny the allegations in Paragraph 75 and Footnote 2.

76.     Rather than work with Slate to resolve the defect problems, Horseshoe stonewalled and demanded payment of its June and July 2024 production runs for Slate—which was during the heart of Horseshoe's production defect issues.

**ANSWER**: Defendants deny the allegations in Paragraph 76.

77.     On August 30, 2024 (before Slate learned of Defendants' launch of Nurri), Slate sent Horseshoe a letter with a supplemental notice of breach under the Manufacturing Agreement. That letter identified various breaches of that Agreement by Horseshoe, including breaches for Horseshoe's failures to produce beverages for Slate that are free of defects, failure to monitor production and packaging in compliance with agreed-upon quality assurance standards, failure to produce sufficient quantities of products (because, among other reasons, Horseshoe had disposed of large quantities of products due to defects), and failure to respond promptly and in good faith to such quality issues.  That letter also notified Horseshoe of Slate's intention to terminate the Manufacturing Agreement for cause unless Horseshoe remedied its breaches of that Agreement.

**ANSWER:** Defendants admit that Slate sent Horseshoe a letter on August 30, 2024 with a supplemental notice of breach.  Defendants refer to the letter for a complete and accurate depiction of its contents.  Defendants otherwise deny the allegations in Paragraph 77.

78.     In response to Slate's August 30, 2024 letter, Horseshoe again refused to acknowledge its production issues, blamed Slate (and other parties) for any defective products, and claimed that Slate waited too long to raise defect issues and to dispute certain of the unpaid invoices.  This last point flies in the face of reality; Slate did not (and, because of the production

and distribution process could not) reasonably discover Horseshoe's defect issues unless and until Slate's customers received the substandard product and brought those issues to Slate's attention. Moreover, Horseshoe hid the defects from Slate by providing it with defect-free samples.

**ANSWER**: Defendants deny the allegations in Paragraph 78.

79.     Horseshoe's delivery of Slate products that had defects meant that Slate's customers received substandard products.  In addition, Horseshoe's production issues meant that, in or around July 2024, Horseshoe failed to produce and deliver the agreed-upon quantities of Slate's product to the market.  All of this damaged Slate's reputation with its distributors, retailers, and end customers.  It also harmed Slate's ability to present and achieve growth opportunities for its products.

**ANSWER**: Defendants deny the allegations in Paragraph 79.

80.     Upon information and belief, despite knowing about the defect issues for some time, Horseshoe knowingly released defective and substandard product into the market.

**ANSWER**: Defendants deny the allegations in Paragraph 80.

81.     Due to Horseshoe's pervasive and persistent defect issues, its failure to address (or even acknowledge) them, its failure to provide Slate with a plan to remedy them, and Slate's recent discovery of Horseshoe's theft of Slate's confidential information and trade secrets, Slate has stopped using Horseshoe for any production runs.  In accordance with the August 30, 2024 letter, and in light of Horseshoe's failure to cure its breaches (no such cure is possible, as a practical matter, because Horseshoe continues to place products into the market which suffer from the same defects raised by Slate in its August 30th letter) and tortious conduct in launching the Nurri knockoff (which has irreparably damaged the parties' relationship and rendered any potential cure impossible), Slate has terminated the Manufacturing Agreement for cause.  Although Slate

disputes the unpaid invoices from Horseshoe, it has put the net amount of the disputed amount into a separate bank account, where it will remain pending the resolution of this dispute.

**ANSWER**: Defendants deny the allegations in Paragraph 81.

<u>**COUNT I**</u>

**Misappropriation of Trade Secrets Under Federal Defend Trade Secrets Act
(18 U.S.C. § 1836, *et seq*.) (All Defendants)**

82.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**:  Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 81.

83.    Slate's trade secrets include some of the information that it provided to Horseshoe in connection with the Manufacturing Agreement.  This information includes, but is not limited to:  (a) the know-how, processes, and methodologies to combine ultrafiltered milk with other ingredients and sweetener systems; (b) the know-how, processes, and methodologies to make Slate's products lactose free; (c) the know-how, processes, and methodologies to prevent "foaming" of the ultrafiltered milk during the manufacture of Slate's products; (d) the know- how, processes, and methodologies to ensure that the resulting product would not "clump" or "separate" during manufacture; (e) Slate's development, formulation, manufacturing, and testing, of the New Slate Product; (f) Slate's plan to make the New Slate Product focused on nutrition, including adding vitamins and minerals to it; (g) information about Slate's business plans including the potential business opportunity Slate had with the Club with respect to the New Slate Product; (h) information about Slate's pricing strategies for the New Slate Product at the Club; (i)  Slate's interactions with the Club about the New Slate Product; (j) Slate's anticipated schedule for selling the New Slate Product to Club; and (k) the names and contact information of Slate's suppliers and

-38-

vendors for its current products (and the New Slate Product). Slate believes that discovery will reveal other and additional specific trade secret information that it provided Horseshoe, and which Defendants misappropriated. All the foregoing information is, individually and collectively, referred to as "Slate Trade Secrets" herein.

**ANSWER:** Paragraph 83 contains legal conclusions that require no response. To the extent that Paragraph 83 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

84. The Slate Trade Secrets comprise information that qualifies as trade secrets under the Defend Trade Secrets Act (the "DTSA"). Specifically, (a) Slate has taken reasonable measures to keep such information secret (e.g., via the Manufacturing Agreement and the other above-described measures to keep information confidential); and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information. Further, the Slate Trade Secrets relate to Slate products, and potential products, which are used in, and are intended for use in, interstate commerce.

**ANSWER**: Paragraph 84 contains legal conclusions that require no response. To the extent that Paragraph 84 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

85. As set forth above, Defendants have misappropriated and used the Slate Trade Secrets since at least on or about January 2023, when Slate and Horseshoe entered into the Manufacturing Agreement. Defendants are therefore subject to liability under the DTSA.

**ANSWER:** Paragraph 85 contains legal conclusions that require no response. To the extent that Paragraph 85 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

86.     Accordingly, Slate is entitled to damages and injunctive relief, as provided by the DTSA. Because Defendants willfully and maliciously misappropriated the Slate Trade Secrets, Slate is entitled to an award of exemplary damages in an amount up to two times the amount of damages awarded and to an award of reasonable attorney's fees.

**ANSWER**: Paragraph 86 contains legal conclusions that require no response. To the extent that Paragraph 86 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

<u>**COUNT II**</u>
**Misappropriation of Trade Secrets Under Wisconsin Uniform Trade Secrets Act**
**(Wis. Stat. § 134.90) (All Defendants)**

87.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 86.

88.     The Slate Trade Secrets comprise information that: (a) derives independent economic value, actual and potential, from not being generally known, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts to maintain the secrecy that are reasonable under the circumstances. Accordingly, the Slate Trade Secrets constitute "trade secrets" under Wisconsin's Uniform Trade Secrets Act, Section 134.90 of the Wisconsin Statutes.

**ANSWER**: Paragraph 88 contains legal conclusions that require no response. To the extent that Paragraph 88 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

89.     Horseshoe misappropriated the Slate Trade Secrets after acquiring them via the Manufacturing Agreement. Horseshoe used or disclosed the Slate Trade Secrets without the consent of Slate and for use and purposes outside the obligations under the Manufacturing Agreement. Among other things, Horseshoe used and/or disclosed the Slate Trade Secrets to Trilliant and in connection with the manufacturing production, packaging, and sale of Nurri to the Club. Horseshoe also misappropriated the Slate Trade Secrets by using them to manufacture Trilliant's Nurri product.

**ANSWER**: Paragraph 89 contains legal conclusions that require no response. To the extent that Paragraph 89 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

90.     Trilliant misappropriated the Slate Trade Secrets by acquiring them from Horseshoe by means which it knew or had reason to know constitute improper means and by using or disclosing the Slate Trade Secrets without the consent of Slate after having acquired them by improper means. Slate never provided, or authorized Horseshoe or any other person or entity, to provide the Slate Trade Secrets to Trilliant (or to any other third party).

**ANSWER:** Paragraph 90 contains legal conclusions that require no response. To the extent that Paragraph 90 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

91.     Slate is entitled to recover from Defendants the damages provided for by law, including, without limitation, the actual loss caused by the violation and the unjust enrichment caused by the violation that is not taken into account in computing actual loss.

**ANSWER:** Paragraph 91 contains legal conclusions that require no response.  To the extent that Paragraph 91 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

92.     Slate is entitled to an injunction restraining Horseshoe and Trilliant, and each of their respective officers, agents, employees, owners, directors, and all persons acting in concert with them, from engaging in further such unlawful conduct and from reaping any additional commercial advantage from their misappropriation of the Slate Trade Secrets.

**ANSWER:** Paragraph 92 contains legal conclusions that require no response.  To the extent that Paragraph 92 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

93.     Defendants' acts of misappropriation were willful and malicious, and therefore Slate is entitled to recover punitive or exemplary damages in an amount up to twice the award of damages.

**ANSWER**: Paragraph 93 contains legal conclusions that require no response.  To the extent that Paragraph 93 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

94.     Further, because Defendants' acts of misappropriation were willful and deliberate, Slate should be awarded its reasonable attorneys' fees.

**ANSWER:** Paragraph 94 contains legal conclusions that require no response. To the extent that Paragraph 94 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

**COUNT III**
**Breach of Contract—Confidentiality (Horseshoe only)**

95.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 94.

96.     As set forth above, Slate and Horseshoe entered into the Manufacturing Agreement. The Manufacturing Agreement is a valid and binding contract, and Slate performed its obligations under such Agreement in all material respects.

**ANSWER:** Defendants admit that Slate and Horseshoe entered into the Manufacturing Agreement. The remainder of Paragraph 96 contains legal conclusions that require no response. To the extent that the remainder of Paragraph 96 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

97.     Under the Manufacturing Agreement, Horseshoe was obligated to: (a) keep all of Slate's "Confidential Information" (as defined in that Agreement) confidential and only to reveal it to Horseshoe employees and agents who are actively and directly participating in meeting Horseshoe's obligations under the Manufacturing Agreement, and for no other purpose; and (b) establish, implement, and maintain procedures to prevent the disclosure of Slate's "Confidential Information" to any other person. The Manufacturing Agreement also states that Horseshoe shall be responsible for the breach of the Agreement by any of its employee or agents.

The language of the Manufacturing Agreement establishes other obligations for Horseshoe—and protections for Slate—with respect to Slate's confidential information.

**ANSWER**: Paragraph 97 contains legal conclusions that require no response. To the extent that Paragraph 97 contains legal conclusions that require a response, Defendants deny those allegations.

98.     Horseshoe breached the Manufacturing Agreement by using, disseminating, and misappropriating Slate's "Confidential Information" (as defined by the Manufacturing Agreement), which includes, but is not limited to, the Slate Trade Secrets, in connection with Horseshoe's and Trilliant's manufacture, packaging, distribution, and sale of Nurri.

**ANSWER**: Paragraph 98 contains legal conclusions that require no response. To the extent that Paragraph 98 contains legal conclusions that require a response, Defendants deny those allegations.

99.     Slate has suffered harm as a result of Horseshoe's breaches and is entitled to recover all damages permitted by law.

**ANSWER**: Paragraph 99 contains legal conclusions that require no response. To the extent that Paragraph 99 contains legal conclusions that require a response, Defendants deny those allegations.

<u>**COUNT IV**</u>
**Breach of Contract—Defect Issues (Horseshoe only)**

100.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 99.

