UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

| | |
|---|---|
| SLATE CRAFT GOODS, INC.<br><br>            Plaintiff,<br><br>    v.<br><br>HORSESHOE BEVERAGE COMPANY, LLC and TRILLIANT FOOD AND NUTRITION, LLC<br><br>            Defendants. | Case No.  1:24-CV-1292-WCG<br><br>[PUBLIC VERSION – UNREDACTED VERSION FILED UNDER RESTRICTION] |

**PLAINTIFF SLATE CRAFT GOODS, INC.'S
ANSWER TO DEFENDANTS' COUNTERCLAIMS**

Pursuant to Rule 8 of the Federal Rules of Civil Procedure, Plaintiff Slate Craft Goods, Inc. ("Slate" or "Plaintiff") hereby answers and asserts affirmative defenses to Defendants' Horseshoe Beverage Company, LLC ("Horseshoe") and Trilliant Food and Nutrition, LLC ("Trilliant") (together, "Defendants") Counterclaims, and in doing so deny the allegations set forth in the Counterclaims, except as specifically stated below.

Slate denies all allegations contained in the headings and all unnumbered paragraphs in the Counterclaims, except for such allegations as are explicitly and specifically admitted below. Defendants' Counterclaims contain a lengthy "Preliminary Statement," which contains unnumbered paragraphs, to which Slate does not believe it is necessary to respond. Nevertheless, to the extent necessary, Slate denies all the allegations in the "Preliminary Statement."  In response to the allegations in the specific numbered paragraphs in the Counterclaims, Slate answers the Counterclaims as follows:

1.      Defendants and Counterclaimants Horseshoe and Trilliant assert counterclaims against Slate for a declaratory judgment and breach of contract.

**ANSWER:** Slate admits Defendants have asserted two counterclaims against Slate, one for a declaratory judgment and the second for breach of contract, but denies that Defendants are entitled to judgment on either (or both) of such counterclaims. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 1.

2. *First*, Defendants seek a declaratory judgment that Defendants independently developed their breakthrough Nurri brand of beverages ("Nurri") without the use of Slate's confidential information or purported trade secrets. Over the last four-plus decades, Defendants have invested enormous effort and resources to establish expertise in developing and manufacturing innovative beverage and related nutrition products. Defendants set themselves apart in the beverage industry by employing a specialized team of food scientists and engineers, in addition to maintaining state-of-the-art and vertically-integrated manufacturing facilities.

**ANSWER:** Slate admits that Defendants seek a declaratory judgment against Slate as a counterclaim in this action, but denies that Defendants are entitled to the relief they requested. Slate admits that Defendants manufacture and sell the "Nurri" brand of beverages, but denies that they did so "without the use of Slate's confidential information or purported trade secrets." Slate admits that Horseshoe maintains "manufacturing facilities." Slate denies, at least based on its knowledge and experience, that "Defendants set themselves apart in the beverage industry by employing a specialized team of food scientists and engineers." Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 2, and therefore denies them on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 2.

3. In late 2023, Defendants' customer of almost a decade, Costco, informed Defendants that it wished to develop a beverage comparable to the national leading brand's 30g protein ultrafiltered milk shake beverage. This was a long-standing problem for Costco because it had been unable to find an additional supplier beyond the leading brand that could manufacture an ultrafiltered milk-based beverage with high levels of protein that retained a smooth texture, rather than thickening to a pudding-like consistency. On information and belief, around the same time period, Costco had asked multiple manufacturers to create a product similar to the national leading brand's product to alleviate demand and shortage of supply. Defendants tasked their team of experts with creating a novel solution that remained unsolved by other manufacturers. After millions of dollars of investment and hundreds of rounds of testing over the course of many

months, Defendants' experts succeeded where many others have failed: Defendants developed an innovative manufacturing process to formulate ultrafiltered milk-based beverages with high levels of protein (i.e., over 24g or more) that retain a smooth texture and desirable viscosity. Defendants' innovation relies on a patent pending innovative solution that is different from the stabilizer gums commonly used in the beverage industry to improve viscosity, including in Slate's products. The Nurri line of ultrafiltered milk-based beverages incorporates Defendants' breakthrough technology and is the result of a further intensive development process.

**ANSWER:** Slate admits that, between August 2022 and June 2023, Costco Wholesale Club Corp. ("Costco") asked Slate to "develop a 30g protein ultrafiltered milk shake beverage" because Costco wanted to grow its protein drink offerings in its stores, and because Slate was the natural choice, given it was (and is) the second largest player in the ultrafiltered milk-based protein drink market. Slate also admits that it made Horseshoe aware of this opportunity in late-November 2023 and that Horseshoe indicated that it wanted to be Slate's co-manufacturer for the New Slate Product.[1] Slate also admits Costco subsequently spoke to Slate about the New Slate Product, including in February 2024. Slate denies that Costco "had been unable to find an additional supplier beyond the leading brand that could manufacture an ultrafiltered milk-based beverage with high levels of protein that retained a smooth texture, rather than thickening to a pudding-like consistency." Slate denies any implication that Defendants' decision to develop Nurri and the alleged "intensive development process" did not make improper use of Slate's Confidential Information and/or trade secrets. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 3, and therefore denies them on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 3.

4. Defendants came up with their unique approach to developing Nurri through their own considerable research and development efforts—not from any confidential information or alleged trade secrets obtained from another entity, and certainly not from Slate, which has no technical expertise and no beverage containing more than 20g protein on the market. Indeed,

---

[1] All capitalized terms herein have the same meaning as in Slate's Complaint.

because Defendants believe that others in the beverage industry have not used the method they use to formulate Nurri for any other ultrafiltered milk-based high protein beverages, Defendants have filed a provisional patent application detailing their unique method.

**ANSWER:** Slate denies that Defendants did not use Slate's Confidential Information and/or trade secrets in connection with Nurri and/or the "research and development efforts" for Nurri and that Slate "has no technical expertise and no beverage containing more than 20g protein on the market." Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 4, and therefore denies them on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 4.

5.      Defendants further seek declaratory relief that, consistent with Section 15.3 of the Manufacturing Agreement between Horseshoe and Slate, Horseshoe's liability to Slate, which Defendants dispute exists, is limited to the amounts that Slate paid to Horseshoe during the twelve-month period preceding any purported breach. The Manufacturing Agreement also bars Slate from collecting indirect, consequential, incidental, special, punitive, or exemplary damages of any nature (including but not limited to loss of business and lost profits) from Defendants.

**ANSWER:** Slate admits that Defendants are seeking declaratory relief relating to Horseshoe's liability to Slate under the Manufacturing Agreement. Slate denies that Section 15.3 of the Manufacturing Agreement applies in any way to Trilliant, including because Trilliant is not a party to the Manufacturing Agreement. Slate refers the Court to the Manufacturing Agreement for a complete and accurate depiction of its contents. Slate denies the remainder of the allegations in Paragraph 5.

6.      *Second*, Horseshoe asserts a breach of contract claim against Slate for its failures to make payments plainly owed to Horseshoe under the Manufacturing Agreement. Slate entered into a Manufacturing Agreement with Horseshoe in early 2023 to co-manufacture specific lactose-free ultrafiltered milk-based shakes containing 20g of protein. Among other things, the agreement requires Slate to commit to a minimum volume of product at a contracted price through 2025 or pay Horseshoe the equivalent price multiplied by the equivalent volume. Notwithstanding Defendants' efforts to help Slate increase its production order volumes, Slate's production orders for its 20g product decreased such that it became apparent Slate would likely not hit its annualized contract volume in 2024 unless its production orders experienced a significant increase. Slate also failed to pay outstanding invoices for product Slate had accepted without utilizing the process provided by the Manufacturing Agreement to dispute these invoices. Rather than simply paying what it owed to Horseshoe, Slate concocted baseless

allegations regarding packaging defects and misappropriation of trade secret and confidential information to avoid its payment obligations under the Manufacturing Agreement.

**ANSWER:** Slate admits that Horseshoe is asserting a breach of contract claim against Slate as a counterclaim in this action, but denies that Horseshoe is entitled to the relief it seeks. Slate admits that it entered into the Manufacturing Agreement with Horseshoe on or about January 1, 2023. Slate refers the Court to the Manufacturing Agreement for a complete and accurate depiction of its contents. Slate admits that its "production orders" to Horseshoe decreased as a result of Horseshoe's failure to remedy (or even address) production problems/defect issues with the products Horseshoe was manufacturing for Slate. Slate admits that it provided Horseshoe proper notice of breach and termination of the Manufacturing Agreement. Slate denies the remainder of the allegations in Paragraph 6.

7. Horseshoe has been and continues to be damaged by Slate's failure to perform its obligations under the Manufacturing Agreement, including but not limited to Slate's (a) failure to pay outstanding invoices for Horseshoe's productions of Slate's 20g protein beverages, none of which is excused by Slate's belated assertions of packaging defects, and (b) failure to accept or pay for its minimum order commitment for 2024 or 2025. Horseshoe further seeks attorney's fees under Section 19 of the Manufacturing Agreement, which entitles the prevailing party to its attorney and other reasonably necessary fees, costs, and expenses incurred in connection with this litigation.

**ANSWER:** Slate admits that, in its counterclaim, Horseshoe is seeking attorney's fees under Section 19 of the Manufacturing Agreement, but denies that Horseshoe is entitled to them or that Slate has breached the Manufacturing Agreement. Slate lacks the information or knowledge sufficient to form a belief as to Horseshoe's belief that it "has been and continues to be damaged," and therefore denies all such allegations on that basis. Slate denies the remainder of the allegations in Paragraph 7.

## FACTUAL ALLEGATIONS

### I. Trilliant and Horseshoe

8. Trilliant has been a pioneer in the U.S. beverage market since 1979, when it was

founded as Victor Allen's Coffee. Trilliant produces an expansive portfolio of coffee and other beverage and nutrition products at state-of-the-art facilities located in Wisconsin.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 8, and therefore denies all such allegations on that basis.

9. Trilliant is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140.

**ANSWER:** Slate believes that Trilliant is a Wisconsin limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140. Slate lacks the information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 9, and therefore denies all such allegations on that basis.

10. Horseshoe was founded as part of the Trilliant family of companies in 2017 to expand beverage production capabilities. Horseshoe produces a broad array of ready-to-drink liquid (as opposed to dry) beverage and nutrition products.

**ANSWER:** Slate believes that Horseshoe and Trilliant share senior executive(s), ultimate owner(s), and employee(s), but states that Slate entered into the Manufacturing Agreement with Horseshoe, not Trilliant or the "Trilliant family of companies." Slate also admits that Horseshoe was one of Slate's co-manufacturers/co-packers for Slate's beverage products. Slate lacks the information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 10, and therefore denies all such allegations on that basis.

11. Horseshoe is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140.

**ANSWER:** Slate believes that Horseshoe is a Delaware limited liability company with its principal place of business at 1101 Moasis Drive, Little Chute, Wisconsin 54140. Slate lacks the information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 11, and therefore denies all such allegations on that basis.

12. Defendants develop, produce, and sell (a) their own brands, such as Nurri, (b) private label, customizable products for its customers, and (c) products for other brands through

6

co-manufacturing partnerships.

**ANSWER:** Slate admits that Defendants produce and sell Nurri. Slate admits that

Horseshoe was one of Slate's co-manufacturers/co-packers for certain of Slate's beverage

products. Slate denies any implication that Defendants "develop[ed]" Nurri without using

Slate's Confidential Information. Slate lacks the information or knowledge sufficient to form a

belief as to the remaining allegations in Paragraph 12, and therefore denies all such allegations

on that basis.

13. To meet consumer demand, over the course of the past 45 years, Defendants have invested hundreds of millions of dollars into its manufacturing facilities and employee resources to build its capabilities and product expertise.

**ANSWER:** Slate admits that Horseshoe was one of Slate's co-manufacturers/co-packers

for certain of Slate's beverage products. Slate lacks the information or knowledge sufficient to

form a belief as to the remaining allegations in Paragraph 13, and therefore denies all such

allegations on that basis.

14. As an example, Defendants employ in-house expert research and development staff with advanced degrees in food chemistry to create innovative products that match national brand targets. Defendants' scientific expertise and capability sets them apart from other manufacturers in the beverage industry.

**ANSWER:** Slate denies that, based on its experience with Horseshoe, "Defendants'

scientific expertise and capability sets them apart from other manufacturers in the beverage

industry." Slate lacks the information or knowledge sufficient to form a belief as to the

remaining allegations in Paragraph 14, and therefore denies all such allegations on that basis.

15. Defendants partner with multi-billion-dollar industry leaders in the beverage and coffee spaces as well as smaller beverage startup companies without technical benches or track records of beverage development at various stages of their process for developing and commercially manufacturing saleable product in the market.

**ANSWER:** Slate admits that it is a beverage startup company and that it entered into the

7

Manufacturing Agreement with Horseshoe. Slate denies that Slate is "without [a] technical bench[] or track record[] of beverage development at various stages of [its] process for developing and commercially manufacturing saleable product in the market." Slate lacks the information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 15, and therefore denies all such allegations on that basis.