-44-

101.    As set forth above, Slate and Horseshoe entered into the Manufacturing Agreement. The Manufacturing Agreement is a valid and binding contract, and Slate performed its obligations under such Agreement in all material respects, and has deposited the net amount of money Horseshoe claims it is owed under such Agreement for unpaid invoices into a separate bank account, where it will remain pending the resolution of this dispute.

**ANSWER:** Defendants admit that Slate and Horseshoe entered into the Manufacturing Agreement.  Defendants refer to the Manufacturing Agreement for a complete and accurate depiction of its contents.  The remainder of Paragraph 101 contains legal conclusions that require no response.  To the extent that the remainder of Paragraph 101 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

102.    Generally speaking, under the Manufacturing Agreement, Horseshoe had several obligations with respect to manufacturing, packaging, and distributing Slate's beverages to be of merchantable quality and free of defects.  Horseshoe breached those obligations by failing to do what it undertook to do.  Such defects include, but are not limited to, significant damage to the aluminum cans packaged with Slate's products, including silver streaks and black scarring across the entire design, and Horseshoe's failure to produce agreed-upon quantities of product.

**ANSWER:** Paragraph 102 contains legal conclusions that require no response.  To the extent that Paragraph 102 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

103.    As explained above, Slate has suffered harm as a result of Horseshoe's breaches and is entitled to recover all damages permitted by law.

**ANSWER**: Paragraph 103 contains legal conclusions that require no response.  To the extent that Paragraph 103 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

<u>**COUNT V**</u>
**Breach of Covenant of Good Faith and Fair Dealing (Horseshoe only)**

104.    Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 103.

105.    In the Manufacturing Agreement, Horseshoe made certain express promises to Slate to: (a) protect and limit the use and disclosure of Slate's confidential and proprietary information and/or the Slate Trade Secrets; (b) work with Slate in a timely manner on new product and use its best efforts to do so; and (c) ensure that the product is manufactured, packaged, and distributed on Slate's behalf were of merchantable quality and free of defects.

**ANSWER**: Paragraph 105 contains legal conclusions that require no response.  To the extent that Paragraph 105 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

106.    Horseshoe owed Slate a duty of good faith and fair dealing implied from the Manufacturing Agreement.  The implied covenant of good faith and fair dealing contained in the Manufacturing Agreement prohibited Horseshoe from:  (a) engaging in the misappropriation and misuse of Slate's confidential and proprietary information and/or the Slate Trade Secrets; (b) intentionally delaying the trials of the New Slate Product while it was working with Trilliant to develop the same product with Slate's confidential and proprietary information and/or the Slate

Trade Secrets; and (c) failing to disclose the defect issues with Horseshoe's production runs of Slate's existing products.

**ANSWER**: Paragraph 106 contains legal conclusions that require no response. To the extent that Paragraph 106 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

107. Slate has done all of the things required of it under the Manufacturing Agreement, and has deposited the net amount of money Horseshoe claims it is owed under such Agreement for unpaid invoices into a separate bank account, where it will remain pending the resolution of this dispute.

**ANSWER**: Defendants deny that Slate has done all of things required of it under the Manufacturing Agreement. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 107.

108. Through the intentional and deceitful conduct alleged above, Horseshoe breached the covenants of good faith and fair dealing implied in the Manufacturing Agreement.

**ANSWER:** Paragraph 108 contains legal conclusions that require no response. To the extent that Paragraph 108 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

109. Horseshoe's conduct, at a minimum, violated the spirit of the Manufacturing Agreement by accomplishing exactly what the Manufacturing Agreement sought to prevent: Horseshoe being able to use Slate's confidential and proprietary information and/or the Slate Trade Secrets to develop a product in competition with Horseshoe's trusting business partner.

**ANSWER**: Paragraph 109 contains legal conclusions that require no response. To the extent that Paragraph 109 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

110. Slate has incurred substantial damages as a direct and proximate cause of Horseshoe's willful and material breaches of the implied covenants of good faith and fair dealing, and is entitled to recover all damages permitted by law.

**ANSWER**: Paragraph 110 contains legal conclusions that require no response. To the extent that Paragraph 110 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

<u>**COUNT VI**</u>
**Tortious Interference With Potential Prospective Contractual Relations (All Defendants)**

111. Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 110.

112. Slate had a prospective contractual relationship with the Club as it relates to the New Slate Product. Among other things: (a) Slate had an existing relationship with the Club for the sale of Slate's 20g protein drink; (b) the Club requested, multiple times, that Slate create the New Slate Product for sale at the Club's stores, and the Club has already purchased significant quantities of Slate's products; and (c) based on numerous conversations with representatives of the Club, Slate reasonably believed that, once Slate launched the New Slate Product and offered it to sale to the Club, that the Club would enter into purchase orders and purchase significant quantities of the New Slate Product for sale in its stores.

**ANSWER**: Paragraph 112 contains legal conclusions that require no response. To the extent that Paragraph 112 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

113. Defendants knew or should have known that Slate anticipated receiving purchase orders for the New Slate Product from the Club because, among other reasons, Slate provided Horseshoe with Slate's confidential and proprietary information and/or the Slate Trade Secrets, including information about the prospect of such sales and the timing of such sales to the Club (and, upon information and belief, Horseshoe, through Mr. Upchurch and others, provided Trilliant with such information).

**ANSWER**: Paragraph 113 contains legal conclusions that require no response. To the extent that Paragraph 113 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

114. Defendants knowingly and intentionally interfered with Slate's prospective contractual relationship with the Club when they induced the Club not to purchase the New Slate Product through at least one of more of the following means: (a) using Slate's confidential and proprietary information and/or the Slate Trade Secrets to understand that there was a potential for sale of such a product to the Club; (b) using Slate's non-public strategy regarding its target pricing for sales of the New Slate Product to the Club in order to undercut Slate; and (c) using Slate's non-public information about timing—coupled with Horseshoe's intentional and knowing delay of the trials of the New Slate Product—to "beat" Slate to the opportunity to sell the New Slate Product to the Club. As to timing, being the "first mover" in this space is/was a significant advantage for Horseshoe (and thus lost opportunity for Slate) because of the substantial unmet demand by the

Club's customers for ultrafiltered milk-based protein drinks and for canned (rather than plastic) packaging.

**ANSWER**: Paragraph 114 contains legal conclusions that require no response. To the extent that Paragraph 114 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

115. Defendants intentionally interfered with Slate's prospective contractual relations with the Club for the New Slate Product, and Defendants' primary purpose was to cause such interference as a result of their conduct, or at minimum they knew or should have known that such interference was substantially certain.

**ANSWER:** Paragraph 115 contains legal conclusions that require no response. To the extent that Paragraph 115 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

116. Defendants had no justification or privilege to interfere in these potential contracts.

**ANSWER:** Paragraph 116 contains legal conclusions that require no response. To the extent that Paragraph 116 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

117. Defendants' wrongful interference damaged Slate in the form of lost profits in an amount to be proven at trial.

**ANSWER:** Paragraph 117 contains legal conclusions that require no response. To the extent that Paragraph 117 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

118. In addition to Slate's lost profits, it has lost an opportunity to sell the New Slate Product to the Club for a substantial time due to the buying cycle for the Club and the "stickiness"

of Club customers to Nurri at the expense of the New Slate Product. Even if Slate were to sell the New Slate Product to the Club, it would have to do so at a reduced price (from its target price, which Slate reasonably believed the Club would have agreed to). And, given Defendants' public plans to sell additional flavors of Nurri—flavors that Slate sells and anticipates selling—the damage to Slate is further magnified. These additional damages are in an amount to be proven at trial.

**ANSWER:** Paragraph 118 contains legal conclusions that require no response. To the extent that Paragraph 118 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

119. Defendants' conduct was a substantial factor and/or was a substantial influence in producing Slate's claimed damages.

**ANSWER:** Paragraph 119 contains legal conclusions that require no response. To the extent that Paragraph 119 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

<u>**COUNT VII**</u>
**Conversion (All Defendants)**

120. Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 119.

121. Slate is the owner of its confidential information, which was wrongfully used and obtained by Defendants.

-51-

**ANSWER:** Paragraph 121 contains legal conclusions that require no response. To the extent that Paragraph 121 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

122. Horseshoe willfully engaged in the act of conversion when it provided Slate's confidential and proprietary information to Trilliant, and when it used such information to develop, manufacture, package, and distribute Nurri for Trilliant.

**ANSWER:** Paragraph 122 contains legal conclusions that require no response. To the extent that Paragraph 122 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

123. Trilliant willfully engaged in the act of conversion when it received Slate's confidential and proprietary information from Horseshoe, when it used such information to develop Nurri, and when it learned that Horseshoe was using such information for Trilliant's benefit, rather than Slate's. This conduct constitutes conversion because Defendants took Slate's confidential information without Slate's consent and without lawful authority, which resulted in serious interference with Slate's rights to possess that property.

**ANSWER**: Paragraph 123 contains legal conclusions that require no response. To the extent that Paragraph 123 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

124. As a result of the conversion by Defendants of Slate's property, Slate has been and will continue to be injured, while Defendants will continue to be unjustly enriched.

**ANSWER**: Paragraph 124 contains legal conclusions that require no response. To the extent that Paragraph 124 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

125.     Defendants' conduct was intentional and malicious, entitling Slate to an award of exemplary and punitive damages.

**ANSWER**: Paragraph 125 contains legal conclusions that require no response.  To the extent that Paragraph 125 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

**COUNT VIII**
**Unjust Enrichment (All Defendants)**

126.     Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER:** Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 125.

127.     Slate was, and is, entitled to the benefit of its confidential and proprietary information.

**ANSWER**: Paragraph 127 contains legal conclusions that require no response.  To the extent that Paragraph 127 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

128.     With knowledge of Slate's rights, Defendants unjustly obtained (stole) the benefit of Slate's property, resulting in damage to Slate.

**ANSWER**: Paragraph 128 contains legal conclusions that require no response.  To the extent that Paragraph 128 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

129.     At all relevant times, Defendants had knowledge of the benefit of Slate's confidential information that they stole from Slate.  Slate, under the confidentiality protections of the Manufacturing Agreement, told Horseshoe, among other things, how to formulate the New

Slate Product and that the Club sought to purchase such Product (and other details about Slate's business plans for the Club and the New Slate Product).

**ANSWER**: Paragraph 129 contains legal conclusions that require no response. To the extent that Paragraph 129 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

130. Defendants have unjustly and wrongfully benefitted, and continue to benefit, from their misappropriation and use of the property of Slate, to the detriment of Slate and against fundamental principles of justice, equity, and good conscience. Under the circumstances described above, it is inequitable for Defendants to accept or retain the benefits of Slate's confidential information.

**ANSWER**: Paragraph 130 contains legal conclusions that require no response. To the extent that Paragraph 130 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

131. Defendants were, and continue to be, unjustly enriched and Slate was, and continues to be, damaged in an amount to be proven at trial.

**ANSWER**: Paragraph 131 contains legal conclusions that require no response. To the extent that Paragraph 131 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

## <u>COUNT IX</u>
### Civil Conspiracy – Injury to Business (Wis. Stat. § 134.01) (All Defendants)

132. Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 131.