16. Defendants are able to offer their co-manufacturing partners expertise and resources in research & development formulation, turn-key supply chain management inclusive of sourcing and procurement, superior processing capabilities, flexible packaging options, and merchandising and sales support.

**ANSWER:** Slate admits that Horseshoe was one of its co-manufacturing partners for certain of Slate's beverage products, but denies that Horseshoe offered Slate competent "expertise and resources in research & development formulation" or that Horseshoe offers "superior processing capabilities." Slate lacks the information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 16, and therefore denies all such allegations on that basis.

17. Defendants also partner with retailers, such as Costco and Walmart, who seek to expand their beverage offerings with quality and innovative branded products.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 17, and therefore denies all such allegations on that basis.

18. The expansive array of products that Defendants manufacture—either through their own brands, co-manufacturing relationships, or through third party retail brands—are available through numerous distribution channels and geographic regions, including retailers, food service distributors, e-commerce channels, and coffee houses.

**ANSWER:** Slate admits that, during the term of the Manufacturing Agreement, Horseshoe was one of Slate's co-manufacturers for certain of Slate's beverage products and that such Slate products were "available through numerous distribution channels and geographic regions, including retailers, food service distributors, [and] e-commerce channels." Slate lacks

the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 18, and therefore denies all such allegations on that basis.

19.    Defendants have previously manufactured and produced high protein and nutritional beverages. For example, in 2018, Defendants launched a suite of canned nutrition beverages in partnership with Walmart, featuring a 30g protein base under the brand name "Foundation Fitness."

**ANSWER:** Slate admits, during the term of the Manufacturing Agreement, Horseshoe manufactured certain of Slate's protein beverages. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 19, and therefore denies all such allegations on that basis.

20.    Since dairy is a common ingredient in coffee and other beverages Defendants produce, Defendants are also highly experienced with developing milk-based products and working with dairy suppliers.

**ANSWER:** Slate denies that Defendants are "highly experienced" in developing ultrafiltered milk protein beverages and in working with dairy suppliers for such beverages. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 20, and therefore denies all such allegations on that basis.

21.    Defendants are also experienced in developing beverages that use ultrafiltered milk and sourcing ultrafiltered milk from suppliers. Ultrafiltration processing is a commonly-used technique in the food, nutrition, and beverage industry that allows for the retention of specific components based on molecular weight. In the dairy industry, this technique allows for the retention of milk proteins with high molecular weight, and the removal of components such as water and lactose with low molecular weight. The ultrafiltration technique results in a milk that is lactose-free, lower in sugar, and higher in protein.

**ANSWER:** Slate admits that Horseshoe gained experience manufacturing beverages "that use ultrafiltered milk and sourcing ultrafiltered milk from suppliers" as a co-manufacturer for certain of Slate's "ultrafiltered" products under the Manufacturing Agreement, but denies that Horseshoe had any such experience prior to working with Slate. Based on Slate's interactions with Horseshoe, Slate denies that, aside from working with Slate under the Manufacturing

Agreement, that Horseshoe had any such experience "developing beverages that use ultrafiltered milk." Slate denies that "ultrafiltration processing" of milk is "common" in the protein beverage industry, but Slate lacks the information or knowledge sufficient to form a belief as to the allegations as to other industries and therefore denies such allegations on that basis. Slate denies the remainder of the allegations in Paragraph 21.

22.     Defendants have a history of working on numerous confidential projects involving ultrafiltered milk with its co-manufacturing customers. In 2019, for example, Defendants worked with a customer on a project to develop a 30g protein drink using ultrafiltered milk. Also in 2019, Defendants explored using ultrafiltered milk for a proposed nutritional shake for kids. In another example, in 2020, Defendants worked with another customer to develop a canned dairy beverage using ultrafiltered milk. In 2022, Defendants engaged in explorations with another customer to develop an energy drink using ultrafiltered milk.

**ANSWER:** Slate admits that Horseshoe "worked on" certain of Slate's beverages and the New Slate Product, and states that all such work was confidential and/or under the Manufacturing Agreement. Further answering, Slate states that Horseshoe never told Slate that it had experience working with ultrafiltered milk, and that Horseshoe's actions suggested otherwise. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 22, and therefore denies all such allegations on that basis.

23.     Because many of the products that Defendants produce are common within the beverage industry, it is not uncommon for Defendants to co-manufacture products that are similar in kind for multiple customers, or for a customer and Defendants' own private label. For example, Defendants produce single use coffee pods for their own brands, while also manufacturing coffee pods on behalf of Defendants' private label and co-manufacturing customers. This is a typical practice within the beverage private label and co-manufacturing space.

**ANSWER:** Slate admits that Horseshoe "produced" certain of Slate's beverage products under the Manufacturing Agreement, but denies that such products are "common within the beverage industry." Slate lacks the information or knowledge sufficient to form a belief as to the

10

allegations in Paragraph 23, and therefore denies all such allegations on that basis.

## II.    Slate

24.    Slate was founded in 2018 by Manny Lubin and Josh Belinsky, who were then recent college graduates. Upon information and belief, neither of Slate's cofounders had any degrees or background in manufacturing beverages.

**ANSWER:**  Slate admits that Manny Lubin and Josh Belinsky founded Slate in 2018,

that Mr. Belinsky graduated from college in 2018 with a degree in business, and that Mr. Lubin

graduated from college in 2015 with a degree in communications.  Slate denies the remainder of

the allegations in Paragraph 24.

25.    Slate is a Delaware corporation with its principal place of business at 237 Strasser Avenue, Westwood, Massachusetts 02090.

**ANSWER:**  Slate admits the allegations in Paragraph 25.

26.    In 2020, Slate was featured on the reality television show Shark Tank, in which entrepreneurs make business presentations to five venture capitalists (called "Sharks" on the program) who decide whether to invest in their companies. After Slate's presentation, all the Sharks declined to invest in Slate, citing several reasons, including that Slate had no existing revenue at the time and the taste of the product samples.[2]

**ANSWER:**  Admitted that Josh Belinsky and Manny Lubin appeared on the reality

television show Shark Tank in 2020, and that the "Sharks declined to invest in Slate."  Slate

refers the Court to the entire episode of the show for a complete and accurate depiction of the

contents of that show, rather than the website cited in  Paragraph 26, footnote 2.  Slate also states

that the presentation to the "Sharks" was longer, and included more information, than the edited

version which aired in television.  To the extent necessary, Slate denies the remainder of the

allegations in Paragraph 26.

27.    Upon information and belief, Slate does not develop or manufacture its own products in-house, but rather outsources to third parties everything required to bring a product to

---

[2] Kimberly E. Graf, *Slate Chocolate Milk Update / Shark Tank Season 11*, Shark Tank Recap Blog, https://sharktankrecap.com/slate-chocolate-milk-update-shark-tank-season-11/ (last visited Dec. 9, 2024).

market, including its research, development, manufacturing, distribution and marketing.

**ANSWER:** Slate denies the allegations in Paragraph 27.

28.     Upon information and belief, Slate began selling ultrafiltered and lactose-free milk-based products containing 20g of protein in 2019.

**ANSWER:** Slate admits that, in 2019, it began selling several "ultrafiltered and lactose-free milk-based products containing 20g of protein." To the extent necessary, Slate denies the remainder of the allegations in Paragraph 28.

29.     To Defendants' knowledge, Slate has not introduced any ultrafiltered milk-based beverage with 30g of protein, or any beverage containing more than 20g of protein, to the market.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as "Defendants' knowledge," and therefore denies all such allegations on that basis. Slate denies that it "has not introduced any ultrafiltered milk-based beverage with 30g of protein, or any beverage containing more than 20g of protein, to the market." To the extent necessary, Slate denies the remainder of the allegations in Paragraph 29.

**III.     Jurisdiction and Venue**

30.     This is an action for breach of contract and for a declaratory judgment.

**ANSWER:** Paragraph 30 contains legal conclusions that do not require a response. To the extent Paragraph 30 contains factual allegations or otherwise requires a response, Slate denies them.

31.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), as this action arises from same case or controversy as Slate's claims against Horseshoe and Trilliant in the above-captioned case.

**ANSWER:** Paragraph 31 contains legal conclusions that do not require a response. To the extent Paragraph 31 contains factual allegations or otherwise requires a response, Slate denies them.

32.     This Court has personal jurisdiction over Slate because it transacted business in part by contracting to receive services from Horseshoe and Trilliant within Wisconsin and this district which give rise to this action. This action arises out of Slate's contacts with Wisconsin and this district. Slate has availed itself of the privilege of doing business in Wisconsin.

**ANSWER:** Slate admits that it entered into the Manufacturing Agreement with

Horseshoe and that Horseshoe is located in Wisconsin, but denies that it "contract[]ed to receive

services" from Trilliant "within Wisconsin and this district" or otherwise. The remainder of

Paragraph 32 contains legal conclusions that do not require a response. To the extent Paragraph

32 contains additional factual allegations or otherwise requires a response, Slate denies them.

33.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, or omissions giving rise to Defendants' claims occurred in this district, and because the Manufacturing Agreement provides that Slate and Horseshoe agree that disputes "arising out of or relating to" the Manufacturing Agreement may be "hear and determined in this district."

**ANSWER:** Slate admits that Horseshoe is located in Wisconsin and that the

Manufacturing Agreement "provides that Slate and Horseshoe agree that disputes 'arising out of

or relating to' the Manufacturing Agreement may be 'hear and determined in this district.'" The

remainder of Paragraph 33 contains legal conclusions that do not require a response. To the

extent Paragraph 33 contains additional factual allegations or otherwise requires a response,

Slate denies them.

## IV.     Defendants' Independent Development of Nurri

34.     One of Defendants' brands, Nurri, offers high protein milk shakes that are sold at Costco locations throughout the United States. Nurri milk shakes are made with ultrafiltered skim milk, are lactose-free and low sugar, and contain 30 grams of protein.

**ANSWER:** Slate admits that Nurri is sold at one or more Costco locations in the United

States and that, according to Nurri's packaging states that the each serving of the beverage

contains (among other things) "ultra filtered skim milk" that has been rendered lactose free, 1g

sugar (0g added sugar), and contains 30g of protein. Slate admits that Nurri's packaging states

that it is manufactured by Horseshoe and that public documents suggest that Nurri is a Trilliant "brand." To the extent necessary, Slate denies the remainder of the allegations in Paragraph 34.

35. The process for Defendants' development of the Nurri beverages began with a request from Costco. Defendants have a long-standing relationship with Costco dating back several years, and Defendants have been manufacturing coffee products for Costco in the United States and Canada since 2015.

**ANSWER:** Slate denies that Defendants have provided factual allegations in these Counterclaims that "[t]he process for Defendants' development of the Nurri beverages began with a request from Costco." Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 35, and therefore denies all such allegations on that basis.

36. On or around December 6, 2023, Costco Canada visited Defendants' manufacturing facility. During the visit, Costco Canada inquired about Defendants' capabilities to produce high protein beverages. Following that visit, Costco Canada asked Defendants for a quote to formulate and manufacture such a product for Costco.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 36, and therefore denies all such allegations on that basis.

37. Costco Canada told Defendants that it was interested in a product that would be comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake. According to its packaging, the national leading brand's chocolate protein shake is made with ultrafiltered milk, is lactose-free, and contains 30 grams of protein, 2 grams of sugar, and a blend of vitamins and minerals.

**ANSWER:** Slate lacks the information or knowledge as to what "packaging" in Paragraph 37 refers to, and therefore denies all such allegations relating such "packaging." Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 37, and therefore denies all such allegations on that basis.

38. Defendants understood that Costco was interested in an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk shake due to rising demand and significant supply constraints in the ultrafiltered milk protein beverage market. Upon information and belief, including conversations with other formulators in the beverage industries, Costco had

14

approached other manufacturers around the same time regarding creating an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

**ANSWER:** Slate lacks the information or knowledge as to what "Defendants understood" and therefore denies all such allegations relating such "understanding" on that basis. Slate admits that, between August 2022 and June 2023, Costco first asked Slate to "develop a 30g protein ultrafiltered milk shake beverage" because Costco wanted to grow its protein drink offerings in its stores, and that Slate was the natural choice, given it was (and is) the second largest player in the ultrafiltered milk-based protein drink market and that Slate told Horseshoe of this opportunity in late-November 2023. Slate lacks the information or knowledge as to any alleged interactions Costco had with "other formulators in the beverage industries" [sic] and/or "other manufacturers" and therefore denies all such allegations on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 38.

39.     Defendants began working with Costco Canada on an alternative to the national leading brand's chocolate 30g protein ultrafiltered milk protein shake in late 2023 and early 2024, including developing pricing quotes and specifications, providing samples, and identifying dairy suppliers. Costco Canada indicated that the timeline for developing an alternative to the national leading brand was "ASAP." Costco US also asked Defendants in or around early February 2024 about a formulation similar to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 39, and therefore denies all such allegations on that basis.

40.     Defendants initially explored with Costco developing such a product for Costco's Kirkland brand, before ultimately shifting to creating a new private owned brand.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 40, and therefore denies all such allegations on that basis.

41.     For its new private owned brand, Nurri, Defendants targeted pricing that would show value against pricing of the national leading brand product, and be inclusive of Defendants' cost. Defendants did not reference any pricing information from Slate when determining pricing for Nurri.