-54-

133.    Defendants unlawfully and maliciously acted (and are acting) together to injure Slate's business.

**ANSWER**: Paragraph 133 contains legal conclusions that require no response.  To the extent that Paragraph 133 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

134.    Defendants acted together with a common purpose to injure Slate's business by, among other things: (a) Horseshoe misappropriating Slate's non-public information about the New Slate Product and Slate's business plans and sharing that information with Trilliant; (b) Defendants' developing, manufacturing, and selling Nurri; (c) Horseshoe intentionally slowing Slate's ability to sell the New Slate Product to the Club; and (d) Defendants' offering Nurri to the Club (which the Club purchased).  Defendants did so in a successful bid to beat the New Slate Product to market (including offering such product to the Club), and to undercut Slate's projected pricing with the Club.

**ANSWER:** Paragraph 134 contains legal conclusions that require no response.  To the extent that Paragraph 134 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

135.    Defendants' common and agreed-upon purpose was, among other things, to "beat" the New Slate Product market, to try to sell Nurri to the Club before Slate entered into any purchase order(s) with the Club for the New Slate Product, and to prevent Slate from being able to get the New Slate Product into the Club at all.  This common and agreed-upon purpose was undertaken to financially benefit Defendants, and intentionally at the expense of Slate's business.

**ANSWER:** Paragraph 135 contains legal conclusions that require no response. To the extent that Paragraph 135 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

136. Defendants knew and intended their actions to injure Slate's business; they acted with intent to cause harm to Slate and with malice against Slate. Through their actions, Defendants knowingly and intentionally ripped-off the New Slate Product and Slate's confidential business/product strategy; Defendants' creation of Nurri and their business plan for Nurri was (and is) squarely and intentionally aimed to cause Slate harm (and to benefit Defendants), in violation of the Manufacturing Agreement and in deliberate disregard for Slate's property rights.

**ANSWER:** Paragraph 136 contains legal conclusions that require no response. To the extent that Paragraph 136 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

137. Defendants' improper actions financially harmed Slate, including (but not necessarily limited to) by causing Slate to lose foreseeable purchase orders from the Club for the New Slate Product; depriving Slate of control over its non-public information about the New Slate Product, Slate's business plans, and go-to-market strategy; and causing Slate to waste time and resources dealing with Horseshoe's alleged difficulties manufacturing the New Slate Product.

**ANSWER:** Paragraph 137 contains legal conclusions that require no response. To the extent that Paragraph 137 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

## <u>COUNT X</u>
### <u>Declaratory Judgment—Unpaid Invoices and Termination For Cause (Horseshoe only)</u>

138. Slate repeats and realleges the allegations set forth in each of the preceding paragraphs, as though fully set forth herein.

-56-

**ANSWER**: Defendants reallege and incorporate by reference herein their responses to the allegations in Paragraph 1 through Paragraph 137.

139.    As described in greater detail above, and in correspondence between Slate and Horseshoe, on or about September 4, 2024, Horseshoe sent Slate a letter demanding immediate payment of unpaid invoices.  In that letter, Horseshoe also denied that it breached the Manufacturing Agreement with respect to the aforementioned defect issues, and stated that Horseshoe intended to enforce the Manufacturing Agreement, which, upon information and belief, includes payment of the disputed invoices.

**ANSWER**: Defendants admit that Horseshoe sent Slate a letter on September 4, 2024 and refer to the September 4, 2024 letter for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 139.

140.    As explained above, those disputed invoices were for Horseshoe's production runs of Slate's products that had the aforementioned defect issues, and Slate therefore disputes that it is required to pay Horseshoe, in whole or in part, for these disputed invoices.

**ANSWER**: Defendants deny the allegations in Paragraph 140.

141.    In addition, as explained above, Slate told Horseshoe, including in its August 30, 2024 letter, that it intended to terminate the Manufacturing Agreement for cause, at least for the reasons stated in that letter.  In its September 4, 2024 letter, Horseshoe denied that it breached the Manufacturing Agreement, stated that there is no basis for Slate to terminate the Manufacturing Agreement (for cause or for no cause), and informed Slate that Horseshoe intended to enforce that Agreement.

**ANSWER:** Defendants admit that Slate sent Horseshoe an August 30, 2024 letter and refer to the August 30, 2024 letter for a complete and accurate depiction of its contents.  Defendants

further that Horseshoe sent Slate a letter on September 4, 2024 and refer to the September 4, 2024 letter for a complete and accurate depiction of its contents. Defendants otherwise deny the allegations in Paragraph 141 and Footnote 3.

142. Slate is entitled to declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, because there is an actual and justiciable controversy over whether, given the defect and intentional delay issues associated with the production runs for the disputed invoices, Slate must pay Horseshoe for those invoices; and there is an actual and justiciable controversy over whether Horseshoe's actions and inactions with respect to such issues, and with respect to Nurri entitle Slate to terminate the Manufacturing Agreement for cause.

**ANSWER**: Paragraph 142 contains legal conclusions that require no response. To the extent that Paragraph 142 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

143. As explained above, Slate has put the net amount at issue with the disputed invoices into a separate account, pending the resolution of this dispute.

**ANSWER:** Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 143.

144. Slate is entitled to a declaration that: (a) Horseshoe is not entitled to payment on the disputed invoices, in whole or in part; and (b) Slate was entitled to terminate the Manufacturing Agreement for cause.

**ANSWER**: Paragraph 144 contains legal conclusions that require no response. To the extent that Paragraph 144 contains factual allegations or otherwise requires a response, Defendants deny the allegations.

## AFFIRMATIVE DEFENSES

Defendants plead the following separate and distinct affirmative defenses to the Complaint without conceding that they bear the burden of proof as to any of these issues and without intending any alteration of the burden of proof and/or burden of going forward with evidence that otherwise exists with respect to any particular issue. All such defenses are pleaded in the alternative, and do not constitute an admission of liability or that Plaintiff is entitled to any relief whatsoever. Defendants expressly reserve the right to assert additional affirmative defenses as they become known through further investigation during the course of discovery.

### FIRST DEFENSE
### (Failure to Allege Trade Secrets with Sufficient Particularity)

Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to plead its alleged trade secrets with the requisite particularity.

### SECOND DEFENSE
### (No Misappropriation)

Plaintiff's claims are barred, in whole or in part, because no misappropriation of Plaintiff's trade secrets occurred. Defendants did not misappropriate Plaintiff's alleged trade secrets and Defendants developed Nurri independent of Plaintiff's alleged trade secrets and Plaintiff's alleged confidential information.

### THIRD DEFENSE
### (Trade Secrets Are Readily Ascertainable)

The trade secret misappropriation claims asserted in the Complaint are barred, in whole or in part, because Plaintiff's alleged trade secrets are readily ascertainable such that they do not constitute trade secrets.

-59-

## FOURTH DEFENSE
### (Failure to Use Reasonable Measures to Protect Trade Secrets)

The trade secret misappropriation claims asserted in the Complaint are barred, in whole or in part, because Plaintiff failed to use reasonable measures to maintain the secrecy of its alleged trade secrets.

## FIFTH DEFENSE
### (Claims Contractually Barred by Terms of Agreement)

Plaintiff's claims are barred, released, waived, or otherwise precluded, in whole or in part, by the terms of the Manufacturing Agreement.

## SIXTH DEFENSE
### (Prior Breach by Plaintiff)

Plaintiff's claims are barred, in whole or in part, by reason of one or more prior material breaches by Plaintiff.

## SEVENTH DEFENSE
### (Laches)

Plaintiff's claims are barred, in whole or in part, by the equitable defense of laches.

## EIGHTH DEFENSE
### (Waiver)

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

## NINTH DEFENSE
### (Ratification)

Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification. Specifically, Plaintiff failed to timely object to the quality of production runs despite the explicit right of inspection, the burden of which fell on Plaintiff as set forth in Section 11 of the Manufacturing Agreement.

## TENTH DEFENSE
### (Lack of Causation)

Plaintiff's claims are barred, in whole or in part, because no conduct attributable to Defendants was the but-for cause or the proximate cause of any losses or damages that Plaintiff seeks to recover in this action.

## ELEVENTH DEFENSE
### (Alleged Damages Contractually Barred)

Plaintiff's claims are barred, in whole or in part, by the limitation of liability clause in the Manufacturing Agreement.

## TWELFTH DEFENSE
### (Alleged Damages Too Speculative)

Plaintiff's claims are barred, in whole or in part, because its alleged damages are too remote and speculative to ascertain or apportion.

## THIRTEENTH DEFENSE
### (Failure to Mitigate)

Plaintiff is barred from recovery, in whole or in part, because Plaintiff failed to mitigate or attempt to mitigate damages, if in fact Plaintiff sustained any damages, which Defendants expressly deny, and any recovery by Plaintiff must be barred or reduced by reason thereof.

## FOURTEENTH DEFENSE
### (Comparative Fault)

Without admitting that any violation of law occurred, any damages that might be recovered by Plaintiff must be reduced to account for comparative fault or negligence attributable to Slate or other parties.

-61-

## FIFTEENTH DEFENSE
### (Failure to Exercise Reasonable Care and Due Diligence)

Plaintiff failed to exercise reasonable care and due diligence to avoid the risk of and/or enhancement of any purported harm allegedly attributable to Defendants. Any relief awarded to Plaintiff must therefore be limited to recovery for only those alleged injuries Plaintiff would have sustained had it exercised such reasonable care and diligence.

## SIXTEENTH DEFENSE
### (Good Faith)

Plaintiff is barred from recovery, in whole or in part, because any actions taken by Defendants with respect to Slate were based on an honest, reasonable, and good faith belief in the facts as known and understood at the time.

## SEVENTEENTH DEFENSE
### (Consent)

Plaintiff is barred from recovery, in whole or in part, by the doctrine of consent.

## RESERVATION OF RIGHTS

Defendants presently have insufficient knowledge or information upon which to form a basis as to whether they may have additional, as yet unstated, defenses available. Defendants have not knowingly or intentionally waived any applicable defenses and reserve the right to assert additional defenses, counterclaims, cross-claims, and third-party claims at any subsequent stage of this action in the event that discovery indicates that such additional defenses or claims would be appropriate.

## STATEMENT OF COUNTERCLAIMS

1. Defendants and Counterclaimants Horseshoe and Trilliant assert counterclaims against Slate for a declaratory judgment and breach of contract.

-62-

2.     *First*, Defendants seek a declaratory judgment that Defendants independently developed their breakthrough Nurri brand of beverages ("Nurri") without the use of Slate's confidential information or purported trade secrets. Over the last four-plus decades, Defendants have invested enormous effort and resources to establish expertise in developing and manufacturing innovative beverage and related nutrition products. Defendants set themselves apart in the beverage industry by employing a specialized team of food scientists and engineers, in addition to maintaining state-of-the-art and vertically-integrated manufacturing facilities.

3.     In late 2023, Defendants' customer of almost a decade, Costco, informed Defendants that it wished to develop a beverage comparable to the national leading brand's 30g protein ultrafiltered milk shake beverage. This was a long-standing problem for Costco because it had been unable to find an additional supplier beyond the leading brand that could manufacture an ultrafiltered milk-based beverage with high levels of protein that retained a smooth texture, rather than thickening to a pudding-like consistency. On information and belief, around the same time period, Costco had asked multiple manufacturers to create a product similar to the national leading brand's product to alleviate demand and shortage of supply. Defendants tasked their team of experts with creating a novel solution that remained unsolved by other manufacturers. After millions of dollars of investment and hundreds of rounds of testing over the course of many months, Defendants' experts succeeded where many others have failed: Defendants developed an innovative manufacturing process to formulate ultrafiltered milk-based beverages with high levels of protein (i.e., over 24g or more) that retain a smooth texture and desirable viscosity. Defendants' innovation relies on a patent pending innovative solution that is different from the stabilizer gums commonly used in the beverage industry to improve viscosity, including in Slate's products. The

Nurri line of ultrafiltered milk-based beverages incorporates Defendants' breakthrough technology and is the result of a further intensive development process.