**ANSWER:** Slate admits that it told Horseshoe the target price for the New Slate Product at Costco and that such target price "would show value against pricing of the national leading brand product." Upon information and belief, Slate provided Horseshoe this information before Defendants' determined Nurri's "target[] pricing." Slate also admits that public documents suggest that Nurri is a brand of Trilliant's. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 41, and therefore denies all such allegations on that basis.

42. During development, Defendants targeted the ingredients, nutritional profile, taste, and mouthfeel of the national leading brand's chocolate 30g protein ultrafiltered milk shake, not any Slate product. Defendants invested millions in developing a national leading brand comparator in response to Costco's requests. Those efforts culminated in the development of Nurri.

**ANSWER:** Slate denies that Defendants have provided factual allegations in these Counterclaims that the "development of Nurri" was "in response to Costco's requests." Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 42, and therefore denies all such allegations on that basis.

43. The development process for a new beverage begins with a "bench phase," or an exploratory proof-of-concept phase involving multiple iterations of potential formulations; identifying product specifications, mouth feel, flavor profile, and a process for creating batches of samples; testing samples; and obtaining feedback. Concurrently during the formulation process, samples are subjected to heat penetration and thermal process studies. A formulation that passes both of these tests then proceeds to a "manufacturing phase," during which adjustments are made to the formulation and to the manufacturing process for large scale commercial production at a particular manufacturing facility. There is a feedback loop at all stages of the development process, during which the manufacturer solicits feedback from any partners (such as co-manufacturers or retail partners), any third-party formulators, and potential customers. Defendants work on beverage projects at all stages of development, including exploratory projects that never reach the manufacturing phase.

**ANSWER:** Slate admits that, generally speaking, development of a new beverage product has different "phases," which may include a "exploratory proof-of-concept phase" and a

"manufacturing adjustment phase," but that each beverage company, formulator, and co-manufacturer may have different "phases," may have different names and definitions for each "phase," and the timing conduct of each "phase" may differ. Slate admits that Horseshoe performed the "manufacturing adjustment phase" for the Slate beverages it made under the Manufacturing Agreement, that Slate and its formulators (not Horseshoe) created the formula/formulation for the New Slate Product and provided samples to Horseshoe, but that Horseshoe never successfully completed any "phase" in connection with the New Slate Product. Slate lacks the information or knowledge sufficient to form a belief as whether "Defendants work on beverage projects at all stages of development, including exploratory projects that never reach the manufacturing phase," and therefore denies all such allegations on that basis. Slate denies the remainder of the allegations in Paragraph 43.

44. To develop Nurri, Defendants needed to solve a longstanding problem with developing ultrafiltered milk-based beverages with higher amounts of protein. Specifically, ultrafiltered milk-based beverages with higher amounts of protein (namely, over 24g) are susceptible to viscosity issues at higher and lower temperatures that negatively impact the beverage consistency. Once that level of protein is introduced during the manufacturing process, the beverage tends to thicken into a substance that is more like a pudding, rather than a liquid beverage.

**ANSWER:** Slate admits that there are challenges in "developing ultrafiltered milk-based beverages with higher amounts of protein." Slate denies that "ultrafiltered milk-based beverages with higher amounts of protein (namely, over 24g) are susceptible to viscosity issues at higher and lower temperatures that negatively impact the beverage consistency. Once that level of protein is introduced during the manufacturing process, the beverage tends to thicken into a substance that is more like a pudding, rather than a liquid beverage," although it admits that Horseshoe botched samples of the New Slate product. Slate lacks the information or knowledge sufficient to form a belief as to what Defendants believed they "needed to solve" and therefore

denies all such allegations on that basis. Slate denies the remainder of the allegations in Paragraph 44.

45. Upon information and belief, in recent years, many beverage manufacturers have tried to solve the problem of viscosity when formulating ultrafiltered milk-beverages with high amounts of protein, without success. A common strategy for addressing viscosity issues in beverages, which is adjusting gum stabilizers, was not successful in addressing the issue. Prior to Defendants' breakthrough with Nurri, Defendants are aware of only one other beverage company, the national leading brand, that offered a shelf-stable 30g protein ultrafiltered milk-based product.

**ANSWER:** Slate denies that Slate has failed to "solve the problem of viscosity when formulating ultrafiltered milk-beverages with high amounts of protein," that "gum stabilizers" are not "successful in addressing viscosity issues" with such beverages, including because at least one of Slate's other co-manufacturers was successful in formulating the New Slate Product using the same exact formula/formulation for the New Slate Product that Slate had confidentially disclosed to Horseshoe. Slate admits that Horseshoe had tasted and enjoyed samples of the New Slate Product that Slate provided to Horseshoe, as well as formulated samples of the New Slate Product (although such samples did not meet Slate's requirements). Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 45, and therefore denies all such allegations on that basis.

46. Defendants deployed its research and development experts to tackling this problem, in an intensive months-long development process. In February 2024, Defendants consulted with a doctoral candidate at the University of Tennessee, who would later come to work with Defendants full-time. The candidate, who had no exposure to Slate's manufacturing and was not on-site with Defendants at the time, suggested utilizing a novel solution to solve the issue of producing a high protein ultrafiltered milk-based shake. Utilizing this framework, Defendants' employees (including an individual with a doctorate in Chemistry, and another with a Bachelor's of Science degree in Food Science and Technology and over 30 years of industry experience) worked to develop the idea and invent a functioning method to produce a high protein ultrafiltered milk beverage. Defendants tested approximately 150 to 200 iterations of Nurri before it was finally approved.

**ANSWER:** Slate denies that there was a "problem" with using gum stabilizers for "high

protein ultrafiltered milk-based shake," including because Slate's other co-manufacturer was successful in formulating the New Slate Product the same exact formula/formulation for the New Slate Product that Slate had confidentially disclosed to Horseshoe. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 46, and therefore denies all such allegations on that basis.

47. After significant effort, Defendants ultimately succeeded in developing an innovative approach to formulating high protein ultrafiltered milk-based beverages that retain a smooth and creamy texture at cool temperatures. Defendants' unique approach is a solution that differs from the use of stabilizer gums that is the common approach in the beverage industry to improve texture, viscosity, and density of beverages, and to prevent ingredients from separating. To Defendants' knowledge, no other beverage manufacturer uses the same approach that Defendants developed to create high protein ultrafiltered milk-based beverages. Defendants used this unique approach to formulate and manufacture Nurri.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 47, and therefore denies all such allegations on that basis.

48. Defendants developed its unique approach to manufacturing Nurri through significant research and development efforts—not based on confidential information from Slate or any other entity. No Slate information was considered when developing Nurri. Slate did not use the same approach Defendants developed to create high protein ultrafiltered milk-based beverages for any of the products Slate asked Defendants to co-manufacture. The 20g protein beverages Slate sells on the market rely on stabilizer gums commonly used in the beverage industry to address texture and viscosity.

**ANSWER:** Slate denies that Defendants did not develop Nurri using Slate's Confidential Information and/or trade secrets. Slate admits that Slate's 20g protein beverages that Horseshoe made under the Manufacturing Agreement contain stabilizer gums. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 48, and therefore denies all such allegations on that basis.

49. On or around March or April 2024, Trilliant began exploring filing a patent application for its unique method for formulating ultrafiltered milk beverages containing over 24g of protein with viscosity stability. Trilliant filed a provisional patent application related to its method on August 20, 2024.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the

allegations in Paragraph 49, and therefore denies all such allegations on that basis.

50.     In addition to developing its innovative approach to incorporating additional proteins to ultrafiltered milk, Defendants conducted dozens of additional tests on flavor and thickness of the Nurri milk shakes. Defendants worked in close partnership with Costco throughout the process to ensure that it met Costco's expectations that the Nurri milk shakes are comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake. For example, Defendants tested at least 50 iterations of the Nurri chocolate flavor to achieve a flavor profile comparable to the national leading brand's chocolate 30g protein ultrafiltered milk shake.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the

allegations in Paragraph 50, and therefore denies all such allegations on that basis.

51.     Defendants invested millions of dollars in the development of Nurri. This included paying their research team, including doctorates in food science, third party consultants on food chemistry; the use of testing machines and bench time; costs associated with manufacturing and shipping samples, and updating formulas on a feedback loop from Costco dozens of times; and costs related to market research and developing a marketing and advertising strategy.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the

allegations in Paragraph 51, and therefore denies all such allegations on that basis.

52.     Defendants were able to commercialize Nurri in the span of months because of their expertise, investment of resources, consistency in their iterations and formulas, and their capabilities as vertically-integrated manufacturers that allowed them to adjust stabilizers and other ingredients allowed them to quickly learn and innovate.

**ANSWER:** Slate denies any implication that Defendants were able to "commercialize

Nurri in the span of months" without using Slate's Confidential Information and/or trade secrets.

Based on Slate's experience with Horseshoe, Slate denies that Horseshoe could "adjust

stabilizers and other ingredients allowed them to quickly learn and innovate." Slate lacks the

information or knowledge sufficient to form a belief as to the remainder of the allegations in

Paragraph 52, and therefore denies all such allegations on that basis.

53.     Nurri milk shakes share a number of similarities to the national leading brand's chocolate 30g protein ultrafiltered milk shake that Defendants were asked by Costco to target:

both are Grade A dairy products that are made with ultrafiltered milk, are lactose-free, contain 30g of protein, contain 150 calories, and contain the same or similar amounts of sugar, fat, vitamin A, Vitamin D, Calcium, Iron, Potassium, Phosphorus, Iodine, Magnesium, Zinc, and Chloride.

**ANSWER:** Slate admits that, based at least on the product labels, Nurri beverages "share a number of similarities" to the New Slate Product and to the "national leading brand's 30g protein ultrafiltered milk shake." Slate denies that Defendants have provided factual allegations in these Counterclaims that Costco "asked" Defendants "to target" anything. Slate refers the Court to the labels of Nurri and the "national leading brand's chocolate 30g protein milk shake" and the documents showing formula/formulations of the New Slate Product for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 53.

54. By contrast, the Nurri beverage differs in several significant respects from Slate's beverages, as further alleged in Section IX below.

**ANSWER:** Slate denies the allegations in Paragraph 54, and incorporates by reference its responses to the allegations in Section IX of the Counterclaims.

**V. Slate Manufacturing Agreement**

55. On March 17, 2023, Horseshoe and Slate entered into the Beverage Contract Manufacturing Agreement (the "Manufacturing Agreement") with an effective date of January 1, 2023. **Exhibit A**.

**ANSWER:** Slate admits that, on or about March 17, 2023, Horseshoe and Slate entered into the Beverage Contract Manufacturing Agreement (the "Manufacturing Agreement") with an effective date of January 1, 2023, and that a copy of such agreement is attached at Ex. A to Defendants' Counterclaims. To the extent necessary, Slate denies any remaining allegations in Paragraph 55.

56. The initial term of the Manufacturing Agreement was January 1, 2023 to December 31, 2025. Manufacturing Agreement § 3.

**ANSWER:** To the extent the language in Paragraph 56 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement for a complete and accurate depiction of its contents. To the extent necessary, Slate denies any remaining allegations in Paragraph 56.

57.      Under the Manufacturing Agreement, Slate contracted with Horseshoe to produce and package certain beverages specified in an appended Beverage Product and Pricing Exhibit: Slate's Mocha Latte, Vanilla Latte, French Vanilla – Stevia, Classic Chocolate, and a TBD flavored beverage. The Exhibit specifies that the "Manufacturer," defined as Horseshoe, "is not providing any guarantees of production outside of the brands and packages listed," and that "[o]ther brands and packages may be agreed in writing by the parties hereto from time to time, after which such changes shall become a part of this Exhibit."

**ANSWER:** To the extent the language in Paragraph 57 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies any remaining allegations in Paragraph 57.

58.      Each of the beverages listed in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement for production contain 20 grams of protein. The parties never amended the Beverage Product and Pricing Exhibit to include a product containing 30 grams of protein.

**ANSWER:** To the extent the language in Paragraph 58 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies any remaining allegations in Paragraph 58.

59.      Relevant provisions of the Manufacturing Agreement state as follows:





4.4.1 Customer and Manufacturer agree that any amounts paid by Customer to Manufacturer pursuant to this Agreement in connection with the Minimum Order Commitment production fees shall be in the nature of liquidated damages (and not a penalty), and (i) represent the Parties' best, good faith efforts to estimate Manufacturer's actual damages if Customer does not purchase the Minimum Order Commitment; (ii) Manufacturer's actual damages would be difficult to ascertain and calculate with precision; (iii) are reasonable under the circumstances, including but not limited to the capital and other commitments Manufacturer will make in reliance

## 5. BEVERAGE

Each Beverage shall be produced in accordance with a Formula provided by Customer and approved by Manufacturer, such approval not to be unreasonably withheld. To the extent Customer supplies any Ingredients, Customer shall furnish, or cause to be furnished, Manufacturer Certificates of Analysis, Packing Lists, and individual Pallet Labels for all such Ingredients at time of delivery and Manufacturer shall be entitled to rely on the accuracy of such Certificates of Analysis for all purposes."