4.     Defendants came up with their unique approach to developing Nurri through their own considerable research and development efforts—not from any confidential information or alleged trade secrets obtained from another entity, and certainly not from Slate, which has no technical expertise and no beverage containing more than 20g protein on the market.  Indeed, because Defendants believe that others in the beverage industry have not used the method they use to formulate Nurri for any other ultrafiltered milk-based high protein beverages, Defendants have filed a provisional patent application detailing their unique method.

5.     Defendants further seek declaratory relief that, consistent with Section 15.3 of the Manufacturing Agreement between Horseshoe and Slate, Horseshoe's liability to Slate, which Defendants dispute exists, is limited to the amounts that Slate paid to Horseshoe during the twelve-month period preceding any purported breach.  The Manufacturing Agreement also bars Slate from collecting indirect, consequential, incidental, special, punitive, or exemplary damages of any nature (including but not limited to loss of business and lost profits) from Defendants.

6.     *Second*, Horseshoe asserts a breach of contract claim against Slate for its failures to make payments plainly owed to Horseshoe under the Manufacturing Agreement.  Slate entered into a Manufacturing Agreement with Horseshoe in early 2023 to co-manufacture specific lactose-free ultrafiltered milk-based shakes containing 20g of protein.  Among other things, the agreement requires Slate to commit to a minimum volume of product at a contracted price through 2025 or pay Horseshoe the equivalent price multiplied by the equivalent volume.  Notwithstanding Defendants' efforts to help Slate increase its production order volumes, Slate's production orders for its 20g product decreased such that it became apparent Slate would likely not hit its annualized

contract volume in 2024 unless its production orders experienced a significant increase. Slate also failed to pay outstanding invoices for product Slate had accepted without utilizing the process provided by the Manufacturing Agreement to dispute these invoices. Rather than simply paying what it owed to Horseshoe, Slate concocted baseless allegations regarding packaging defects and misappropriation of trade secret and confidential information to avoid its payment obligations under the Manufacturing Agreement.

7. Horseshoe has been and continues to be damaged by Slate's failure to perform its obligations under the Manufacturing Agreement, including but not limited to Slate's (a) failure to pay outstanding invoices for Horseshoe's productions of Slate's 20g protein beverages, none of which is excused by Slate's belated assertions of packaging defects, and (b) failure to accept or pay for its minimum order commitment for 2024 or 2025. Horseshoe further seeks attorney's fees under Section 19 of the Manufacturing Agreement, which entitles the prevailing party to its attorney and other reasonably necessary fees, costs, and expenses incurred in connection with this litigation.

## FACTUAL ALLEGATIONS

### I.  Trilliant and Horseshoe

8. Trilliant has been a pioneer in the U.S. beverage market since 1979, when it was founded as Victor Allen's Coffee. Trilliant produces an expansive portfolio of coffee and other beverage and nutrition products at state-of-the-art facilities located in Wisconsin.

9. Trilliant is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140.

10.     Horseshoe was founded as part of the Trilliant family of companies in 2017 to expand beverage production capabilities. Horseshoe produces a broad array of ready-to-drink liquid (as opposed to dry) beverage and nutrition products.

11.     Horseshoe is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140.

12.     Defendants develop, produce, and sell (a) their own brands, such as Nurri, (b) private label, customizable products for its customers, and (c) products for other brands through co-manufacturing partnerships.

13.     To meet consumer demand, over the course of the past 45 years, Defendants have invested hundreds of millions of dollars into its manufacturing facilities and employee resources to build its capabilities and product expertise.

14.     As an example, Defendants employ in-house expert research and development staff with advanced degrees in food chemistry to create innovative products that match national brand targets. Defendants' scientific expertise and capability sets them apart from other manufacturers in the beverage industry.

15.     Defendants partner with multi-billion-dollar industry leaders in the beverage and coffee spaces as well as smaller beverage startup companies without technical benches or track records of beverage development at various stages of their process for developing and commercially manufacturing saleable product in the market.

16.     Defendants are able to offer their co-manufacturing partners expertise and resources in research & development formulation, turn-key supply chain management inclusive of sourcing and procurement, superior processing capabilities, flexible packaging options, and merchandising and sales support.

17.     Defendants also partner with retailers, such as Costco and Walmart, who seek to expand their beverage offerings with quality and innovative branded products.

18.     The expansive array of products that Defendants manufacture—either through their own brands, co-manufacturing relationships, or through third party retail brands—are available through numerous distribution channels and geographic regions, including retailers, food service distributors, e-commerce channels, and coffee houses.

19.     Defendants have previously manufactured and produced high protein and nutritional beverages.  For example, in 2018, Defendants launched a suite of canned nutrition beverages in partnership with Walmart, featuring a 30g protein base under the brand name "Foundation Fitness."

20.     Since dairy is a common ingredient in coffee and other beverages Defendants produce, Defendants are also highly experienced with developing milk-based products and working with dairy suppliers.

21.     Defendants are also experienced in developing beverages that use ultrafiltered milk and sourcing ultrafiltered milk from suppliers.  Ultrafiltration processing is a commonly-used technique in the food, nutrition, and beverage industry that allows for the retention of specific components based on molecular weight.  In the dairy industry, this technique allows for the retention of milk proteins with high molecular weight, and the removal of components such as water and lactose with low molecular weight.  The ultrafiltration technique results in a milk that is lactose-free, lower in sugar, and higher in protein.

22.     Defendants have a history of working on numerous confidential projects involving ultrafiltered milk with its co-manufacturing customers.  In 2019, for example, Defendants worked with a customer on a project to develop a 30g protein drink using ultrafiltered milk.  Also in 2019,

Defendants explored using ultrafiltered milk for a proposed nutritional shake for kids. In another example, in 2020, Defendants worked with another customer to develop a canned dairy beverage using ultrafiltered milk. In 2022, Defendants engaged in explorations with another customer to develop an energy drink using ultrafiltered milk.

23.     Because many of the products that Defendants produce are common within the beverage industry, it is not uncommon for Defendants to co-manufacture products that are similar in kind for multiple customers, or for a customer and Defendants' own private label. For example, Defendants produce single use coffee pods for their own brands, while also manufacturing coffee pods on behalf of Defendants' private label and co-manufacturing customers. This is a typical practice within the beverage private label and co-manufacturing space.

## II.     Slate

24.     Slate was founded in 2018 by Manny Lubin and Josh Belinsky, who were then recent college graduates. Upon information and belief, neither of Slate's cofounders had any degrees or background in manufacturing beverages.

25.     Slate is a Delaware corporation with its principal place of business at 237 Strasser Avenue, Westwood, Massachusetts 02090.

26.     In 2020, Slate was featured on the reality television show Shark Tank, in which entrepreneurs make business presentations to five venture capitalists (called "Sharks" on the program) who decide whether to invest in their companies. After Slate's presentation, all the Sharks declined to invest in Slate, citing several reasons, including that Slate had no existing revenue at the time and the taste of the product samples.[2]

---

[2] Kimberly E. Graf, *Slate Chocolate Milk Update | Shark Tank Season 11*, Shark Tank Recap Blog, https://sharktankrecap.com/slate-chocolate-milk-update-shark-tank-season-11/ (last visited Dec. 9, 2024).

27. Upon information and belief, Slate does not develop or manufacture its own products in-house, but rather outsources to third parties everything required to bring a product to market, including its research, development, manufacturing, distribution and marketing.

28. Upon information and belief, Slate began selling ultrafiltered and lactose-free milk-based products containing 20g of protein in 2019.

29. To Defendants' knowledge, Slate has not introduced any ultrafiltered milk-based beverage with 30g of protein, or any beverage containing more than 20g of protein, to the market.

III.    Jurisdiction and Venue

30. This is an action for breach of contract and for a declaratory judgment.

31. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), as this action arises from same case or controversy as Slate's claims against Horseshoe and Trilliant in the above-captioned case.

32. This Court has personal jurisdiction over Slate because it transacted business in part by contracting to receive services from Horseshoe and Trilliant within Wisconsin and this district which give rise to this action. This action arises out of Slate's contacts with Wisconsin and this district. Slate has availed itself of the privilege of doing business in Wisconsin.

33. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, or omissions giving rise to Defendants' claims occurred in this district, and because the Manufacturing Agreement provides that Slate and Horseshoe agree that disputes "arising out of or relating to" the Manufacturing Agreement may be "hear and determined in this district."

## IV. Defendants' Independent Development of Nurri

34. One of Defendants' brands, Nurri, offers high protein milk shakes that are sold at Costco locations throughout the United States. Nurri milk shakes are made with ultrafiltered skim milk, are lactose-free and low sugar, and contain 30 grams of protein.

35. The process for Defendants' development of the Nurri beverages began with a request from Costco. Defendants have a long-standing relationship with Costco dating back several years, and Defendants have been manufacturing coffee products for Costco in the United States and Canada since 2015.

36. On or around December 6, 2023, Costco Canada visited Defendants' manufacturing facility. During the visit, Costco Canada inquired about Defendants' capabilities to produce high protein beverages. Following that visit, Costco Canada asked Defendants for a quote to formulate and manufacture such a product for Costco.

37. Costco Canada told Defendants that it was interested in a product that would be comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake. According to its packaging, the national leading brand's chocolate protein shake is made with ultrafiltered milk, is lactose-free, and contains 30 grams of protein, 2 grams of sugar, and a blend of vitamins and minerals.

38. Defendants understood that Costco was interested in an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk shake due to rising demand and significant supply constraints in the ultrafiltered milk protein beverage market. Upon information and belief, including conversations with other formulators in the beverage industries, Costco had approached other manufacturers around the same time regarding creating an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

-70-

39.     Defendants began working with Costco Canada on an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk protein shake in late 2023 and early 2024, including developing pricing quotes and specifications, providing samples, and identifying dairy suppliers.  Costco Canada indicated that the timeline for developing an alternative to the national leading brand was "ASAP."  Costco US also asked Defendants in or around early February 2024 about a formulation similar to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

40.     Defendants initially explored with Costco developing such a product for Costco's Kirkland brand, before ultimately shifting to creating a new private owned brand.

41.     For its new private owned brand, Nurri, Defendants targeted pricing that would show value against pricing of the national leading brand product, and be inclusive of Defendants' cost.  Defendants did not reference any pricing information from Slate when determining pricing for Nurri.

42.     During development, Defendants targeted the ingredients, nutritional profile, taste, and mouthfeel of the national leading brand's chocolate 30g protein ultrafiltered milk shake, not any Slate product.   Defendants invested millions in developing a national leading brand comparator in response to Costco's requests.  Those efforts culminated in the development of Nurri.