7.    **PROCUREMENT**

7.1 <u>Generally</u>. Unless the Parties agree otherwise in writing, Customer shall procure those Ingredients and Packaging Materials required to manufacture the Beverage Product.



8.    **DELIVERY**

All Packaged Beverage(s) are delivered Ex Works Manufacturer's production facility. Legal title to the Packaged Beverage passes at the same time risk of loss passes under the Ex Works Incoterm. Manufacturer will not be liable for the carrier's failure to deliver as estimated or for damage, contamination or loss occurring in shipment. If Manufacturer prepays any freight or related costs for the benefit of Customer, Customer shall reimburse Manufacturer therefor. Any other provision of this Agreement to the contrary notwithstanding, Manufacturer shall

24

have the right, upon written notice, to withhold delivery to Customer of any Beverage that fails to meet Packaged Beverage Specifications.

8.2 <u>Carriers</u>. All carriers selected by Customer to take shipments on behalf of Customer shall be subject to Manufacturer's approval, which approval shall not be unreasonably withheld or delayed.



9.2 <u>Invoicing</u>. Four weeks prior to each planned Production Campaign, Manufacturer shall invoice Customer for the Production Fees, and, if applicable, any Ingredients and Packaging Materials procured by Manufacturer for such Production Campaign. Customer agrees to pre-pay this invoice at least two weeks prior to commencement of the Production Campaign. In the event that Customer does not pay within two weeks of the planned production, Manufacturer has the right to cancel production and Customer shall be responsible for picking up any Customer-provided ingredients and materials for the planned production or, alternatively, paying Manufacturer storage fees as described in Section 7.2 or paying Manufacturer for the cost of discarding these materials.

9.3 <u>Disputed Invoices</u>. If Customer in good faith disputes any portion of an invoice, Customer shall pay the undisputed portion of the invoice and submit written notice to Manufacturer regarding the disputed amount, which notice shall include documentation supporting the alleged billing error (each such notice, a "Fee Dispute Notice"). A Fee Dispute Notice must be submitted to Manufacturer within thirty (30) days from the date of the invoice. Customer waives the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period. The Parties shall negotiate in good faith to attempt to resolve any such disputes within sixty (60) days after Customer's delivery of the applicable Fee Dispute Notice. Fee disputes unresolved within that time period shall be resolved by the mediation and arbitration procedures set forth in Sections 27 below.

## 11. INSPECTION AND RETURNS

Customer has the right to inspect and evaluate the Packaged Beverage to ensure

that it is suitable for Customer's purposes. Customer shall, within thirty (30) days of receipt, notify Manufacturer in writing if any of the Packaged Beverages have not been produced or packaged in compliance with the Specifications and provide Manufacturer with evidence thereof including samples of the Packaged Beverage. If timely notice is received by Manufacturer, Manufacturer shall credit to Customer the amounts paid for all non-conforming beverages as well as all cost of disposal or return on the next invoice until the entire credit has been applied.

15.3 Customer Supplied Ingredients and Packaging Materials. For Customer supplied Ingredients and Packaging Materials, Customer shall indemnify, defend and hold Manufacturer harmless from any and all liability arising out of claims made by third parties against Manufacturer related to or regarding the Customer supplied Ingredients and or Packaging Materials.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, IN NO EVENT SHALL THE PARTIES BE LIABLE TO THE OTHER PARTY OR TO THE OTHER PARTY'S OFFICERS, EMPLOYEES OR REPRESENTATIVES, OR TO ANY THIRD PARTY, FOR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY NATURE (INCLUDING, BUT NOT LIMITED TO, LOSS OF BUSINESS, LOST PROFITS, DAMAGE TO GOODWILL OR REPUTATION AND/OR INTERRUPTION DEGRADATION IN VALUE OF BRANDS, TRADEMARKS, TRADENAMES, SERVICE NAMES OR SERVICE MARKS). NOTWITHSTANDING ANY OTHER PROVISIONS OF THIS AGREEMENT, MANUFACTURER'S ENTIRE AGGREGATE LIABILITY TO CUSTOMER OR ANY THIRD PARTY UNDER THIS AGREEMENT IS LIMITED TO THE AMOUNTS PAID BY CUSTOMER TO MANUFACTURER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO SUCH LIABILITY.

19. CONSENT TO JURISDICTION AND PREVAILING PARTY ATTORNEYS' FEES

Each of the Parties consents and voluntarily submits to personal jurisdiction in the State of Wisconsin and agrees that the state and federal courts in such state located in Winnebago County, Wisconsin and the United States District Court for the Eastern District of Wisconsin have jurisdiction to settle any proceeding arising out of or relating to this Agreement, and agrees that all claims raised in such proceeding shall be heard and determined exclusively in such courts. Each of the Parties further consents and agrees that such Party may be served with process in the same manner as a notice may be given under this Agreement.

If a suit, action, or other proceeding of any nature whatsoever (including any proceeding under the US Bankruptcy Code) is instituted in connection with any controversy, interpretation, or enforcement of any rights under this Agreement, the Party substantially prevailing will be entitled to recover its attorney and all other reasonably necessary fees, costs, and expenses actually incurred in connection with

Case 1:24-cv-01292-WCG    Filed 01/31/25    Page 26 of 63    Document 45

that proceeding, in addition to all other amounts provided by law. The court will determine which Party is substantially prevailing taking into account the number and importance of all claims and defenses, the outcomes of those claims, and any offers of settlement made by the Parties.

## 21. CONFIDENTIALITY

21.1 <u>Confidential Information</u>. Manufacturer and Customer acknowledge that in the performance of this Agreement, each Party may obtain information from the other Party deemed confidential. "Confidential Information" means all information and materials regarding the business of either Party that are identified in writing by the Party to be confidential information or which a party should reasonably believe to be confidential information of a Party, including contracts (including this Agreement), the Formula or other recipes, Packaged Beverage Specifications or other technical specifications, business plans, formulas, know-how, financial information, historical financial statements, financial projections and budgets, historical and projected sales, pricing strategies and other pricing information, marketing plans, research and consumer insights, capital spending budgets and plans, the names and backgrounds of key personnel, personnel policies, plans, training techniques and materials, organizational strategies and plans, employment or consulting agreement information, Customer agreements and information (including for distributors or retailers), names and terms of arrangements with vendors or suppliers, or other similar information. "Confidential Information" does not include, however, information which (a) is or becomes generally available to the public other than as a result of a breach by the receiving Party or its affiliates of its obligations of confidentiality and non-use set forth herein or (b) was available to the receiving Party or its affiliates on a nonconfidential basis prior to disclosure by the disclosing Party.

21.2 <u>Obligations</u>. Unless otherwise agreed to in writing by the Party disclosing the Confidential Information (the "**Disclosing Party**"), the other party (the "**Receiving Party**") shall (and shall cause its affiliates to) (a) keep confidential all Confidential Information of the Disclosing Party and not disclose or reveal any of such Confidential Information to any Person other than those directors, officers, employees, stockholders, legal counsel, accountants, and other agents of the Receiving Party or its affiliates (the "**Representatives**") who are actively and directly participating in the performance of the obligations and exercise of the rights of the Receiving Party under this Agreement, provided that the Receiving Party shall be responsible for the breach of this Agreement by any such Representatives, and (b) not use Confidential Information of the Disclosing Party for any purpose other than in connection with the performance of the obligations and exercise and enforcement of the rights of the Receiving Party hereunder. The obligation to maintain the confidentiality of and restrictions on the use of Confidential Information hereunder include any Confidential Information of the Disclosing Party obtained by the Receiving Party prior to the date hereof. If the Receiving Party is required by a requirement of law or government order to disclose Confidential Information of the Disclosing Party, the Receiving Party shall, to the

extent not prohibited by law, provide notice thereof to the Disclosing Party and, after consultation with the Disclosing Party and, at the sole cost and expense of the Disclosing Party, reasonably cooperating with the Disclosing Party to object to or limit such disclosure, shall be permitted to disclose only that Confidential Information so required to be disclosed.

21.3 <u>Protection</u>. The Parties agree that the Confidential Information provided under this Agreement is competitively sensitive, and the Receiving Party shall establish, implement and maintain procedures and take such other steps that are reasonable to prevent disclosure of such Confidential Information to any person other than those Representatives to which disclosure is determined to be advisable in connection with the performance of the objectives and exercise of rights under this Agreement, but in no event may the Receiving Party use less than the degree of care that it takes to protect its own confidential information of a similar nature.

<u>BEVERAGE PRODUCT AND PRICING EXHIBIT</u>

<u>Quality Assurance Exhibit – Part A</u>

Customer will provide manufacturing instructions as part of the Beverage Specifications. Any issues related to product specifications as documented will be the responsibility of Customer.

**ANSWER:** Slate admits that Paragraph 59 accurately quotes portions of the Manufacturing Agreement, but denies that these quoted portions are all "relevant portions" of such Agreement as it relates to this litigation. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 59.

60.     Under the Manufacturing Agreement, Slate was responsible for providing beverage formulations. Section 5 of the Agreement provides that "[e]ach Beverage shall be produced in accordance with a **Formula provided by Customer**...." Manufacturing Agreement § 5 (emphasis added). Section 5.2 further provides that "Customer shall own the Formula in its entirety and Manufacturer will manufacture the Beverages in accordance with the Formula for the Customer."

**ANSWER:** To the extent the language in Paragraph 60 differs from the language set

forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 60.

61.     The "Formula" is defined as "[t]he written instructions set forth in the Quality Assurance Exhibit – Part A or otherwise agreed by the Parties in writing from time to time for combining specified quantities of Ingredients to produce the Beverage." Manufacturing Agreement § 2.10.

**ANSWER:** To the extent the language in Paragraph 61 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 61.

62.     The Quality Assurance Exhibit – Part A, in turn, sets forth ingredients and product specifications for each beverage. It also states that "Customer will provide manufacturing instructions as part of the Beverage Specifications. Any issues related to product specifications as documented will be the responsibility of Customer."

**ANSWER:** To the extent the language in Paragraph 62 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 62.

63.     The Quality Assurance Exhibit – Part A further states that the specifications it contains are "based on small-scale production/theoretical values from beverage technology. Final specifications may differ and need to be revised from those stated above, based upon collections of data from large scale production runs." Furthermore, the Exhibit provides that "Customer will direct shelf life as part of the Beverage Specifications. Any issues related to shelf life (e.g., instability, separation, flavor migration) will be the responsibility of Customer."

**ANSWER:** To the extent the language in Paragraph 63 differs from the language set

forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 63.

64.    Significantly, the Manufacturing Agreement does **not** require Horseshoe to assist with research and development in the formulation of any of the products set forth in the Beverage Product and Pricing Exhibit beyond such assistance needed to update formulations for production and to improve batching times in Horseshoe's facility. Specifically, the Agreement provides that ████████████████████████████████████████████████████████████████ ████████ Manufacturing Agreement § 5.4. The Agreement further specifies that any further ████████ ████████████████████████████ *Id.* Horseshoe has not invoiced Slate for such further R&D time, and Slate has not paid any amount to Horseshoe for further R&D time.

**ANSWER:**  Slate admits that it has not received any invoices from Horseshoe for "R&D time." To the extent the language in Paragraph 64 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 64.

65.    The Manufacturing Agreement also does not obligate Horseshoe to produce any new beverage product, or ████████████████████ Slate requests. Manufacturing Agreement § 4.5. But the Manufacturing Agreement requires Slate ████████████████████████



**ANSWER:**  Slate admits that it ████████████████████████████████ ████████████████████ that Horseshoe told Slate that it wished to manufacture it for Slate, and that Horseshoe began the first stages of doing so, but that Horseshoe inexplicably failed to provide a quality product. To the extent the language in Paragraph 65 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction

of their contents.  To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 65.

66.     Upon information and belief, Slate has released new beverage products during the term of the Manufacturing Agreement without using good faith efforts to first offer Horseshoe the opportunity to produce and sell these new beverage products. For example, Slate debuted Classic Strawberry and Sweet Cream Latte flavors on September 5, 2024, without first offering Horseshoe the opportunity to produce or sell these new beverage products.

**ANSWER:**  Slate admits that it has released Classic Strawberry and Sweet Cream Latte

flavors on or about September 5, 2024 and that Horseshoe does not manufacture such products

for Slate, but denies the remainder of the allegations in Paragraph 66.

67.     Unless the Parties agree otherwise in writing, the Manufacturing Agreement also sets forth that Slate is responsible for procuring ingredients and packaging materials required to manufacture beverages under the agreement. Manufacturing Agreement § 7.1. Slate is further responsible ███████████████████████████████████ *Id.* § 7.4.

**ANSWER:**  To the extent the language in Paragraph 67 differs from the language set

forth in the Manufacturing Agreement, Slate denies those allegations.  Slate refers the Court to

the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents.  To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 67.

## VI.    Horseshoe's Production of Slate's 20g Protein Formulations

68.     Upon entering into a co-manufacturing relationship with Horseshoe, Slate provided Horseshoe with pre-developed ingredients and product specifications for the 20g protein beverages Horseshoe agreed to manufacture, as set forth in the Beverage Product and Pricing Exhibit and the Quality Assurance Exhibit – Part A to the Manufacturing Agreement. Because Slate had already commercialized the 20g protein beverages, Slate had already identified suppliers, product ratios, and calculations for the manufacturing process of the 20g protein beverages.