43.     The development process for a new beverage begins with a "bench phase," or an exploratory proof-of-concept phase involving multiple iterations of potential formulations; identifying product specifications, mouth feel, flavor profile, and a process for creating batches of samples; testing samples; and obtaining feedback.  Concurrently during the formulation process, samples are subjected to heat penetration and thermal process studies.  A formulation that passes

both of these tests then proceeds to a "manufacturing phase," during which adjustments are made to the formulation and to the manufacturing process for large scale commercial production at a particular manufacturing facility. There is a feedback loop at all stages of the development process, during which the manufacturer solicits feedback from any partners (such as co-manufacturers or retail partners), any third-party formulators, and potential customers. Defendants work on beverage projects at all stages of development, including exploratory projects that never reach the manufacturing phase.

44.     To develop Nurri, Defendants needed to solve a longstanding problem with developing ultrafiltered milk-based beverages with higher amounts of protein. Specifically, ultrafiltered milk-based beverages with higher amounts of protein (namely, over 24g) are susceptible to viscosity issues at higher and lower temperatures that negatively impact the beverage consistency. Once that level of protein is introduced during the manufacturing process, the beverage tends to thicken into a substance that is more like a pudding, rather than a liquid beverage.

45.     Upon information and belief, in recent years, many beverage manufacturers have tried to solve the problem of viscosity when formulating ultrafiltered milk-beverages with high amounts of protein, without success. A common strategy for addressing viscosity issues in beverages, which is adjusting gum stabilizers, was not successful in addressing the issue. Prior to Defendants' breakthrough with Nurri, Defendants are aware of only one other beverage company, the national leading brand, that offered a shelf-stable 30g protein ultrafiltered milk-based product.

46.     Defendants deployed its research and development experts to tackling this problem, in an intensive months-long development process. In February 2024, Defendants consulted with a doctoral candidate at the University of Tennessee, who would later come to work with Defendants full-time. The candidate, who had no exposure to Slate's manufacturing and was not

on-site with Defendants at the time, suggested utilizing a novel solution to solve the issue of producing a high protein ultrafiltered milk-based shake. Utilizing this framework, Defendants' employees (including an individual with a doctorate in Chemistry, and another with a Bachelor's of Science degree in Food Science and Technology and over 30 years of industry experience) worked to develop the idea and invent a functioning method to produce a high protein ultrafiltered milk beverage. Defendants tested approximately 150 to 200 iterations of Nurri before it was finally approved.

47. After significant effort, Defendants ultimately succeeded in developing an innovative approach to formulating high protein ultrafiltered milk-based beverages that retain a smooth and creamy texture at cool temperatures. Defendants' unique approach is a solution that differs from the use of stabilizer gums that is the common approach in the beverage industry to improve texture, viscosity, and density of beverages, and to prevent ingredients from separating. To Defendants' knowledge, no other beverage manufacturer uses the same approach that Defendants developed to create high protein ultrafiltered milk-based beverages. Defendants used this unique approach to formulate and manufacture Nurri.

48. Defendants developed its unique approach to manufacturing Nurri through significant research and development efforts—not based on confidential information from Slate or any other entity. No Slate information was considered when developing Nurri. Slate did not use the same approach Defendants developed to create high protein ultrafiltered milk-based beverages for any of the products Slate asked Defendants to co-manufacture. The 20g protein beverages Slate sells on the market rely on stabilizer gums commonly used in the beverage industry to address texture and viscosity.

-73-

49.    On or around March or April 2024, Trilliant began exploring filing a patent application for its unique method for formulating ultrafiltered milk beverages containing over 24g of protein with viscosity stability.  Trilliant filed a provisional patent application related to its method on August 20, 2024.

50.    In addition to developing its innovative approach to incorporating additional proteins to ultrafiltered milk, Defendants conducted dozens of additional tests on flavor and thickness of the Nurri milk shakes.  Defendants worked in close partnership with Costco throughout the process to ensure that it met Costco's expectations that the Nurri milk shakes are comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake.  For example, Defendants tested at least 50 iterations of the Nurri chocolate flavor to achieve a flavor profile comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

51.    Defendants invested millions of dollars in the development of Nurri.  This included paying their research team, including doctorates in food science, third party consultants on food chemistry; the use of testing machines and bench time; costs associated with manufacturing and shipping samples, and updating formulas on a feedback loop from Costco dozens of times; and costs related to market research and developing a marketing and advertising strategy.

52.    Defendants were able to commercialize Nurri in the span of months because of their expertise, investment of resources, consistency in their iterations and formulas, and their capabilities as vertically-integrated manufacturers that allowed them to adjust stabilizers and other ingredients allowed them to quickly learn and innovate.

53.    Nurri milk shakes share a number of similarities to the national leading brand's chocolate 30g protein ultrafiltered milk shake that Defendants were asked by Costco to target: both are Grade A dairy products that are made with ultrafiltered milk, are lactose-free, contain 30g

of protein, contain 150 calories, and contain the same or similar amounts of sugar, fat, vitamin A, Vitamin D, Calcium, Iron, Potassium, Phosphorus, Iodine, Magnesium, Zinc, and Chloride.

54.     By contrast, the Nurri beverage differs in several significant respects from Slate's beverages, as further alleged in Section IX below.

**V.      Slate Manufacturing Agreement**

55.     On March 17, 2023, Horseshoe and Slate entered into the Beverage Contract Manufacturing Agreement (the "Manufacturing Agreement") with an effective date of January 1, 2023.  **Exhibit A**.

56.     The initial term of the Manufacturing Agreement was January 1, 2023 to December 31, 2025.  Manufacturing Agreement § 3.

57.     Under the Manufacturing Agreement, Slate contracted with Horseshoe to produce and package certain beverages specified in an appended Beverage Product and Pricing Exhibit: Slate's Mocha Latte, Vanilla Latte, French Vanilla – Stevia, Classic Chocolate, and a TBD flavored beverage.  The Exhibit specifies that the "Manufacturer," defined as Horseshoe, "is not providing any guarantees of production outside of the brands and packages listed," and that "[o]ther brands and packages may be agreed in writing by the parties hereto from time to time, after which such changes shall become a part of this Exhibit."

58.     Each of the beverages listed in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement for production contain 20 grams of protein.  The parties never amended the Beverage Product and Pricing Exhibit to include a product containing 30 grams of protein.

59.     Relevant provisions of the Manufacturing Agreement state as follows:



-75-



4.4.1 Customer and Manufacturer agree that any amounts paid by Customer to Manufacturer pursuant to this Agreement in connection with the Minimum Order Commitment production fees shall be in the nature of liquidated damages (and not a penalty), and (i) represent the Parties' best, good faith efforts to estimate Manufacturer's actual damages if Customer does not purchase the Minimum Order Commitment; (ii) Manufacturer's actual damages would be difficult to ascertain and calculate with precision; (iii) are reasonable under the circumstances, including but not limited to the capital and other commitments Manufacturer will make in reliance



5. <u>BEVERAGE</u>

Each Beverage shall be produced in accordance with a Formula provided by Customer and approved by Manufacturer, such approval not to be unreasonably withheld. To the extent Customer supplies any Ingredients, Customer shall furnish, or cause to be furnished, Manufacturer Certificates of Analysis, Packing Lists, and individual Pallet Labels for all such Ingredients at time of delivery and Manufacturer shall be entitled to rely on the accuracy of such Certificates of Analysis for all purposes."



## 7. PROCUREMENT

7.1 <u>Generally</u>.  Unless the Parties agree otherwise in writing, Customer shall procure those Ingredients and Packaging Materials required to manufacture the Beverage Product.

## 8. DELIVERY

All Packaged Beverage(s) are delivered Ex Works Manufacturer's production facility.  Legal title to the Packaged Beverage passes at the same time risk of loss passes under the Ex Works Incoterm.  Manufacturer will not be liable for the carrier's failure to deliver as estimated or for damage, contamination or loss

occurring in shipment. If Manufacturer prepays any freight or related costs for the benefit of Customer, Customer shall reimburse Manufacturer therefor. Any other provision of this Agreement to the contrary notwithstanding, Manufacturer shall have the right, upon written notice, to withhold delivery to Customer of any Beverage that fails to meet Packaged Beverage Specifications.

8.2 <u>Carriers</u>. All carriers selected by Customer to take shipments on behalf of Customer shall be subject to Manufacturer's approval, which approval shall not be unreasonably withheld or delayed.



9.2 <u>Invoicing</u>. Four weeks prior to each planned Production Campaign, Manufacturer shall invoice Customer for the Production Fees, and, if applicable, any Ingredients and Packaging Materials procured by Manufacturer for such Production Campaign. Customer agrees to pre-pay this invoice at least two weeks prior to commencement of the Production Campaign. In the event that Customer does not pay within two weeks of the planned production, Manufacturer has the right to cancel production and Customer shall be responsible for picking up any Customer-provided ingredients and materials for the planned production or, alternatively, paying Manufacturer storage fees as described in Section 7.2 or paying Manufacturer for the cost of discarding these materials.

9.3 <u>Disputed Invoices</u>. If Customer in good faith disputes any portion of an invoice, Customer shall pay the undisputed portion of the invoice and submit written notice to Manufacturer regarding the disputed amount, which notice shall include documentation supporting the alleged billing error (each such notice, a "Fee Dispute Notice"). A Fee Dispute Notice must be submitted to Manufacturer within thirty (30) days from the date of the invoice. Customer waives the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period. The Parties shall negotiate in good faith to attempt to resolve any such disputes within sixty (60) days after Customer's delivery of the applicable Fee Dispute Notice. Fee disputes unresolved within that time period shall be resolved by the mediation and arbitration procedures set forth in Sections 27 below.

-78-

11.  INSPECTION AND RETURNS

Customer has the right to inspect and evaluate the Packaged Beverage to ensure that it is suitable for Customer's purposes.  Customer shall, within thirty (30) days of receipt, notify Manufacturer in writing if any of the Packaged Beverages have not been produced or packaged in compliance with the Specifications and provide Manufacturer with evidence thereof including samples of the Packaged Beverage. If timely notice is received by Manufacturer, Manufacturer shall credit to Customer the amounts paid for all non-conforming beverages as well as all cost of disposal or return on the next invoice until the entire credit has been applied.

15.3  Customer Supplied Ingredients and Packaging Materials.  For Customer supplied Ingredients and Packaging Materials, Customer shall indemnify, defend and hold Manufacturer harmless from any and all liability arising out of claims made by third parties against Manufacturer related to or regarding the Customer supplied Ingredients and or Packaging Materials.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL THE PARTIES BE LIABLE TO THE OTHER PARTY OR TO THE OTHER PARTY'S OFFICERS, EMPLOYEES OR REPRESENTATIVES, OR TO ANY THIRD PARTY, FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY NATURE (INCLUDING, BUT NOT LIMITED TO, LOSS OF BUSINESS, LOST PROFITS, DAMAGE TO GOODWILL OR REPUTATION AND/OR INTERRUPTION DEGRADATION IN VALUE OF BRANDS, TRADEMARKS, TRADENAMES, SERVICE NAMES OR SERVICE MARKS).  NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, MANUFACTURER'S ENTIRE AGGREGATE LIABILITY TO CUSTOMER OR ANY THIRD PARTY UNDER THIS AGREEMENT IS LIMITED TO THE AMOUNTS PAID BY CUSTOMER TO MANUFACTURER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

19.  CONSENT TO JURISDICTION AND PREVAILING PARTY ATTORNEYS' FEES

Each of the Parties consents and voluntarily submits to personal jurisdiction in the State of Wisconsin and agrees that the state and federal courts in such state located in Winnebago County, Wisconsin and the United States District Court for the Eastern District of Wisconsin have jurisdiction to settle any proceeding arising out of or relating to this Agreement, and agrees that all claims raised in such proceeding shall be heard and determined exclusively in such courts.  Each of the Parties further consents and agrees that such Party may be served with process in the same manner as a notice may be given under this Agreement.