**ANSWER:**  To the extent the language in Paragraph 68 differs from the language set

forth in the Manufacturing Agreement, Slate denies those allegations.  Slate refers the Court to

the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents. Slate admits that it "provided Horseshoe with pre-developed ingredients and product specifications for the 20g protein beverages," that it "identified suppliers, product ratios, and calculations for the manufacturing process of the 20g protein beverages," and that Horseshoe "agreed to manufacture" certain of Slate's 20g protein beverages. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 68.

69. Slate did not, however, provide detailed manufacturing instructions, which are typically provided by co-manufacturers and specify, among other things, the order ingredients are added and the thermal processing time to heat the formulation to create a commercially sterile product.

**ANSWER:** Slate denies that it "did not … provide detailed manufacturing instructions" to Horseshoe, but states that Horseshoe required the use of Horseshoe's specific thermal process (cooking time and temperatures) so that Horseshoe could be satisfied that it would "create a commercially sterile product," and that all of Slate's co-manufacturers have the same requirement with respect to their specific thermal process. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 69.

70. Since food manufacturing facilities differ based on their machines and volume capacity, among other elements, Horseshoe worked with Slate to ensure that the productions at Slate was consistent with prior productions, including updating its 20g protein milk shake formulations to qualify for production and improve batching times at Horseshoe's manufacturing facility.

**ANSWER:** Slate states that it "worked with" Horseshoe on Slate's 20g protein milk shake to "improve batching times," which was to benefit Horseshoe in saving time and money in the manufacturing process. Slate admits that co-manufacturing facilities for beverages "differ based on their machines and volume capacity." To the extent necessary, Slate denies the remainder of the allegations in Paragraph 70.

## VII. Slate's Production Orders Decrease

71. Under Section 4.4 of the Manufacturing Agreement, Slate agreed to a Minimum

Order Commitment of  cases per year across all agreed upon beverages in the Beverage Product and Packaging Exhibit. The cost per case was set at ▮▮▮ in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement. The Beverage Product and Pricing Exhibit also dictated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Manufacturing Agreement, Beverage Product and Pricing Exhibit (emphasis added).

**ANSWER:** To the extent the language in Paragraph 71 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 71.

72.     If Slate fails to purchase the Minimum Order Commitment of ▮▮▮ cases in a given year, Slate agreed that Horseshoe may invoice Slate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Manufacturing Agreement § 4.4. Section 4.4.1 equates such a fee to be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the language in Paragraph 72 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 72.

73.     Slate's production orders slowed in 2024. During the first quarter of 2024, Slate ordered only ▮▮▮ cases, of which ▮▮▮ cases were attributed to its 2023 Minimum Order Commitment, to be produced and shipped. By the end of July 2024, Slate had only ordered ▮▮▮ of its Minimum Order Commitment, or ▮▮▮ cases, to be produced. No further production order was ever placed.

**ANSWER:** Slate admits that "no further production order was ever placed" because of Horseshoe's failures with respect to the 20g protein products it had manufactured for Slate under the Manufacturing Agreement, and for the reasons stated in Slate's Notice of Termination that it

sent to Horseshoe.  To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 73.

74.     When Slate's production orders slowed such that it might not make sufficient
orders for the Minimum Order Requirement under the Manufacturing Agreement, Slate
approached Horseshoe about potentially changing some of the terms of the Manufacturing
Agreement, including a reduction in price. Slate also offered Horseshoe a potential equity stake
in Slate. Horseshoe told Slate that any reduction in price in 2024 and 2025 would need to be
offset with additional volume to recover profit impact. Horseshoe also responded that it was not
interested in obtaining an equity interest in Slate.

**ANSWER:**  Slate denies the allegations in Paragraph 74.

75.     Although Horseshoe is not required to do so under the Manufacturing Agreement,
Horseshoe sought to help Slate increase its sales volumes over the course of the parties' co-
manufacturing relationship. This included Horseshoe recommending to Costco Canada to carry
Slate, prompting outreach from Costco Canada to Slate in December 2023.

**ANSWER:**  Slate admits that language of the Manufacturing Agreement does not state

that Horseshoe is "require[d] to … help Slate increase its sales volumes."  To the extent the

language in Paragraph 75 differs from the language set forth in the Manufacturing Agreement,

Slate denies those allegations.  Slate refers the Court to the Manufacturing Agreement, and all

exhibits thereto, for a complete and accurate depiction of their contents.  Slate admits that it had

communications with Costco Canada, but denies the implication that Slate first communicated

with Costco Canada in December 2023.  Slate lacks the information or knowledge sufficient to

form a belief regarding communications between Horseshoe and Costco Canada, and therefore

denies such allegations on that basis.  Slate denies the remainder of the allegations in Paragraph

75.

76.     Horseshoe also gave Slate leeway on the payment provisions of the
Manufacturing Agreement, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as dictated by the
Beverage Product and Pricing Exhibit of the Manufacturing Agreement, ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Horseshoe made these accommodations without waiving any rights under the Manufacturing

Agreement.[3]

**ANSWER:** To the extent the language in Paragraph 76 and footnote 3 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. Slate denies the remainder of the allegations in Paragraph 76.

## VIII. Slate Unsuccessfully Explores a Potential Higher Protein Product

77. On January 10, 2024, Slate emailed certain of Horseshoe's employees about a new Slate beverage containing 30 grams of protein and added vitamins and minerals that Slate hoped to bring to market. Slate claimed that it had completed its formula, with the exception of added vitamins and minerals, which it acknowledged may impact taste or mouthfeel of the beverage. Slate did not provide its formula ingredients at that time and noted that the ingredients would be nearly the same as its 20g protein product, but at different percentages. Slate acknowledged the issue of stabilizers in this initial email, stating that it may need to adjust its stabilization process to get the desired results.

**ANSWER:** Slate admits that "[o]n January 10, 2024, Slate emailed certain of Horseshoe's employees about a new Slate beverage containing 30 grams of protein and added vitamins and minerals that Slate hoped to bring to market." Slate refers the Court the January 10, 2024 emails for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 77.

78. On January 30, 2024, Slate provided Horseshoe with a formula for the potential 30g beverage that specified only a list of ingredients and their proportions, indicating to Horseshoe that input is welcome "but not required." Slate acknowledged that the formula did not yet include the added vitamins and minerals mix. Slate did not provide instructions on how manufacture a finished product, such as the order of ingredients, mass and volumes of ingredients, heating temperatures, heating time, anticipated specifications for key checkpoints along the batching process, and anticipated specifications for finished product solids or pH ranges. Critically, Slate also did not provide instructions on how to incorporate stabilizer gums into the solution. When Horseshoe's employees asked about these details, Slate provided only early pH and solids estimates from its formulator.

---

[3] Section 18.2 of the Manufacturing Agreement provides that a party's failure to require strict performance of any of the provisions shall not waive or diminish any of that party's right thereafter to demand strict compliance, and that a party shall not be deemed to have waived rights unless such waiver is in writing and signed by an authorized officer.

**ANSWER:** Slate admits that, on January 30, 2024, it sent an email to Horseshoe which contained, among other things, the formula for the New Slate Product. Slate refers the Court the January 30, 2024 email for a complete and accurate depiction of their contents. Slate admits that the only information Horseshoe employees asked for was finished product solids and pH, which Slate sent to Horseshoe on or about February 1, 2024. Slate admits that it understood, based on its prior experience with Horseshoe and Slate's 20g product, that Horseshoe would need to determine the heating time and temperature because Horseshoe would be liable for commercial stability of the New Slate Product. Slate denies the remainder of the allegations in Paragraph 78.

79. On February 5, 2024, Horseshoe's employees told Slate that it would be best to get a final vitamin blend to start lab work to adjust the formula for Horseshoe's manufacturing plant, as any alteration could change the many pieces of the development process. Horseshoe's employees also requested samples to match the intended attributes of the ultimate product. In response, Slate asked Horseshoe to proceed with creating the 30g protein product without the added vitamins and minerals. Slate again acknowledged that "we will still likely need to test the stability system" on thermal processing to create a commercially sterile product.

**ANSWER:** Slate admits that, in early February 2024, Slate and Horseshoe exchanged emails related to, among other things, vitamins and minerals for the New Slate Product. Slate admits it sent an email to Horseshoe stating the Slate decided to proceed with the New Slate Product "WITHOUT the added vitamins/minerals." (capitalization in original). Slate refers the Court to those emails for a complete and accurate depiction of their contents. Slate denies the remainder of the allegations in Paragraph 79.

80. Having not received complete information from Slate about how to create a potential Slate 30g protein product beyond ingredients, Horseshoe applied the same batching instructions used for the Slate 20g protein products to create trial samples of the potential Slate 30g protein product. However, it quickly became clear that Horseshoe needed to amend its bench process because Slate's proposed 30g protein formula stratified and became unstable.

**ANSWER:** Slate admits that it understood and expected Horseshoe to "apply the same batching instructions used for the Slate 20g protein products to create trial samples of the

potential Slate 30g protein product." Slate admits that the "trial samples" of the New Slate Product that Horseshoe provided were "stratified and became unstable," but denies that was the result of Slate's formula or formulation for the New Slate Product it provided to Horseshoe. Slate lacks the information or knowledge sufficient to form a belief as to what Horseshoe believed it needed to do to "amend its bench process," and therefore denies such allegations on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 80.

81. By the end of February 2024, Horseshoe produced lab samples of the potential Slate 30g protein product. Horseshoe's employees indicated to Slate that they dropped the stabilizer gum level down to the same level as the Slate 20g protein product due a concern about thermal processing times. The lab samples required refrigeration and were not shelf-stable, and were sent to different recipients at Slate. Horseshoe has no visibility into whether the samples were exposed to variables that would affect these early samples, including the temperature at which they were served, the length of time that passed before they were sampled, and whether the cans were agitated before sampling.

**ANSWER:** Slate admits that Horseshoe provided it with samples of the New Slate Product, that Slate understood that the "lab samples" "required refrigeration and were not shelf-stable," that Slate is familiar with how to handle and sample "lab samples" from Horseshoe— including the temperature at which "lab samples" are served, the length of time that passed before sampling "lab samples," and whether (or not) to "agitate" "the cans were agitated before sampling"— and that Slate handled and sampled the Horseshoe "lab samples" the same way. Slate lacks the information or knowledge sufficient to form a belief as to how Horseshoe handled the "lab samples" prior to their delivery to Slate employees, and therefore denies such allegations on that basis. Slate denies the remainder of the allegations in Paragraph 81.

82. The feedback loop on Slate's potential higher protein product moved slowly. Horseshoe waited for extended periods to receive responses from Slate about trial samples or questions on the formulation and manufacturing process. Slate worked with its third-party formulator to provide feedback and iterate on formulations, and provided piecemeal and incomplete information to Horseshoe. Throughout the process, Slate failed to provide technical information on how to get the formulation to perform and result in an acceptable finished product.

**ANSWER:** Slate denies the allegations in Paragraph 82.

83. In March 2024, Horseshoe produced additional samples of a potential 30g protein product for Slate. Horseshoe's employees indicated to Slate that they were finding gelling and thickening in the samples, likely because of "how the high protein is reacting," and suggested that Slate contact its formulator. Horseshoe's employees also indicated that the samples they received from Slate's formulator also had thickened. Slate acknowledged that the gelling "could be due to the stabilizer levels with the increased protein level" and that Slate was interested in seeing results with decreased stabilizers.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to whether (or not) "the samples [Horseshoe] received from Slate's formulator also had thickened" and whether Horseshoe's samples actually "gelled," therefore denies all such allegations. Based on the information that Horseshoe provided to Slate at the time, "acknowledged that the gelling 'could be due to the stabilizer levels with the increased protein level.'" To the extent necessary, Slate denies the remainder of the allegations in Paragraph 83.

84. On April 1, 2024, when Slate reported that the potential 30g protein product samples that Horseshoe had a different flavor and sweetness than expected, Horseshoe's employees indicated that stabilizer combinations in the formula were impacting the samples.

**ANSWER:** Slate admits that on April 1, 2024, it informed Horseshoe that the "potential 30g protein product samples that Horseshoe had a different flavor and sweetness than expected." Slate admits that Horseshoe told Slate that "stabilizer combinations in the formula were impacting the samples." To the extent necessary, Slate denies the remainder of the allegations in Paragraph 84.

85. On June 4, 2024, the same day that Costco independently approved Defendants' product as successful alternative to the national leading brand, Slate provided three updated formula iterations for a 32g, rather than a 30g, protein shake that it wanted Horseshoe to trial. The formula iterations included a new flavor and employed multiple different sweeteners and stabilizers. Slate acknowledged that the formulations reflect "some significant changes we believe will help solve some of the issues we have experienced in prior versions." Horseshoe's employees responded with concerns about the use of the multiple stabilizers and asked Slate to work with its formulator to outline the process they used, including batching order of operations with mass and volumes of ingredients, temperatures, and anticipated specifications for key checkpoints along the

38

batching process.