If a suit, action, or other proceeding of any nature whatsoever (including any proceeding under the US Bankruptcy Code) is instituted in connection with any

-79-

controversy, interpretation, or enforcement of any rights under this Agreement, the Party substantially prevailing will be entitled to recover its attorney and all other reasonably necessary fees, costs, and expenses actually incurred in connection with that proceeding, in addition to all other amounts provided by law. The court will determine which Party is substantially prevailing taking into account the number and importance of all claims and defenses, the outcomes of those claims, and any offers of settlement made by the Parties.

21. <u>CONFIDENTIALITY</u>
21.1 <u>Confidential Information</u>. Manufacturer and Customer acknowledge that in the performance of this Agreement, each Party may obtain information from the other Party deemed confidential. "Confidential Information" means all information and materials regarding the business of either Party that are identified in writing by the Party to be confidential information or which a party should reasonably believe to be confidential information of a Party, including contracts (including this Agreement), the Formula or other recipes, Packaged Beverage Specifications or other technical specifications, business plans, formulas, know-how, financial information, historical financial statements, financial projections and budgets, historical and projected sales, pricing strategies and other pricing information, marketing plans, research and consumer insights, capital spending budgets and plans, the names and backgrounds of key personnel, personnel policies, plans, training techniques and materials, organizational strategies and plans, employment or consulting agreement information, Customer agreements and information (including for distributors or retailers), names and terms of arrangements with vendors or suppliers, or other similar information. "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach by the receiving Party or its affiliates of its obligations of confidentiality and non-use set forth herein or (b) was available to the receiving Party or its affiliates on a nonconfidential basis prior to disclosure by the disclosing Party.

21.2 <u>Obligations</u>. Unless otherwise agreed to in writing by the Party disclosing the Confidential Information (the "**Disclosing Party**"), the other party (the "**Receiving Party**") shall (and shall cause its affiliates to) (a) keep confidential all Confidential Information of the Disclosing Party and not disclose or reveal any of such Confidential Information to any Person other than those directors, officers, employees, stockholders, legal counsel, accountants, and other agents of the Receiving Party or its affiliates (the "**Representatives**") who are actively and directly participating in the performance of the obligations and exercise of the rights of the Receiving Party under this Agreement, provided that the Receiving Party shall be responsible for the breach of this Agreement by any such Representatives, and (b) not use Confidential Information of the Disclosing Party for any purpose other than in connection with the performance of the obligations and exercise and enforcement of the rights of the Receiving Party hereunder. The obligation to maintain the confidentiality of and restrictions on the use of Confidential Information hereunder include any Confidential Information of the Disclosing

Party obtained by the Receiving Party prior to the date hereof. If the Receiving Party is required by a requirement of law or government order to disclose Confidential Information of the Disclosing Party, the Receiving Party shall, to the extent not prohibited by law, provide notice thereof to the Disclosing Party and, after consultation with the Disclosing Party and, at the sole cost and expense of the Disclosing Party, reasonably cooperating with the Disclosing Party to object to or limit such disclosure, shall be permitted to disclose only that Confidential Information so required to be disclosed.

21.3 Protection. The Parties agree that the Confidential Information provided under this Agreement is competitively sensitive, and the Receiving Party shall establish, implement and maintain procedures and take such other steps that are reasonable to prevent disclosure of such Confidential Information to any person other than those Representatives to which disclosure is determined to be advisable in connection with the performance of the objectives and exercise of rights under this Agreement, but in no event may the Receiving Party use less than the degree of care that it takes to protect its own confidential information of a similar nature.

BEVERAGE PRODUCT AND PRICING EXHIBIT

Quality Assurance Exhibit – Part A
Customer will provide manufacturing instructions as part of the Beverage Specifications. Any issues related to product specifications as documented will be the responsibility of Customer.

60.     Under the Manufacturing Agreement, Slate was responsible for providing beverage formulations. Section 5 of the Agreement provides that "[e]ach Beverage shall be produced in accordance with a **Formula provided by Customer**…." Manufacturing Agreement § 5 (emphasis added). Section 5.2 further provides that "Customer shall own the Formula in its entirety and Manufacturer will manufacture the Beverages in accordance with the Formula for the Customer."

61.     The "Formula" is defined as "[t]he written instructions set forth in the Quality Assurance Exhibit – Part A or otherwise agreed by the Parties in writing from time to time for combining specified quantities of Ingredients to produce the Beverage." Manufacturing Agreement § 2.10.

-81-

62.     The Quality Assurance Exhibit – Part A, in turn, sets forth ingredients and product specifications for each beverage.  It also states that "Customer will provide manufacturing instructions as part of the Beverage Specifications.  Any issues related to product specifications as documented will be the responsibility of Customer."

63.     The Quality Assurance Exhibit – Part A further states that the specifications it contains are "based on small-scale production/theoretical values from beverage technology.  Final specifications may differ and need to be revised from those stated above, based upon collections of data from large scale production runs."  Furthermore, the Exhibit provides that "Customer will direct shelf life as part of the Beverage Specifications.  Any issues related to shelf life (e.g., instability, separation, flavor migration) will be the responsibility of Customer."

64.     Significantly, the Manufacturing Agreement does **not** require Horseshoe to assist with research and development in the formulation of any of the products set forth in the Beverage Product and Pricing Exhibit beyond such assistance needed to update formulations for production and to improve batching times in Horseshoe's facility.  Specifically, the Agreement provides that ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ Manufacturing Agreement § 5.4.  The Agreement further specifies that any further ████████ ████████████████████████████████████████ *Id.*  Horseshoe has not invoiced Slate for such further R&D time, and Slate has not paid any amount to Horseshoe for further R&D time.

65.     The Manufacturing Agreement also does not obligate Horseshoe to produce any new beverage product, or ████████████████████ Slate requests.  Manufacturing Agreement § 4.5. But the Manufacturing Agreement requires Slate to ████████████████████████ ██████████████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████

66.     Upon information and belief, Slate has released new beverage products during the term of the Manufacturing Agreement without using good faith efforts to first offer Horseshoe the opportunity to produce and sell these new beverage products.  For example, Slate debuted Classic Strawberry and Sweet Cream Latte flavors on September 5, 2024, without first offering Horseshoe the opportunity to produce or sell these new beverage products.

67.     Unless the Parties agree otherwise in writing, the Manufacturing Agreement also sets forth that Slate is responsible for procuring ingredients and packaging materials required to manufacture beverages under the agreement.  Manufacturing Agreement § 7.1.  Slate is further responsible for ████████████████████████████████████████

███████████████████ *Id.* § 7.4.

## VI.     Horseshoe's Production of Slate's 20g Protein Formulations

68.     Upon entering into a co-manufacturing relationship with Horseshoe, Slate provided Horseshoe with pre-developed ingredients and product specifications for the 20g protein beverages Horseshoe agreed to manufacture, as set forth in the Beverage Product and Pricing Exhibit and the Quality Assurance Exhibit – Part A to the Manufacturing Agreement.  Because Slate had already commercialized the 20g protein beverages, Slate had already identified suppliers, product ratios, and calculations for the manufacturing process of the 20g protein beverages.

69.     Slate did not, however, provide detailed manufacturing instructions, which are typically provided by co-manufacturers and specify, among other things, the order ingredients are added and the thermal processing time to heat the formulation to create a commercially sterile product.

70.     Since food manufacturing facilities differ based on their machines and volume capacity, among other elements, Horseshoe worked with Slate to ensure that the productions at Slate was consistent with prior productions, including updating its 20g protein milk shake formulations to qualify for production and improve batching times at Horseshoe's manufacturing facility.

**VII.     Slate's Production Orders Decrease**

71.     Under Section 4.4 of the Manufacturing Agreement, Slate agreed to a Minimum Order Commitment of ▬▬▬ cases per year across all agreed upon beverages in the Beverage Product and Packaging Exhibit.  The cost per case was set at ▬▬▬ in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement.  The Beverage Product and Pricing Exhibit also dictated that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Manufacturing Agreement, Beverage Product and Pricing Exhibit (emphasis added).

72.     If Slate fails to purchase the Minimum Order Commitment of ▬▬▬ cases in a given year, Slate agreed that Horseshoe may invoice Slate ▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Manufacturing Agreement § 4.4.  Section 4.4.1 equates such a fee to be ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

73.     Slate's production orders slowed in 2024.  During the first quarter of 2024, Slate ordered only ▬▬▬ cases, of which ▬▬▬ cases were attributed to its 2023 Minimum Order Commitment, to be produced and shipped.  By the end of July 2024, Slate had only ordered ▬▬▬

of its Minimum Order Commitment, or ███████ cases, to be produced.  No further production order was ever placed.

74.     When Slate's production orders slowed such that it might not make sufficient orders for the Minimum Order Requirement under the Manufacturing Agreement, Slate approached Horseshoe about potentially changing some of the terms of the Manufacturing Agreement, including a reduction in price.  Slate also offered Horseshoe a potential equity stake in Slate. Horseshoe told Slate that any reduction in price in 2024 and 2025 would need to be offset with additional volume to recover profit impact.  Horseshoe also responded that it was not interested in obtaining an equity interest in Slate.

75.     Although Horseshoe is not required to do so under the Manufacturing Agreement, Horseshoe sought to help Slate increase its sales volumes over the course of the parties' co-manufacturing relationship.  This included Horseshoe recommending to Costco Canada to carry Slate, prompting outreach from Costco Canada to Slate in December 2023.

76.     Horseshoe also gave Slate leeway on the payment provisions of the Manufacturing Agreement, including by ████████████████████████ as dictated by the Beverage Product and Pricing Exhibit of the Manufacturing Agreement, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Horseshoe made these accommodations without waiving any rights under the Manufacturing Agreement.[3]

---

[3] Section 18.2 of the Manufacturing Agreement provides that a party's failure to require strict performance of any of the provisions shall not waive or diminish any that party's right thereafter to demand strict compliance, and that a party shall not be deemed to have waived rights unless such waiver is in writing and signed by an authorized officer.

## VIII.  Slate Unsuccessfully Explores a Potential Higher Protein Product

77.     On January 10, 2024, Slate emailed certain of Horseshoe's employees about a new Slate beverage containing 30 grams of protein and added vitamins and minerals that Slate hoped to bring to market.  Slate claimed that it had completed its formula, with the exception of added vitamins and minerals, which it acknowledged may impact taste or mouthfeel of the beverage. Slate did not provide its formula ingredients at that time and noted that the ingredients would be nearly the same as its 20g protein product, but at different percentages.  Slate acknowledged the issue of stabilizers in this initial email, stating that it may need to adjust its stabilization process to get the desired results.

78.     On January 30, 2024, Slate provided Horseshoe with a formula for the potential 30g beverage that specified only a list of ingredients and their proportions, indicating to Horseshoe that input is welcome "but not required."  Slate acknowledged that the formula did not yet include the added vitamins and minerals mix.  Slate did not provide instructions on how manufacture a finished product, such as the order of ingredients, mass and volumes of ingredients, heating temperatures, heating time, anticipated specifications for key checkpoints along the batching process, and anticipated specifications for finished product solids or pH ranges.  Critically, Slate also did not provide instructions on how to incorporate stabilizer gums into the solution.  When Horseshoe's employees asked about these details, Slate provided only early pH and solids estimates from its formulator.