**ANSWER:** Slate admits that, because of the problems with the "samples" of the New Slate Product that Horseshoe provided, Slate decided to provide additional formula iterations for the New Slate Product to Horseshoe. Slate refers the Court to the emails quoted and described in Paragraph 85 for a complete and accurate depiction of their contents. Slate lacks the information or knowledge sufficient to form a belief as to whether, on June 4, 2024, "Costco independently approved Defendants' product as successful alternative to the national leading brand" therefore denies such allegation on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 85.

86. Horseshoe generated and sent to Slate and its formulators samples of the new formulas in July. Slate did not send further feedback on these samples.

**ANSWER:** Slate admits that Horseshoe sent Slate "samples of the new formulas in July" but denies that Slate "did not send further feedback on these samples." Slate lacks the information or knowledge sufficient to form a belief as to Slate's "formulators" and therefore denies such allegations on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 86.

87. Horseshoe ultimately tested over a dozen formulas for Slate of a potential higher protein product with varying levels of protein and other ingredients. As with the 20g protein formulations, Slate did not engage Horseshoe to develop formulations for the potential higher protein product and did not pay Horseshoe for research and development time. Rather, Slate worked with a third-party formulator to develop potential higher protein formulations. Unlike the 20g formulations, however, which had already been commercialized, the potential higher protein formulations were in early conceptual stages of development.

**ANSWER:** Slate admits that Horseshoe attempted "lab trials" of the New Slate Product, that Slate did "not engage Horseshoe to develop formulations for the potential higher protein product and did not pay Horseshoe for research and development time," that Slate "worked with a third-party formulator to develop potential higher protein formulations," and that the New Slate

Product had not "already been commercialized" when Slate provided formulations of such

product to Horseshoe. Slate denies the remainder of the allegations in Paragraph 87.

88.     Slate's higher protein formulations continued to fail at trials, and Slate never proceeded past the proof-of concept phase with its planned higher protein beverage in its interactions with Horseshoe. Slate's relationship with Horseshoe related to a higher protein version of Slate's 20g protein milk shakes was limited to exploring the formulation and manufacturing process for small-scale production of a potential higher protein product. Slate did not approve a protein amount (which changed from 30g to 32g), flavor profile, any prototype, or move forward with any formulation with Horseshoe following the sampling process. Horseshoe never conducted any heat penetration study or thermal processing of any Slate higher protein milk shake formulation that would be required before a formulation is ready to be scaled for commercial production. Each of these steps would be necessary technical prerequisites before Slate higher protein milk shake formulation could reach the manufacturing floor for large scale production runs at Horseshoe's facilities.

**ANSWER:**  Slate admits Horseshoe's attempted "lab trials" for the New Slate Product

failed for reasons Slate could not understand (notwithstanding Horseshoe's implausible reasons).

Slate also admits that, because of these repeated unexplainable failures, it did not authorize

Horseshoe to proceed past the "lab trial" stage with the New Slate Product.  To the extent

necessary, Slate denies the remainder of the allegations in Paragraph 88.

89.     Slate did not seek to amend the Manufacturing Agreement, the Beverage Product and Pricing Exhibit, or the Quality Assurance Exhibit – Party A to include a beverage with more than 20g of protein.

**ANSWER:**  Slate admits that, because Horseshoe could not successfully complete the

"lab trials" for the New Slate Product, Slate did not seek to amend the Manufacturing

Agreement, the Beverage Product and Pricing Exhibit, or the Quality Assurance Exhibit – Party

A to include the New Slate Product.  To the extent necessary, Slate denies the remainder of the

allegations in Paragraph 89.

90.     Upon information and belief, Slate has not launched any 30g protein milk shake beverage, or any beverage containing more than 20g of protein, to the market.

**ANSWER:**  Slate denies the allegations in Paragraph 90.

## IX. Slate's Product Formulations Did Not Influence the Development of Nurri

91. Defendants' development of Nurri took place independent of any information from Slate.

**ANSWER:** Slate denies the allegations in Paragraph 91.

92. As alleged above, Defendants had begun separately developing a 30g ultrafiltered milk-based beverage as an alternative to a national leading brand product, at the request of Costco in late 2023. On information and belief, Costco made similar requests of multiple manufacturers.

**ANSWER:** Slate denies that Defendants have provided factual allegations in these

Counterclaims that Costco "requested" they develop a 30g ultrafiltered milk-based beverage as an

alternative to a national leading brand product. Slate admits that it was unaware of Defendants'

development of a 30g ultrafiltered milk-based beverage at the time Horseshoe was working, at

Slate's instruction, on the New Slate Product and further admits that Slate was acting in good faith

with Horseshoe with respect to the New Slate Product. Slate lacks the information or knowledge

sufficient to form a belief as to the remainder of the allegations in Paragraph 92, and therefore

denies all such allegations on that basis.

93. Defendants had a longstanding relationship with Costco and did not learn of any opportunity with Costco because of Slate.

**ANSWER:** Slate denies that Defendants "did not learn of any opportunity [for an

ultrafiltered milk beverage 30g protein] with Costco because of Slate, including because even

according to the timeline Defendants allege in these Counterclaims, Slate told Horseshoe about

the opportunity at Costco for the New Slate Product before Defendants' alleged first interaction

with Costco Canada (which allegedly happened on December 6, 2024). Slate lacks the

information or knowledge sufficient to form a belief as to the remainder of the allegations in

Paragraph 93, and therefore denies all such allegations on that basis.

94. Defendants began exploring development of an alternative to the national leading brand product with Costco before Slate provided the initial iteration of its ingredients for a

potential Slate 30g protein product on January 30, 2024.

**ANSWER:** Slate denies any implication that Defendants "began exploring development of an alternative to the national leading brand product with Costco" before Slate told Horseshoe about the New Slate Product and the opportunity at Costco. Slate lacks the information or knowledge sufficient to form a belief as to the remainder of the allegations in Paragraph 94, and therefore denies all such allegations on that basis.

95. As alleged above, Defendants invested considerable time and resources to developing their Nurri line of beverages, including developing a breakthrough method for addressing viscosity issues with high protein ultrafiltered milk-based beverages that is the subject of a provisional patent application.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 95, and therefore denies all such allegations on that basis.

96. The 20g protein beverages that Horseshoe manufactured for Slate pursuant to the Manufacturing Agreement did not use the same method for addressing viscosity issues, but rather relied on stabilizer gums, which are commonly used in the beverage industry to improve texture, viscosity, and density of beverages, and to prevent ingredients from separating.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 96, and therefore denies all such allegations on that basis.

97. Defendants took reasonable steps to prevent disclosure of any of Slate's alleged confidential information to any person other than a representative (as defined under Section 21.2 of the Manufacturing Agreement) to which disclosure of such information is advisable in connection with the performance of the objectives of the Manufacturing Agreement. Those steps included, but are not limited to, restricting access to Slate's formulation information to individuals needed to carry out the purpose of producing and packaging the beverages set forth in the Manufacturing Agreement.

**ANSWER:** Slate denies the allegations in Paragraph 97, including because – according to the allegations in Paragraph 97 – Slate's Confidential Information was disclosed to Trilliant (who is a "Defendant" but is not a party to the Manufacturing Agreement). To the extent necessary, Slate denies the remainder of the allegations in Paragraph 97.

98.     Defendants maintained designated separate lab technician leads for Nurri and Slate. The lab technician lead for Slate did not work on Nurri and vice versa. The lab technicians did not share formula sheets. Feedback loops for Nurri and Slate were also separate.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 98, and therefore denies all such allegations on that basis.

99.     Additionally, none of the external experts Defendants consulted on the formulation for Nurri worked on Slate's products or had visibility into Slate's formulations. The food scientist with a PhD focused on proteins that Defendants engaged in February 2024 worked remotely to help address the viscosity issue and did not have any interaction with Slate's formulations.

**ANSWER:** Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 99, and therefore denies all such allegations on that basis.

100.     The makeup of the Nurri beverages differs in significant ways from Slate's 20g protein milk shakes currently on the market, as well as Slate's trial higher protein formulas. Differences in suppliers, ingredients, and types of stabilizers all impact a product's formulation.

   a.     As alleged above, Slate's formulas did not use the same approach for addressing viscosity issues with high protein ultrafiltered milk-based beverages, but rather relied on stabilizer gums commonly used in the industry.

   b.     Nurri, like the national leading brand, is sold as a Grade A milk product.[4] Slate's 20g protein beverages, by contrast, are not sold as a Grade A or even a milk product.

   c.     Nurri's formula uses a different potassium than those used in Slate's 20g protein products (which use Acesulfame Potassium) and trial higher protein formulations.

   d.     Nurri's formula uses a pectin from a different supplier and at different specifications than Slate's 20g protein products and trial higher protein formulations.

   e.     Nurri's formula uses a different cocoa than that used in Slate's 20g protein products and trial higher protein formulations.

---

[4] Grade A milk is the grade suitable for drinking directly as milk. It passes the highest quality standards. The other grades that exist are AA, B, and C, though C is only used at the US state level, not the federal level. AA milk is exclusively used for making butter. B-grade milk does not meet the quality standards for being sold directly as milk but it is of sufficient quality that it can be used for industrial purposes. This is the milk that gets used for making dehydrated nonfat milk powder and various other industrially-processed forms of milk. C-grade milk, per some state laws, fails to meet the requirements for any other grade.

f.   Nurri contains several ingredients, such as cream, phosphate, and sea salt, not present in Slate's 20g protein products and trial higher protein formulations.

g.   Slate's 20g protein products and trial higher protein formulations contain ingredients not included in Nurri's formulation.

**ANSWER:** Slate denies that "makeup of the Nurri beverages differs in significant ways from Slate's 20g protein milk shakes currently on the market" as well as for the New Slate Product. Slate also denies that it is necessarily the case that "differences in suppliers, ingredients, and types of stabilizers all impact a product's formulation."

a.   Slate admits that the New Slate Product uses stabilizer gums, but is without information or knowledge sufficient to form a belief as to "the industry," and therefore denies all such allegations on that basis.

b.   Slate admits that, according to Nurri's label information, it contains Grade A ultrafiltered milk. Slate admits that the New Slate Product and Slate's 20g protein beverages do not contain Grade A ultrafiltered milk.

c.   Slate admits that the New Slate Product and Slate's 20g protein products do not use Acesulfame Potassium, and that, according to Nurri's label, Nurri contains Acesulfame Potassium.

d.   Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 100(d) and therefore denies all such allegations on that basis.

e.   Slate lacks the information or knowledge sufficient to form a belief as to the allegations in Paragraph 100(e) and therefore denies all such allegations on that basis.

f.   Slate admits that the New Slate Product does not contain cream and phosphate.

Slate admits that New Slate Product uses salt, but not "sea salt." Slate admits that, according to Nurri's label, it contains cream, phosphate, and "sea salt."

g.    Slate admits that, as stated above, the listed ingredients in New Slate Product and Nurri are not verbatim the same, but states that any differences are immaterial.

Slate also denies that the alleged differences in Paragraph 100(a)-(g) between Nurri and the New Slate Product are "significant." Slate further denies that such alleged differences are "significant" between Nurri and Slate's 20g protein beverages that Horseshoe made under the Manufacturing Agreement. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 100.

## X.    Slate's Failures to Comply with the Manufacturing Agreement

101.    Section 9.2 of the Agreement provides the timing within which Slate is obligated to pay invoices. Specifically, it provides that "Four weeks prior to each planned Production Campaign, Manufacturer shall invoice Customer for the Production Fees, and, if applicable, any Ingredients and Packaging Materials procured by Manufacturer for such Production Campaign." It is then Slate's responsibility to pre-pay the invoice "at least two weeks prior to commencement of the Production Campaign." Manufacturing Agreement § 9.2.

**ANSWER:** To the extent the language in Paragraph 101 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies any remaining allegations in Paragraph 101.

102.    Slate owes Horseshoe, at a minimum, a total of $684,207.13 for total unpaid invoices.

**ANSWER:** Slate denies the allegations in Paragraph 102.

103.    Slate accepted products and did not timely dispute any part of these invoices pursuant to Section 9.3 of the Agreement, which mandates that a Fee Dispute Notice "must be submitted to Manufacturer within thirty (30) days from the date of the invoice. Customer waives the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period." Manufacturing Agreement § 9.3 (emphasis added).

**ANSWER:** Slate denies that it "accepted products and did not timely dispute any part of these invoices." To the extent the language in Paragraph 103 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 103.

104.    Slate also did not timely claim that there were any alleged packaging defects for any of the April or June 2024 productions. The Manufacturing Agreement required Slate to "within thirty (30) days of receipt, notify Manufacturer in writing if any of the Packaged Beverages have not been produced or packaged in compliance with the Specifications and provide Manufacturer with evidence thereof including samples of the Packaged Beverage." Manufacturing Agreement § 11.

**ANSWER:** Slate denies that it "did not timely claim that there were any … packaging defects for any of the April or June 2024 productions." To the extent the language in Paragraph 104 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 104.

105.    On July 29, 2024, Horseshoe placed Slate's production and release of inventory on hold in response to the $418,000 of overdue invoices from June 2024. On or around the same date, Matt Knox called Slate founder, Manny Lubin, to discuss the overdue invoices.