79.     On February 5, 2024, Horseshoe's employees told Slate that it would be best to get a final vitamin blend to start lab work to adjust the formula for Horseshoe's manufacturing plant, as any alteration could change the many pieces of the development process.  Horseshoe's employees also requested samples to match the intended attributes of the ultimate product.  In

response, Slate asked Horseshoe to proceed with creating the 30g protein product without the added vitamins and minerals. Slate again acknowledged that "we will still likely need to test the stability system" on thermal processing to create a commercially sterile product.

80.     Having not received complete information from Slate about how to create a potential Slate 30g protein product beyond ingredients, Horseshoe applied the same batching instructions used for the Slate 20g protein products to create trial samples of the potential Slate 30g protein product. However, it quickly became clear that Horseshoe needed to amend its bench process because Slate's proposed 30g protein formula stratified and became unstable.

81.     By the end of February 2024, Horseshoe produced lab samples of the potential Slate 30g protein product. Horseshoe's employees indicated to Slate that they dropped the stabilizer gum level down to the same level as the Slate 20g protein product due a concern about thermal processing times. The lab samples required refrigeration and were not shelf-stable, and were sent to different recipients at Slate. Horseshoe has no visibility into whether the samples were exposed to variables that would affect these early samples, including the temperature at which they were served, the length of time that passed before they were sampled, and whether the cans were agitated before sampling.

82.     The feedback loop on Slate's potential higher protein product moved slowly. Horseshoe waited for extended periods to receive responses from Slate about trial samples or questions on the formulation and manufacturing process. Slate worked with its third-party formulator to provide feedback and iterate on formulations, and provided piecemeal and incomplete information to Horseshoe. Throughout the process, Slate failed to provide technical information on how to get the formulation to perform and result in an acceptable finished product.

83.     In March 2024, Horseshoe produced additional samples of a potential 30g protein product for Slate.  Horseshoe's employees indicated to Slate that they were finding gelling and thickening in the samples, likely because of "how the high protein is reacting," and suggested that Slate contact its formulator.  Horseshoe's employees also indicated that the samples they received from Slate's formulator also had thickened.  Slate acknowledged that the gelling "could be due to the stabilizer levels with the increased protein level" and that Slate was interested in seeing results with decreased stabilizers.

84.     On April 1, 2024, when Slate reported that the potential 30g protein product samples that Horseshoe had a different flavor and sweetness than expected, Horseshoe's employees indicated that stabilizer combinations in the formula were impacting the samples.

85.     On June 4, 2024, the same day that Costco independently approved Defendants' product as successful alternative to the national leading brand, Slate provided three updated formula iterations for a 32g, rather than a 30g, protein shake that it wanted Horseshoe to trial.  The formula iterations included a new flavor and employed multiple different sweeteners and stabilizers.  Slate acknowledged that the formulations reflect "some significant changes we believe will help solve some of the issues we have experienced in prior versions."  Horseshoe's employees responded with concerns about the use of the multiple stabilizers and asked Slate to work with its formulator to outline the process they used, including batching order of operations with mass and volumes of ingredients, temperatures, and anticipated specifications for key checkpoints along the batching process.

86.     Horseshoe generated and sent to Slate and its formulators samples of the new formulas in July.  Slate did not send further feedback on these samples.

87.     Horseshoe ultimately tested over a dozen formulas for Slate of a potential higher protein product with varying levels of protein and other ingredients.  As with the 20g protein formulations, Slate did not engage Horseshoe to develop formulations for the potential higher protein product and did not pay Horseshoe for research and development time.  Rather, Slate worked with a third-party formulator to develop potential higher protein formulations.  Unlike the 20g formulations, however, which had already been commercialized, the potential higher protein formulations were in early conceptual stages of development.

88.     Slate's higher protein formulations continued to fail at trials, and Slate never proceeded past the proof-of concept phase with its planned higher protein beverage in its interactions with Horseshoe.  Slate's relationship with Horseshoe related to a higher protein version of Slate's 20g protein milk shakes was limited to exploring the formulation and manufacturing process for small-scale production of a potential higher protein product.  Slate did not approve a protein amount (which changed from 30g to 32g), flavor profile, any prototype, or move forward with any formulation with Horseshoe following the sampling process.  Horseshoe never conducted any heat penetration study or thermal processing of any Slate higher protein milk shake formulation that would be required before a formulation is ready to be scaled for commercial production.  Each of these steps would be necessary technical prerequisites before Slate higher protein milk shake formulation could reach the manufacturing floor for large scale production runs at Horseshoe's facilities.

89.     Slate did not seek to amend the Manufacturing Agreement, the Beverage Product and Pricing Exhibit, or the Quality Assurance Exhibit – Party A to include a beverage with more than 20g of protein.

90.     Upon information and belief, Slate has not launched any 30g protein milk shake beverage, or any beverage containing more than 20g of protein, to the market.

**IX.     Slate's Product Formulations Did Not Influence the Development of Nurri**

91.     Defendants' development of Nurri took place independent of any information from Slate.

92.     As alleged above, Defendants had begun separately developing a 30g ultrafiltered milk-based beverage as an alternative to a national leading brand product, at the request of Costco in late 2023.  On information and belief, Costco made similar requests of multiple manufacturers.

93.     Defendants had a longstanding relationship with Costco and did not learn of any opportunity with Costco because of Slate.

94.     Defendants began exploring development of an alternative to the national leading brand product with Costco before Slate provided the initial iteration of its ingredients for a potential Slate 30g protein product on January 30, 2024.

95.     As alleged above, Defendants invested considerable time and resources to developing their Nurri line of beverages, including developing a breakthrough method for addressing viscosity issues with high protein ultrafiltered milk-based beverages that is the subject of a provisional patent application.

96.     The 20g protein beverages that Horseshoe manufactured for Slate pursuant to the Manufacturing Agreement did not use the same method for addressing viscosity issues, but rather relied on stabilizer gums, which are commonly used in the beverage industry to improve texture, viscosity, and density of beverages, and to prevent ingredients from separating.

97.     Defendants took reasonable steps to prevent disclosure of any of Slate's alleged confidential information to any person other than a representative (as defined under Section 21.2

of the Manufacturing Agreement) to which disclosure of such information is advisable in connection with the performance of the objectives of the Manufacturing Agreement. Those steps included, but are not limited to, restricting access to Slate's formulation information to individuals needed to carry out the purpose of producing and packaging the beverages set forth in the Manufacturing Agreement.

98. Defendants maintained designated separate lab technician leads for Nurri and Slate. The lab technician lead for Slate did not work on Nurri and vice versa. The lab technicians did not share formula sheets. Feedback loops for Nurri and Slate were also separate.

99. Additionally, none of the external experts Defendants consulted on the formulation for Nurri worked on Slate's products or had visibility into Slate's formulations. The food scientist with a PhD focused on proteins that Defendants engaged in February 2024 worked remotely to help address the viscosity issue and did not have any interaction with Slate's formulations.

100. The makeup of the Nurri beverages differs in significant ways from Slate's 20g protein milk shakes currently on the market, as well as Slate's trial higher protein formulas. Differences in suppliers, ingredients, and types of stabilizers all impact a product's formulation.

   a. As alleged above, Slate's formulas did not use the same approach for addressing viscosity issues with high protein ultrafiltered milk-based beverages, but rather relied on stabilizer gums commonly used in the industry.

   b. Nurri, like the national leading brand, is sold as a Grade A milk product.[4] Slate's 20g protein beverages, by contrast, are not sold as a Grade A or even a milk product.

---

[4] Grade A milk is the grade suitable for drinking directly as milk. It passes the highest quality standards. The other grades that exist are AA, B, and C, though C is only used at the US state level, not the federal level. AA milk is exclusively used for making butter. B-grade milk does not meet the quality standards for being sold directly as milk,

c.  Nurri's formula uses a different potassium than those used in Slate's 20g protein products (which use Acesulfame Potassium) and trial higher protein formulations.

d.  Nurri's formula uses a pectin from a different supplier and at different specifications than Slate's 20g protein products and trial higher protein formulations.

e.  Nurri's formula uses a different cocoa than that used in Slate's 20g protein products and trial higher protein formulations.

f.  Nurri contains several ingredients, such as cream, phosphate, and sea salt, not present in Slate's 20g protein products and trial higher protein formulations.

g.  Slate's 20g protein products and trial higher protein formulations contain ingredients not included in Nurri's formulation.

## X.  Slate's Failures to Comply with the Manufacturing Agreement

101.  Section 9.2 of the Agreement provides the timing within which Slate is obligated to pay invoices.  Specifically, it provides that "Four weeks prior to each planned Production Campaign, Manufacturer shall invoice Customer for the Production Fees, and, if applicable, any Ingredients and Packaging Materials procured by Manufacturer for such Production Campaign." It is then Slate's responsibility to pre-pay the invoice "at least two weeks prior to commencement of the Production Campaign."  Manufacturing Agreement § 9.2.

102.  Slate owes Horseshoe, at a minimum, a total of $684,207.13 for total unpaid invoices.

---

but it is of sufficient quality that it can be used for industrial purposes.  This is the milk that gets used for making dehydrated nonfat milk powder and various other industrially-processed forms of milk.  C-grade milk, per some state laws, fails to meet the requirements for any other grade.

103.    Slate accepted products and did not timely dispute any part of these invoices pursuant to Section 9.3 of the Agreement, which mandates that a Fee Dispute Notice "must be submitted to Manufacturer within thirty (30) days from the date of the invoice.  Customer **waives** the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period."  Manufacturing Agreement § 9.3 (emphasis added).

104.    Slate also did not timely claim that there were any alleged packaging defects for any of the April or June 2024 productions.  The Manufacturing Agreement required Slate to "within thirty (30) days of receipt, notify Manufacturer in writing if any of the Packaged Beverages have not been produced or packaged in compliance with the Specifications and provide Manufacturer with evidence thereof including samples of the Packaged Beverage."  Manufacturing Agreement § 11.

105.    On July 29, 2024, Horseshoe placed Slate's production and release of inventory on hold in response to the $418,000 of overdue invoices from June 2024.  On or around the same date, Matt Knox called Slate founder, Manny Lubin, to discuss the overdue invoices.

106.    On August 1, 2024, Manny Lubin sent an email alleging that Slate had discovered damaged product including Damaged Cans for French Vanilla & Vanilla Latte.  Horseshoe acknowledged receipt of the August 1 email.

107.    On August 7, 2024, Slate employee Manny Lubin sent another email alleging that Slate had discovered purported product issues, including damaged cans.  Slate alleged the production issues began Q4 2023.

108.    Slate had never requested to inspect Horseshoe's facilities or products, and Horseshoe never denied Slate an opportunity to do so.  While the Manufacturing Agreement does not require Horseshoe to conduct any testing of cans Slate procures, after Slate raised potential

-93-

packaging defects, Horseshoe conducted a third-party analysis of unfilled cans that Slate procured for these productions. That analysis indicated that the can scuffing can be attributed to an insufficient cure on portions of certain cans, resulting in exposed aluminum on the exterior surface.

109. Slate raised the issue of alleged packaging defects **after** Horseshoe began seeking Slate's delinquent payments under the Manufacturing Agreement. Slate did not provide evidence of the cause of the alleged defects, but provided only photographs showing Slate products on a shelf with the alleged defects. Slate provided no evidence that the damage occurred at the manufacturing stage rather than at other points in the supply chain or at the retailer. Nor did Slate identify specific case amounts of the allegedly defective products.