**ANSWER:** Slate admits that in or around June 2024 Slate and Horseshoe discussed the alleged "overdue invoices" and Slate's manufacture of damaged and non-conforming product. Slate denies the remainder of the allegations in Paragraph 105.

106.    On August 1, 2024, Manny Lubin sent an email alleging that Slate had discovered damaged product including Damaged Cans for French Vanilla & Vanilla Latte. Horseshoe acknowledged receipt of the August 1 email.

**ANSWER:** Slate admits that, on August 1, 2024, Manny Lubin sent an email to

Horseshoe regarding, at least, damaged cans for Slate's French Vanilla and Vanilla Latte products, which Horseshoe had manufactured, and that Horseshoe acknowledged receipt. Slate denies that this was the first instance of Slate making Horseshoe aware of, at least, such damaged cans. Slate refers the Court to that email for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 106.

107. On August 7, 2024, Slate employee Manny Lubin sent another email alleging that Slate had discovered purported product issues, including damaged cans. Slate alleged the production issues began Q4 2023.

**ANSWER:** Slate admits that, on August 7, 2024, Manny Lubin sent an email to Horseshoe regarding product issues related to the Slate beverages that Horseshoe had manufactured. Slate refers the Court to that email for a complete and accurate depiction of their contents. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 107.

108. Slate had never requested to inspect Horseshoe's facilities or products, and Horseshoe never denied Slate an opportunity to do so. While the Manufacturing Agreement does not require Horseshoe to conduct any testing of cans Slate procures, after Slate raised potential packaging defects, Horseshoe conducted a third-party analysis of unfilled cans that Slate procured for these productions. That analysis indicated that the can scuffing can be attributed to an insufficient cure on portions of certain cans, resulting in exposed aluminum on the exterior surface.

**ANSWER:** Slate admits that, prior to its discovery of issues relating to product Horseshoe had manufactured for Slate, it had no reason to request an inspection of Horseshoe's "facilities or products." Slate admits that, upon informing Horseshoe of product issues, it awaited a cure or explanation from Horseshoe, which was never provided. Slate lacks the information or knowledge sufficient to form a belief as to any "third-party analysis of unfilled cans that Slate procured for these productions" and as to any belief that such alleged "analysis indicated that the can scuffing can be attributed to an insufficient cure on portions of certain

cans, resulting in exposed aluminum on the exterior surface" and therefore denies such

allegations on that basis. To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 108.

109. Slate raised the issue of alleged packaging defects **after** Horseshoe began seeking Slate's delinquent payments under the Manufacturing Agreement. Slate did not provide evidence of the cause of the alleged defects, but provided only photographs showing Slate products on a shelf with the alleged defects. Slate provided no evidence that the damage occurred at the manufacturing stage rather than at other points in the supply chain or at the retailer. Nor did Slate identify specific case amounts of the allegedly defective products.

**ANSWER:** Slate denies the allegations in Paragraph 109.

110. On August 7, 2024, Slate provided Horseshoe with a proposed solution to the problem that "Horseshoe will release Slate from its 2024 minimum order commitment of ███ cases." At this point, it became clear to Horseshoe that Slate was raising issues to avoid fulfillment of its payment obligations.

**ANSWER:** Slate admits that, on or about August 7, 2024, it provided Horseshoe with a

proposed solution in an email and refers the Court to that complete communication (and other

relevant communications) for a full understanding of their contents. Slate lacks the information

or knowledge sufficient to form a belief as to the allegations of what Horseshoe believed was

"clear" but denies that it was "raising issues to avoid fulfillment of" Slate's payment obligations.

To the extent necessary, Slate denies the remainder of the allegations in Paragraph 110.

111. The parties never agreed to modify Slate's ████-case Minimum Order Commitment for the 2024 year under the Manufacturing Agreement.

**ANSWER:** Slate admits that, because of Horseshoe's breaches of the Manufacturing

Agreement and Slate's Notice of Termination of the Manufacturing Agreement, Slate never

sought to "modify Slate's ████-case Minimum Order Commitment for the 2024 year." To

the extent necessary, Slate denies the remainder of the allegations in Paragraph 111.

112. Slate is subject to a binding Minimum Order Commitment of ████ cases for each of the 2023, 2024, and 2025 years of the Manufacturing Agreement's Initial Term. Slate did not meet its Minimum Order Commitment in 2024.

48

**ANSWER:** Slate denies the allegations in Paragraph 112.

113. In 2024, Slate only ordered and paid for the production of ████ cases attributable to the Minimum Order Commitment, which Horseshoe produced and delivered to Slate. ██████████████████████████ -case Minimum Order Commitment for 2024.

**ANSWER:** Slate admits that, because of Horseshoe's breaches of the Manufacturing

Agreement and its production of defective product for Slate, that Slate "ordered and paid for" an

amount of cases less than the ████ -case Minimum Order Commitment for 2024 of Slate's

protein beverages from Horseshoe. Slate denies the remainder of the allegations in Paragraph

113.

114. When the cost-per-case is adjusted ██████████████████ as the Beverage Product and Pricing Exhibit to the Manufacturing Agreement provides, the adjusted per-case cost is ████

**ANSWER:** To the extent the language in Paragraph 114 differs from the language set

forth in the Manufacturing, Slate denies those allegations. Slate refers the Court to the

Manufacturing Agreement for a complete and accurate depiction of its contents. Slate lacks the

information or knowledge sufficient to form a belief as to the remainder of the allegations in

Paragraph 114, and therefore denies such allegations on that basis.

115. At an adjusted per-case cost of ████ , the ████ cases remaining under Slate's 2024 Minimum Order Commitment amount to a total value of ████ .

**ANSWER:** Slate denies the allegations in Paragraph 115.

116. At an adjusted per-case cost of ████ , the ████ cases remaining under Slate's 2025 Minimum Order Commitment amount to a total value of ████ . The tolling amount is subject to further adjustment on January 1, 2025, as is provided for in the Manufacturing Agreement.

**ANSWER:** Slate denies the allegations in Paragraph 116.

117. Rather than pay the past due amounts, on August 30, 2024, Slate sent a Notice of Breach Letter to Horseshoe (the "Notice Letter") noticing alleged packaging defects on the Slate products that Horseshoe was providing. The Notice of Breach Letter did not include a Fee

Dispute Notice or address Slate's outstanding invoices.

**ANSWER:** Slate admits that, on August 30, 2024 it sent Horseshoe a Notice of Breach

Letter. Slate refers the Court to the that Notice of Breach Letter for a complete and accurate

depiction of its contents. To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 117.

118.     Sections 9.3 and 27 of the Manufacturing Agreement require the parties to
"attempt in good faith to resolve any disputes or controversy arising out of this Agreement
promptly by negotiations between executive management... who have authority to settle the
dispute or controversy." If these negotiations fail, then parties "agree to pursue non-binding
mediation." This provision applies to the fee and invoice disputes.

**ANSWER:** To the extent the language in Paragraph 118 differs from the language set

forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to

the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents. To the extent necessary, Slate denies the remainder of the allegations in

Paragraph 118.

119.     In response to the August 30, 2024 letter, Horseshoe made multiple attempts over
the next month to meet in good faith with Slate to resolve the dispute, consistent with Section 9.3
of the Manufacturing Agreement. Horseshoe also denied any breach, asserted that it was entitled
to payment of amounts owed under the contract including unpaid invoices. Slate was
unresponsive to Horseshoe's attempts to meet to resolve the dispute. When Slate did finally
agree to an in-person meeting, it canceled that meeting. Slate did not respond to Horseshoe's
multiple attempts thereafter to schedule a meeting to resolve the dispute.

**ANSWER:** Slate admits that, subsequent to August 30, 2024, Horseshoe and Slate

communicated about finding a mutually agreeable time to discuss issues, and that "Horseshoe

also denied any breach, asserted that it was entitled to payment of amounts owed under the

contract including unpaid invoices" – which Slate disputes (and disputed). Slate admits that it

agreed to an in-person meeting and that it cancelled it. Slate denies that it "was unresponsive to

Horseshoe's attempts to meet to resolve the dispute" and that Slate "did not respond to

Horseshoe's multiple attempts thereafter to schedule a meeting to resolve the dispute." Slate also denies that Horseshoe was acting "in good faith" with Slate during this time (and otherwise). To the extent necessary, Slate denies the remainder of the allegations in Paragraph 119.

120.    On October 10, 2024, after having failed to respond to Horseshoe's requests to meet, Slate sent a "Notice of Termination of Beverage Contract Manufacturing Agreement," claiming that Horseshoe had "misappropriated Slate's New Product Confidential Information." Horseshoe responded on October 11, 2024 informing Slate of its intent to initiate an arbitration pursuant to Section 27 of the Manufacturing Agreement. Once again, Slate was not responsive to requests to mediate and instead, brought this litigation.

**ANSWER:**  Slate admits that, on or about October 10, 2024, it sent Horseshoe a "Notice of Termination of Beverage Contract Manufacturing Agreement," which stated that, among its breaches of the Manufacturing Agreement, Horseshoe had "misappropriated Slate's New Product Confidential Information."  Slate refers the Court to the Notice of Termination for a complete and accurate depiction of its contents.  Slate denies that "Horseshoe responded on October 11, 2024 informing Slate of its intent to initiate an arbitration pursuant to Section 27 of the Manufacturing Agreement."  Slate admits that it "brought this litigation," but denies that it "failed to respond to Horseshoe's requests to meet" and denies that Slate "was not responsive to requests to meditate."  Slate admits that it filed the Complaint in this matter on October 10, 2024 (the same day as it sent its Notice of Termination).  Slate denies that it received anything from Horseshoe (on October 11, 2024 or otherwise) "informing Slate of its intent to initiate an arbitration pursuant to Section 27 of the Manufacturing Agreement," and further denies that it received a request to mediate from Horseshoe.  To the extent necessary, Slate denies the remainder of the allegations in Paragraph 120.

121.    Between June 2023 and September 2024, Horseshoe received a number of ingredients and materials supplied by Slate. Unused ingredients and materials received from these supplies also remained stored at Horseshoe's facilities for more than 60 days from Horseshoe's initial receipt of the items until Slate retrieved the items in December 2024.

**ANSWER:** Slate admits that it suppled "ingredients and materials" to Horseshoe, that it requested, among other things, the return of such "ingredients and materials" in the October 10, 2024 Notice of Termination, that Horseshoe informed Slate it could retrieve such "ingredients and materials" in December 2024, and that Slate promptly arranged to pick up such "ingredients and materials" in December 2024. Slate lacks the information or knowledge sufficient to form a belief as to as to where Horseshoe "stored" such "ingredients and materials" and when Horseshoe actually received them, and therefore denies such allegations on that basis. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 121.

## FIRST COUNTERCLAIM
### Declaratory Relief

122. Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

**ANSWER:** Slate incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

123. An actual controversy has arisen and now exists between Defendants, Horseshoe and Trilliant, and Plaintiff, Slate.

**ANSWER:** Slate admits that it has filed a Complaint against Defendants in this action. The remainder of Paragraph 123 contains legal conclusions that do not require a response. To the extent that Paragraph 123 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

124. As fully described above, Defendants are entitled to declaratory relief that Defendants developed Nurri independently and without the use of Slate's confidential information or claimed trade secrets.

**ANSWER:** Slate denies "Defendants developed Nurri independently and without the use of Slate's confidential information or claimed trade secrets." The remainder of Paragraph 124 contains legal conclusions that do not require a response. To the extent that Paragraph 124

contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

125. Defendants additionally request declaratory relief that Section 15.3 of the Manufacturing Agreement bars Slate from pursuing any indirect, consequential, incidental, special, punitive or exemplary damages, including but not limited to loss of business, lost profits, damage to goodwill or reputation against Defendants, and that Horseshoe's total liability to Slate (to the extent such liability exists), is limited to the amounts Slate paid to Horseshoe under the Manufacturing Agreement during the twelve-month period before any event giving rise to such liability.

**ANSWER:** Slate admits that Defendants have requested, in this Counterclaim "declaratory relief that Section 15.3 of the Manufacturing Agreement bars Slate from pursuing any indirect, consequential, incidental, special, punitive or exemplary damages, including but not limited to loss of business, lost profits, damage to goodwill or reputation against Defendants, and that Horseshoe's total liability to Slate (to the extent such liability exists), is limited to the amounts Slate paid to Horseshoe under the Manufacturing Agreement during the twelve-month period before any event giving rise to such liability," but Slate explicitly denies that Defendants are entitled to such "declaratory relief." Slate denies that Section 15.3 of the Manufacturing Agreement applies in any way to Trilliant, including because Trilliant is not a party to the Manufacturing Agreement. The remainder of Paragraph 125 contains legal conclusions that do not require a response. To the extent that Paragraph 125 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

126. Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

**ANSWER:** To the extent the language in Paragraph 126 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents. The remainder of Paragraph 126 contains legal conclusions that do not require a response. To the extent that Paragraph 126 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

## SECOND COUNTERCLAIM
### Breach of Contract

### A. Failure to Pay Invoices

127. Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

**ANSWER:** Slate incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

128. The Manufacturing Agreement is a valid contract between Horseshoe and Slate.

**ANSWER:** Slate admits that it entered into the Manufacturing Agreement with Horseshoe, but denies any implication that Slate and Trilliant entered into a contract. The remainder of Paragraph 128 contains legal conclusions that do not require a response. To the extent that Paragraph 128 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

129. Horseshoe has performed all or substantially all of the essential obligations which the Manufacturing Agreement required it to do or was excused from performance due to Slate's breach of the Manufacturing Agreement.