110. On August 7, 2024, Slate provided Horseshoe with a proposed solution to the problem that "Horseshoe will release Slate from its 2024 minimum order commitment of ███ cases." At this point, it became clear to Horseshoe that Slate was raising issues to avoid fulfillment of its payment obligations.

111. The parties never agreed to modify Slate's ██████-case Minimum Order Commitment for the 2024 year under the Manufacturing Agreement.

112. Slate is subject to a binding Minimum Order Commitment of ██████ cases for each of the 2023, 2024, and 2025 years of the Manufacturing Agreement's Initial Term. Slate did not meet its Minimum Order Commitment in 2024.

113. In 2024, Slate only ordered and paid for the production of 253,450 cases attributable to the Minimum Order Commitment, which Horseshoe produced and delivered to Slate. █████████ ████████████████████████-case Minimum Order Commitment for 2024.

114. When the cost-per-case is ███████████████████████████ ██████████████████████ as the Beverage Product and Pricing Exhibit to the Manufacturing Agreement provides, the adjusted per-case cost is ██████

115. At an adjusted per-case cost of ██████ the ██████ cases remaining under Slate's 2024 Minimum Order Commitment amount to a total value of ██████.

116. At an adjusted per-case cost of ██████, the ██████ cases remaining under Slate's 2025 Minimum Order Commitment amount to a total value of ██████. The tolling amount is subject to further adjustment on January 1, 2025, as is provided for in the Manufacturing Agreement.

117. Rather than pay the past due amounts, on August 30, 2024, Slate sent a Notice of Breach Letter to Horseshoe (the "Notice Letter") noticing alleged packaging defects on the Slate products that Horseshoe was providing. The Notice of Breach Letter did not include a Fee Dispute Notice or address Slate's outstanding invoices.

118. Sections 9.3 and 27 of the Manufacturing Agreement require the parties to "attempt in good faith to resolve any disputes or controversy arising out of this Agreement promptly by negotiations between executive management… who have authority to settle the dispute or controversy." If these negotiations fail, then parties "agree to pursue non-binding mediation." This provision applies to the fee and invoice disputes.

119. In response to the August 30, 2024 letter, Horseshoe made multiple attempts over the next month to meet in good faith with Slate to resolve the dispute, consistent with Section 9.3 of the Manufacturing Agreement. Horseshoe also denied any breach, asserted that it was entitled to payment of amounts owed under the contract including unpaid invoices. Slate was unresponsive to Horseshoe's attempts to meet to resolve the dispute. When Slate did finally agree to an in-

-95-

person meeting, it canceled that meeting. Slate did not respond to Horseshoe's multiple attempts thereafter to schedule a meeting to resolve the dispute.

120.    On October 10, 2024, after having failed to respond to Horseshoe's requests to meet, Slate sent a "Notice of Termination of Beverage Contract Manufacturing Agreement," claiming that Horseshoe had "misappropriated Slate's New Product Confidential Information." Horseshoe responded on October 11, 2024 informing Slate of its intent to initiate an arbitration pursuant to Section 27 of the Manufacturing Agreement. Once again, Slate was not responsive to requests to mediate and instead, brought this litigation.

121.    Between June 2023 and September 2024, Horseshoe received a number of ingredients and materials supplied by Slate. Unused ingredients and materials received from these supplies also remained stored at Horseshoe's facilities for more than 60 days from Horseshoe's initial receipt of the items until Slate retrieved the items in December 2024.

### FIRST COUNTERCLAIM
### Declaratory Relief

122.    Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

123.    An actual controversy has arisen and now exists between Defendants, Horseshoe and Trilliant, and Plaintiff, Slate.

124.    As fully described above, Defendants are entitled to declaratory relief that Defendants developed Nurri independently and without the use of Slate's confidential information or claimed trade secrets.

125.    Defendants additionally request declaratory relief that Section 15.3 of the Manufacturing Agreement bars Slate from pursuing any indirect, consequential, incidental, special, punitive or exemplary damages, including but not limited to loss of business, lost profits,

damage to goodwill or reputation against Defendants, and that Horseshoe's total liability to Slate (to the extent such liability exists), is limited to the amounts Slate paid to Horseshoe under the Manufacturing Agreement during the twelve-month period before any event giving rise to such liability.

126.    Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

**SECOND COUNTERCLAIM**
**Breach of Contract**

A.    **Failure to Pay Invoices**

127.    Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

128.    The Manufacturing Agreement is a valid contract between Horseshoe and Slate.

129.    Horseshoe has performed all or substantially all of the essential obligations which the Manufacturing Agreement required it to do or was excused from performance due to Slate's breach of the Manufacturing Agreement.

130.    All conditions required by the Manufacturing Agreement for Slate's performance have occurred.

131.    Slate owes Horseshoe at least $684,207.13 for unpaid invoices.

132.    Slate never paid Horseshoe for the product delivered in June 2024.

133.    Section 9.3 of the Manufacturing Agreement sets forth the process to dispute any invoice: "If Customer in good faith disputes any portion of an invoice, Customer shall pay the undisputed portion of the invoice and submit written notice to Manufacturer regarding the disputed amount, which notice shall include documentation supporting the alleged billing error (each such

-97-

notice, a 'Fee Dispute Notice'). A Fee Dispute Notice must be submitted to Manufacturer within thirty (30) days from the date of the invoice." Section 9.3 also dictates that Slate waives its right to dispute any fee if notice is not provided within the 30-day period: "Customer waives the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period."

134.    Slate has not produced a Fee Dispute Notice to Horseshoe related to any of the May, June, and July 2024 invoices.

135.    Even if Slate timely disputed invoices from the July production with proof of alleged defects (an issue Horseshoe disputes) as required by the Manufacturing Agreement, Slate would still be obligated to pay the undisputed portion of the outstanding invoices. The undisputed portion of the invoices total at least $420,800.80.

136.    Slate has materially breached the Manufacturing Agreement by failing to either make timely payments on outstanding invoices or produce a "Fee Dispute Notice" within 30 days of the issuance of the invoice, as required under Section 9.3 of the Manufacturing Agreement.

137.    As a result, Slate's overdue, unpaid invoices now total, at minimum, $684,207.13, which has caused damage to Horseshoe and its business.

138.    As explained above, Horseshoe has suffered damage as a result of Slate's failure to pay its invoices and breach of Section 9.3 of the Manufacturing Agreement, and is entitled to recover all damages permitted by law.

139.    Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

-98-

**B.** **Anticipatory Repudiation of Remaining Guaranteed Minimums**

140.    Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

141.    The Manufacturing Agreement is a valid contract between Horseshoe and Slate.

142.    Section 4.4 of the Manufacturing Agreement provides a binding Minimum Order Commitment of ██████ cases per year, priced at a █████ cost per case as noted in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement.  Manufacturing Agreement § 4.4, Beverage Product and Pricing Exhibit.  The Minimum Order Commitment allows for Horseshoe to ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ *Id.*

143.    Horseshoe has performed all or substantially all of the essential obligations which the Manufacturing Agreement required it to do or was excused from performance due to Slate's breach of the Manufacturing Agreement.

144.    All conditions required by the Manufacturing Agreement for Slate's performance have occurred.

145.    Despite Horseshoe's substantial performance of its obligations under the Manufacturing Agreement, Slate issued a letter on August 30, 2024 and sent a Notice of Termination on October 10, 2024, purportedly terminating the Agreement.

146.    Slate anticipatorily repudiated its obligations under the Manufacturing Agreement by sending a Notice of Termination on October 10, 2024, and previously, through its letter on August 30, 2024.

-99-

147.    Horseshoe made efforts to continue performance under the Contract in response to the August 30 letter, and demanded adequate assurances from Slate that they would continue to fulfill their obligations under Section 4.4 of the Manufacturing Agreement.

148.    However, with Slate's October 10, 2024 Notice of Termination, Slate anticipatorily repudiated their obligations to accept and pay for the minimum order commitment of █████ cases per year, at a rate of at least █████ per case.  When the cost-per-case is adjusted █████ ████████████████████████████████████████████ as the Beverage Product and Pricing Exhibit to the Manufacturing Agreement provides, the adjusted per-case cost is █████.  This rate may be further raised in 2025, as allowed for in the Manufacturing Agreement.

149.    Section 4.4.1 of the contract provides that the Minimum Order Commitment production fees shall "be in the nature of liquidated damages."

150.    █████ cases remain under Slate's █████-case Minimum Order Commitment for 2024.  All █████ cases that comprise of Slate's 2025 Minimum Order Commitment remain unordered.

151.    Thus, for the remainder of 2024, Slate's anticipatory repudiation requires liquidated damages in the amount of $2,558,730 based on the █████ case shortfall with a tolling fee of █████ per case for 2024 pursuant to Section 4.4.1 of the Manufacturing Agreement.

152.    For the 2025 calendar year, Slate owes liquidated damages for all █████ cases.  Thus, the amount owed under Sections 4.4 and 4.4.1 of the Agreement for 2025 is $4,011,000 based on the adjusted per-case cost of █████.

153.    As explained above, Horseshoe has suffered damage as a result of Slate's breach of Section 4.4 of the Manufacturing Agreement and is entitled to recover all damages permitted by law.

-100-

154.    Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

Pursuant to Fed. R. Civ. P. 38(b), Defendants demand a jury trial on all claims herein so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Horseshoe and Trilliant request that the Court grant the following relief:

1.    A declaration that:

a.    Defendants developed Nurri independently and without the use of Slate's confidential information or claimed trade secrets;

b.    Section 15 of Manufacturing Agreement bars Slate from pursuing any indirect, consequential, incidental, special, punitive or exemplary damages, including but not limited to loss of business, lost profits, damage to goodwill or reputation against Defendants; and

c.    Section 15 of the Manufacturing Agreement limits Horseshoe's total liability to Slate, to the extent such liability exists, to the amounts Slate paid to Horseshoe under the Manufacturing Agreement during the twelve-month period before any event giving rise to such liability.

2.    Award Horseshoe damages in an amount to be proven at trial;

3.    Award Horseshoe and Trilliant their costs of suit, including attorney's fees as provided by Section 19 of the Manufacturing Agreement and otherwise allowed by law;

4.     Award Horseshoe and Trilliant prejudgment and post-judgment interest in the maximum amount allowed by law; and

5.     For such other and further relief as the Court deems proper.

Date: December 13, 2024

*/s/ Jenny Pelaez*
Jenny Pelaez
State Bar No.  326765
jpelaez@kslaw.com
King & Spalding LLP
633 W.  Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 433-4310

Frances R.  Fink
WI State Bar No.  1119705
King & Spalding LLP
500 W.  2nd Street, Suite 1800
Austin, TX 78701
E-mail: ffink@kslaw.com
Telephone: (512) 457-2010
Facsimile: (512) 457-2100

Brandon M.  Krajewski
WI State Bar No.  1090077
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2400,
Milwaukee, WI 53202-4428
brandon.krajewski@quarles.com |
Telephone: D.  414-277-5783 |
M.  920-412-1363

Nathan Oesch
WI State Bar No.1101380
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2400,
Milwaukee, WI 53202-4428
nathan.oesch@quarles.com

*Counsel for Defendants Horseshoe Beverage Company, LLC and Trilliant Food and Nutrition, LLC*

-102-