**ANSWER:** Slate denies the allegations in Paragraph 129.

130. All conditions required by the Manufacturing Agreement for Slate's performance have occurred.

**ANSWER:** Slate denies the allegations in Paragraph 130.

131. Slate owes Horseshoe at least $684,207.13 for unpaid invoices.

**ANSWER:** Slate denies the allegations in Paragraph 131.

132. Slate never paid Horseshoe for the product delivered in June 2024.

**ANSWER:** Slate admits that it did not pay Horseshoe for product delivered in June 2024 because of the issues with such product that Slate had raised with Horseshoe, and which Horseshoe failed to cure. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 132.

133. Section 9.3 of the Manufacturing Agreement sets forth the process to dispute any invoice: "If Customer in good faith disputes any portion of an invoice, Customer shall pay the undisputed portion of the invoice and submit written notice to Manufacturer regarding the disputed amount, which notice shall include documentation supporting the alleged billing error (each such notice, a 'Fee Dispute Notice'). A Fee Dispute Notice must be submitted to Manufacturer within thirty (30) days from the date of the invoice." Section 9.3 also dictates that Slate waives its right to dispute any fee if notice is not provided within the 30-day period: "Customer waives the right to dispute any Production Fees or other fees not disputed within such thirty (30) day period."

**ANSWER:** To the extent the language in Paragraph 133 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. The remainder of Paragraph 133 contains legal conclusions that do not require a response. To the extent that Paragraph 133 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

134. Slate has not produced a Fee Dispute Notice to Horseshoe related to any of the May, June, and July 2024 invoices.

**ANSWER:** Slate admits that it disputed the May, June, and July 2024 invoices with one or more Horseshoe employees (including Matt Knox), but admits that it did not send Horseshoe a document titled "Fee Dispute Notice" for such invoices. To the extent necessary, Slate denies the remainder of the allegations in Paragraph 134.

135. Even if Slate timely disputed invoices from the July production with proof of alleged defects (an issue Horseshoe disputes) as required by the Manufacturing Agreement, Slate would still be obligated to pay the undisputed portion of the outstanding invoices. The undisputed portion of the invoices total at least $420,800.80.

55

**ANSWER:** Slate denies the allegations in Paragraph 135.

136. Slate has materially breached the Manufacturing Agreement by failing to either make timely payments on outstanding invoices or produce a "Fee Dispute Notice" within 30 days of the issuance of the invoice, as required under Section 9.3 of the Manufacturing Agreement.

**ANSWER:** Slate denies that it has "materially breached the Manufacturing Agreement." The remainder of Paragraph 136 contains legal conclusions that do not require a response. To the extent that Paragraph 136 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

137. As a result, Slate's overdue, unpaid invoices now total, at minimum, $684,207.13, which has caused damage to Horseshoe and its business.

**ANSWER:** Paragraph 137 contains legal conclusions that do not require a response. To the extent that Paragraph 137 contains factual allegations or otherwise requires a response, Slate denies such allegations.

138. As explained above, Horseshoe has suffered damage as a result of Slate's failure to pay its invoices and breach of Section 9.3 of the Manufacturing Agreement, and is entitled to recover all damages permitted by law.

**ANSWER:** Slate is without information sufficient to form a belief as to what Horseshoe believes is the nature of its alleged "damage," and therefore denies such allegation on that basis. The remainder of Paragraph 138 contains legal conclusions that do not require a response. To the extent that Paragraph 138 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

139. Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

**ANSWER:** To the extent the language in Paragraph 139 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents.  The remainder of Paragraph 139 contains legal conclusions that do not require a response.  To the extent that Paragraph 139 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

**B.    Anticipatory Repudiation of Remaining Guaranteed Minimums**

140.    Defendants incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

**ANSWER:**  Slate incorporates by reference all foregoing and subsequent paragraphs as though fully set forth herein.

141.    The Manufacturing Agreement is a valid contract between Horseshoe and Slate.

**ANSWER:**  Slate admits that it entered into the Manufacturing Agreement with Horseshoe, but denies any implication that Slate and Trilliant entered into a contract.  The remainder of Paragraph 141 contains legal conclusions that do not require a response.  To the extent that Paragraph 141 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

142.    Section 4.4 of the Manufacturing Agreement provides a binding Minimum Order Commitment of ▮▮▮▮▮ cases per year, priced at a ▮▮▮▮ cost per case as noted in the Beverage Product and Pricing Exhibit to the Manufacturing Agreement. Manufacturing Agreement § 4.4, Beverage Product and Pricing Exhibit. The Minimum Order Commitment allows for Horseshoe to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Id.

**ANSWER:**  To the extent the language in Paragraph 142 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations.  Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents.  To the extent necessary, Slate denies any remaining allegations in Paragraph 142.

143.    Horseshoe has performed all or substantially all of the essential obligations which the Manufacturing Agreement required it to do or was excused from performance due to Slate's breach of the Manufacturing Agreement.

57

**ANSWER:** Slate denies the allegations in Paragraph 143.

144. All conditions required by the Manufacturing Agreement for Slate's performance have occurred.

**ANSWER:** Slate denies the allegations in Paragraph 144.

145. Despite Horseshoe's substantial performance of its obligations under the Manufacturing Agreement, Slate issued a letter on August 30, 2024 and sent a Notice of Termination on October 10, 2024, purportedly terminating the Agreement.

**ANSWER:** Slate denies that Horseshoe "substantial[ly] performed … its obligations under the Manufacturing Agreement." Slate admits that it sent Horseshoe a letter on August 30, 2024 and a Notice of Termination on October 10, 2024, which terminated the Manufacturing Agreement. The remainder of Paragraph 145 contains legal conclusions that do not require a response. To the extent that Paragraph 145 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

146. Slate anticipatorily repudiated its obligations under the Manufacturing Agreement by sending a Notice of Termination on October 10, 2024, and previously, through its letter on August 30, 2024.

**ANSWER:** Slate admits that it sent a Horseshoe a letter on August 30, 2024 and a Notice of Termination to Horseshoe on October 10, 2024, which terminated the Manufacturing Agreement. The remainder of Paragraph 146 contains legal conclusions that do not require a response. To the extent that Paragraph 146 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

147. Horseshoe made efforts to continue performance under the Contract in response to the August 30 letter, and demanded adequate assurances from Slate that they would continue to fulfill their obligations under Section 4.4 of the Manufacturing Agreement.

**ANSWER:** Slate admits that it received communications from Horseshoe after August 30, 2024. Slate refers the Court such communications for a complete and accurate

depiction of their contents. The remainder of Paragraph 147 contains legal conclusions that do not require a response. To the extent that Paragraph 147 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

148.    However, with Slate's October 10, 2024 Notice of Termination, Slate anticipatorily repudiated their obligations to accept and pay for the minimum order commitment of ████ cases per year, at a rate of at least ████ per case. When the cost-per-case is adjusted ███████ ████████████████████████ as the Beverage Product and Pricing Exhibit to the Manufacturing Agreement provides, the adjusted per-case cost is ████. This rate may be further raised in 2025, as allowed for in the Manufacturing Agreement.

**ANSWER:** Slate admits that it sent Horseshoe a Notice of Termination on October 10, 2024, which terminated the Manufacturing Agreement. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. The remainder of Paragraph 148 contains legal conclusions that do not require a response. To the extent that Paragraph 148 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

149.    Section 4.4.1 of the contract provides that the Minimum Order Commitment production fees shall "be in the nature of liquidated damages."

**ANSWER:** To the extent the language in Paragraph 149 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. To the extent necessary, Slate denies any remaining allegations in Paragraph 149.

150.    ████ cases remain under Slate's ████-case Minimum Order Commitment for 2024. All ████ cases that comprise of Slate's 2025 Minimum Order Commitment remain unordered.

**ANSWER:** To the extent the language in Paragraph 150 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of

their contents. Slate denies the remainder of the allegations in Paragraph 150.

151. Thus, for the remainder of 2024, Slate's anticipatory repudiation requires liquidated damages in the amount of $2,558,730 based on the ████ case shortfall with a tolling fee of ████ per case for 2024 pursuant to Section 4.4.1 of the Manufacturing Agreement.

**ANSWER:** To the extent the language in Paragraph 151 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. Slate denies that it is required to pay Horseshoe $2,558,730 based on the Manufacturing Agreement (or otherwise). The remainder of Paragraph 151 contains legal conclusions that do not require a response. To the extent that Paragraph 151 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

152. For the 2025 calendar year, Slate owes liquidated damages for all ████ cases. Thus, the amount owed under Sections 4.4 and 4.4.1 of the Agreement for 2025 is $4,011,000 based on the adjusted per-case cost of ████.

**ANSWER:** To the extent the language in Paragraph 152 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. Slate denies that it owes Horseshoe "for all ████ cases" and that it owes $4,011,000 under the Manufacturing Agreement (or otherwise). The remainder of Paragraph 152 contains legal conclusions that do not require a response. To the extent that Paragraph 152 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

153. As explained above, Horseshoe has suffered damage as a result of Slate's breach of Section 4.4 of the Manufacturing Agreement and is entitled to recover all damages permitted by law.

**ANSWER:** Slate denies that it breached Section 4.4 of the Manufacturing Agreement

and that Horseshoe "is entitled to recover" anything. The remainder of Paragraph 153 contains legal conclusions that do not require a response. To the extent that Paragraph 153 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

154. Upon prevailing on this claim, Horseshoe is also entitled to recover its attorneys' fees and all other reasonably necessary fees, costs, and expenses incurred in connection with this suit, pursuant to Section 19 of the Manufacturing Agreement.

**ANSWER:** Slate denies that Horseshoe can "prevail on this claim." To the extent the language in Paragraph 154 differs from the language set forth in the Manufacturing Agreement, Slate denies those allegations. Slate refers the Court to the Manufacturing Agreement, and all exhibits thereto, for a complete and accurate depiction of their contents. The remainder of Paragraph 154 contains legal conclusions that do not require a response. To the extent that Paragraph 154 contains additional factual allegations or otherwise requires a response, Slate denies such allegations.

## AFFIRMATIVE DEFENSES

Pursuant to Fed. R. Civ. P. 8(c), Slate pleads the following separate affirmative defenses to the Counterclaims without intending any alteration of the burden of proof and/or burden of going forward with evidence that otherwise exists with respect to any particular issue. All such affirmative defenses are pleaded in the alternative, and do not constitute an admission of liability or that Defendants are entitled to any relief whatsoever. Slate expressly reserves the right to assert additional affirmative defenses as they become known through further investigation during the course of discovery.

### First Affirmative Defense

Defendants' claims are barred, in whole or in part, for a failure to state a claim.

### Second Affirmative Defense

Defendants' claims are barred, in whole or in part, by the equitable defenses of unclean

hands and/or *in pari delicto* as a result of their improper conduct regarding Slate's Confidential Information and/or trade secrets, including as alleged in Slate's Complaint.

### Third Affirmative Defense

Defendants' claims for breach of contract are precluded, in whole or in part, by Horseshoe's anticipatory breach of the Manufacturing Agreement, including for the reasons set forth in Slate's declaratory judgment claim in its Complaint.

### Fourth Affirmative Defense

Defendants' claims are barred, in whole or in part, because they have been unjustly enriched by misappropriating Slate's Confidential Information and/or trade secrets, including as set forth in Slate's Complaint.

### Fifth Affirmative Defense

Defendants' claims for damages are barred, in whole or in part, because they have failed to mitigate their alleged damages and/or failed to set off any alleged damages against damages owed to Slate.

### Reservation of Rights

Slate presently has insufficient knowledge or information upon which to form a basis as to whether it may have additional, as yet unstated, affirmative defenses under Fed. R. Civ. P. 8(c) available. Slate has not knowingly or intentionally waived any applicable defenses and reserves the right to assert additional affirmative defenses, defenses, affirmative counterclaims, cross-claims, and third-party claims at any subsequent stage of this action, including in the event that discovery indicates that such additional affirmative defenses, defenses, or claims would be appropriate.

Dated: January 31, 2025

*s/ Jonathan T. Smies*
Jonathan T. Smies
State Bar No. 1045422
**GODFREY & KAHN, S.C.**
200 South Washington Street, Suite 100
Green Bay, WI 54301
Telephone: (920) 432-3900
Email: jsmies@gklaw.com

Allison W. Reimann
State Bar No. 1107864
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Telephone: (608) 257-3911
Email: areimann@gklaw.com

Benjamin M. Stern
MA BBO# 646778
Michael Leard
MA BBO# 681468
**NUTTER MCCLENNEN & FISH, LLP**
Seaport West, 155 Seaport Blvd.
Boston, Massachusetts 02210
Telephone:     (617) 439-2000
Facsimile:     (617) 310-9000
Email: bstern@nutter.com
      mleard@nutter.com

*Attorneys for Plaintiff Slate Craft Goods, Inc.*

7020772