# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SLATE CRAFT GOODS, INC.,**

   **Plaintiff,**

  **v.**           **Case No. 24-C-1292**

**HORSESHOE BEVERAGE COMPANY, LLC, and
TRILLIANT FOOD AND NUTRITION, LLC,**

   **Defendants.**

---

## DECISION AND ORDER ON MOTION
## FOR JUDGMENT ON THE PLEADINGS

---

Plaintiff Slate Craft Goods, Inc., commenced this action against Defendants Horseshoe Beverage Company, LLC, and Horseshoe's affiliate, Trilliant Food and Nutrition, LLC, asserting federal and state law claims for misappropriation of trade secrets as well as state law claims for breach of contract, interference with contractual and prospective contractual relations, unfair competition, conspiracy, unjust enrichment, and conversion. In essence, Slate alleges that Defendants stole its confidential business plan to develop and market a lactose-free, high-protein milkshake product. The court has jurisdiction over Slate's claim under the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, pursuant to 28 U.S.C. § 1331 and Slate's state law claims pursuant to 28 U.S.C. § 1367. The case is before the court on Defendants' motion for judgment on the pleadings. Dkt. No. 114. For the reasons set forth below, the motion will be granted-in-part and denied-in-part.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017) (citing *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)). The court must draw all reasonable inferences and view all facts in the light most favorable to the plaintiff. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017). The court is not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

To survive a motion for judgment on the pleadings, the complaint must "contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The court also considers documents incorporated by reference to the complaint; the answer to the complaint, including any admissions in the answer; and facts of which the court may take judicial notice. *Milwaukee Police Ass'n v. Flynn*, 213 F. Supp. 3d 1113, 1115 (E.D. Wis. 2016). If, assuming all the alleged facts are accurate, the plaintiff has no legal claim, the court should grant judgment on the pleadings. *Id.*

2

**FACTUAL ALLEGATIONS**

According to the First Amended Complaint (FAC), Slate was founded in 2018. FAC ¶ 19, Dkt. No. 101. The company creates and sells prepackaged, protein-packed, lactose-free ultrafiltered milk shakes and iced coffees in aluminum cans. *Id.* ¶ 20. Initially, all of Slate's protein drinks were made with ultrafiltered and lactose-free milk, contained 20g of protein and 1g of sugar (the 20g product), and were available in a variety of flavors. *Id.* ¶ 21. Slate began selling its products to customers in late 2019. *Id.*

Slate outsources the production of its beverages to "co-manufacturers," one of which was Horseshoe. *Id.* ¶ 24. Horseshoe and Trilliant are affiliates that develop and manufacture beverages. *Id.* ¶¶ 12, 25. Slate and Horseshoe entered into a Manufacturing Agreement (the Agreement), effective January 1, 2023. *Id.* ¶ 24; Dkt. No. 53-22. Under the terms of the Agreement, Horseshoe was obligated to manufacture Slate's drinks according to Slate's formulations and recipes and then pack and ship the drinks in aluminum cans according to certain specifications. FAC ¶ 24. Slate retained ownership of all formulas and formulations shared, and Horseshoe was permitted to use confidential information provided by Slate solely to perform its obligations under the Agreement. *Id.* ¶ 29.

The FAC alleges that before Horseshoe began its business relation with Slate, "Defendants had never produced a liquid ultrafiltered-milk-based beverage, nor did Defendants have any experience formulating beverages with ultrafiltered milk." *Id.* ¶ 30. Defendants also lacked the equipment needed to produce such a product. *Id.* As a result, Slate needed to share the "knowledge, know-how, and methodologies" necessary to manufacture Slate's products—information that Slate asserts falls within the Agreement's definition of "Confidential Information," some of which also qualifies as trade secrets. *Id.* ¶¶ 30–32. By way of example,

3

Slate describes providing Horseshoe with the proper volume and timing of ingredients, methods for ensuring the drinks were lactose-free by using equipment Slate purchased and stored at Horseshoe's facility, methods to prevent "foaming" while manufacturing, and the "sweetener systems" Slate used for the drink's taste. *Id.* ¶ 31. Slate alleges that all of the know-how, instructions, methodologies, and other information are "confidential and proprietary," and that "certain of this information" qualifies as trade secrets. *Id.* ¶ 32.

In July 2022, a representative from one of the major club wholesale stores approached Slate about a potential business relationship. *Id.* ¶ 34. Although the FAC refers to this store as "Club," Defendants' Answer identifies the store as Costco Wholesale Corporation. Dkt. No. 107 at ¶ 66. Slate already sold several orders of its 20g product to Costco, but the Costco representative expressed interest in Slate producing and selling a drink with 30g of protein as well, which represented a significant business opportunity for Slate. FAC ¶¶ 35–37. In response to this invitation, between August 2023 and November 2023, Slate developed the "New Slate Product," which had 30g of protein and included more vitamins and minerals as well. *Id.* ¶¶ 37–39. During a confidential meeting with Horseshoe in late November 2023, Slate told Horseshoe of its plans to produce the New Slate Product for Costco and provided samples of the product. *Id.* ¶ 40. Horseshoe expressed interest in partnering with Slate to produce the new product, so Slate shared additional confidential information, such as the business plan, costs and suppliers, and the target price at Costco. *Id.* ¶¶ 41–44, 67.

The FAC alleges that Defendants immediately began plotting to use Slate's confidential information to facilitate Defendants' launching of their own competing product with Costco's Canadian entity. *Id.* ¶ 45. Part of Defendants' plot involved delaying Slate's product development and production. Slate provided its formulation for the New Slate Product in January 2024, as well

4

as the timeline for launching its new product with Costco. *Id.* ¶ 50. Horseshoe began providing trial samples throughout February and March 2024, but the samples—which Horseshoe said were from the same "batch"—were deficient and inconsistent in flavor and viscosity. *Id.* ¶¶ 51–52. The FAC alleges that Horseshoe's difficulties were actually a ruse to delay Slate's product presentation to Costco. *Id.* ¶ 178. At the time, however, Slate believed Horseshoe was working in its interests and undertook additional product development efforts. *Id.* ¶ 53. Slate provided Horseshoe with a revised formulation—one that Slate had successfully produced in testing—in June 2024, but Horseshoe again returned substandard product. *Id.* ¶ 54. Frustrated by Horseshoe's failures, Slate turned to another co-manufacturing partner, which provided high-quality samples within only one month. *Id.* ¶ 56. By September 2024, Slate presented samples of its New Slate Product to Costco but was surprised to learn that a new product was now competing with it and undercutting its price. *Id.* ¶ 58.

In the meantime, Defendants (jointly) had been developing their own high protein ultrafiltered milk-based product—Nurri—allegedly using Slate's trade secrets and other confidential information. *Id.* ¶¶ 58–61, 69–70. About a week after Slate's meeting with Costco, around September 12, 2024, Slate learned via a press release that Costco selected Nurri as the high-protein, lactose-free beverage it would sell and that Horseshoe produced Nurri. *Id.* ¶ 59. The FAC alleges that Nurri has nearly all the same characteristics, packaging, volume, and ingredients as Slate's high-protein, lactose-free milkshake product. *Id.* ¶ 64. Slate alleges that Defendants used confidential information and trade secrets, including Slate's ingredient suppliers, prices, charges for ingredients, and timing for product release and development, among other things, to develop Nurri and usurp Slate's market opportunities with their new product. *Id.* ¶¶ 67, 72–73.

The FAC further alleges that Horseshoe harmed it by packaging Slate's 20g product in damaged cans with scarring across the design. *Id.* ¶¶ 77–79. Specifically, Slate alleges that cans produced in April, June, and July 2024 were plagued by defects but were released for sale all the same. *Id.* ¶ 83. Slate learned of the issues independently of Defendants from scattered reports of defective products on store shelves; but Slate eventually learned from Horseshoe that it had disposed of 35% of its products from the July 2024 production run due to the same issues. *Id.* ¶¶ 82–88. After discovering the issues, Slate insisted that Horseshoe correct for the defects and prevent them in the future. *Id.* ¶¶ 89, 91–93. Rather than fix the issue, Horseshoe demanded payment of its June and July 2024 production runs. *Id.* ¶ 90. After extended back-and-forth, Slate terminated the Agreement with Horseshoe. *Id.* ¶¶ 91–92, 95.

The FAC also alleges that Defendants intentionally interfered with Slate's milk supply from the Michigan Milk Producers Association (MMPA), which had supplied Slate with ultrafiltered milk for years and made deliveries directly to Defendants in the past. *Id.* ¶¶ 97–99. To produce its products, Slate worked with MMPA and another supplier to develop an enzymatic process to break down lactose in MMPA's milk before shipping it to Horseshoe's facility for its use in manufacturing Slate's products. *Id.* According to the Agreement, and subject to its confidentiality provision, Slate provided Horseshoe with its pricing arrangements with MMPA and its process for making MMPA's ultrafiltered milk lactose-free. *Id.* ¶¶ 100–01. When Defendants began producing Nurri, Slate alleges they stepped into Slate's shoes and took over the relationship with MMPA, purchasing milk from MMPA instead of from other providers even closer to its facilities. *Id.* ¶ 104. Not only did Defendants begin purchasing their own supply of ultrafiltered milk from MMPA, but Defendants allegedly kept shipments from MMPA that were originally delivered for Horseshoe's use in producing Slate's products. *Id.* ¶ 105. Eventually,

6

MMPA informed Slate that "another customer's" needs meant that MMPA could no longer provide ultrafiltered milk to Slate. *Id.* ¶¶ 109–10. Slate alleges that Defendants are that other customer and are the reason MMPA will no longer supply it with ultrafiltered milk. *Id.*

The FAC asserts the following claims: Count I, misappropriation of trade secrets under the Federal Defend Trade Secrets Act (DTSA) against both defendants; Count II, misappropriation of trade secrets under the Wisconsin Uniform Trade Secrets Act (WUTSA) against both defendants; Count III, breach of contract based on confidentiality against Horseshoe; Count IV, breach of contract based on defects in performance against Horseshoe; Count V, breach of covenant of good faith and fair dealing against Horseshoe; Count VI, tortious interference with contractual relations with Horseshoe against Trilliant; Count VII, tortious interference with potential prospective business/contractual relations with Costco against both defendants; Count VIII, tortious interference with business relations with MMPA against both defendants; Count IX, unfair competition against both defendants; Count X, conversion against both defendants; Count XI, unjust enrichment against both defendants; Count XII, civil conspiracy for injury to business against both defendants; Count XIII, declaratory judgment for unpaid invoices and termination for cause against Horseshoe; Count XIV, breach of contract for confidentiality against Trilliant (pled in the alternative); Count XV, breach of contract for defects in performance against Trilliant (pled in the alternative); Count XVI, breach of covenant of good faith and faith dealing against Trilliant (pled in the alternative); and Count XVII (misnumbered as Count XVIII in the FAC), declaratory judgment for unpaid invoices and termination for cause against Trilliant (pled in the alternative). *Id.* at 32–52.

**ANALYSIS**

Defendants have moved for judgment on the pleadings on all claims in the FAC except Counts I (DTSA), II (WUTSA), and V (Breach of Covenant of Good Faith and Fair Dealing). They first argue that Counts VI (Tortious Interference with Contractual Relations (Trilliant)—Manufacturing Agreement), VII (Tortious Interference with Potential Prospective Business/Contractual Relations—Costco), VIII (Tortious Interference with Business Relations—MMPA), IX (Unfair Competition), XI (Unjust Enrichment), and XII (Civil Conspiracy—Injury to Business) are preempted by the WUTSA. Defendants further argue that Slate's tort and quasi-contract claims (Counts VI through XII) suffer from additional defects that independently warrant dismissal. Defendants also argue that Slate's breach of contract claims (Counts III, IV, XIV, XV, XVI, and XVII) suffer from additional defects warranting dismissal. Finally, Defendants ask the court to hold as a matter of law that the damages cap in the Manufacturing Agreement between Slate and Horseshoe limits Slate's damages.

## I. WUTSA Preemption

Defendants first argue that the Wisconsin Uniform Trade Secrets Act (WUTSA) preempts Slate's claims premised on trade secret misappropriation, including Counts VI, VII, VIII, IX, XI, and XII. Defendants assert that each of those claims depend on the alleged misappropriation of information that Slate alleges meets the WUTSA's definition of a trade secret.

The Wisconsin Uniform Trade Secrets Act provides the exclusive remedy for claims based on the misappropriation of a trade secret as defined therein. Under the WUTSA, the term "trade secret" means:

> information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:

8

1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c). With two pertinent exceptions, the WUTSA is intended to displace "conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret." § 134.90(6)(a). The two pertinent exceptions are "1. Any contractual remedy, whether or not based upon misappropriation of a trade secret, [and] 2. Any civil remedy not based upon misappropriation of a trade secret . . . ." § 134.90(6)(b).

In *Burbank Grease Services, LLC v. Sokolowski*, the Wisconsin Supreme Court held that the WUTSA was intended to "replace all pre-existing definitions of 'trade secret' and remedies for tort claims dependent solely on the existence of a specific class of information statutorily defined as 'trade secrets.'" 2006 WI 103, ¶ 33, 294 Wis. 2d 274, 717 N.W.2d 781. The court further held, however, that the WUTSA left "available all other types of civil actions that do not depend on information that meets the statutory definition of a 'trade secret.'" *Id.* In that case, for example, the court concluded that § 134.90 did not preempt common law claims for breach of an employee's duty of loyalty and intentional interference with business relationships by which the plaintiff sought to recover damages for its former employee's disclosure and use of information that did not come within § 134.90's definition of "trade secret." *Id.* ¶¶ 10, 33, 50.

Defendants argue that, according to the FAC, all of the "Confidential Information" Slate is alleged to have provided Horseshoe meets the WUTSA definition of a trade secret. It is information that the FAC alleges derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other

persons who can obtain economic value from its disclosure or use, and it was allegedly the subject of efforts to maintain its secrecy that are reasonable under the circumstances. *See* Wis. Stat. § 134.90(1)(c). "Because the FAC confirms that the categories of allegedly misappropriated Confidential Information are the same as the allegedly misappropriated trade secrets," Defendants argue, "the WUTSA preempts all of Slate's claims that depend on allegations of misappropriation of Confidential Information." Dkt. No. 114-1 at 19. The claims Defendants contend are based on misappropriation of such information, and thus preempted by the WUTSA, include tortious interference with contractual or prospective business relations, unfair competition, unjust enrichment, and civil conspiracy to injure business. Defendants contend that each of these claims depend "solely on the existence of a specific class of information statutorily defined as 'trade secrets.'" *See Burbank Grease*, 294 Wis. 2d 274, ¶ 33.

Slate argues in response that "Defendants' characterization of Slate's Amended Complaint is both factually incorrect and legally irrelevant." Dkt. No. 125 at 20. It is factually incorrect, Slate contends, because the FAC does not conflate all of its Confidential Information with trade secrets. Slate notes that "the Amended Complaint explains that while the 'knowledge, know-how, and methodologies' for manufacturing Slate products 'all . . . fall within the definition of "Confidential Information,"' Slate considers only 'certain of this information to be its trade secrets.'" *Id.* at 21 (quoting FAC, ¶ 30). It is legally incorrect, Slate contends, because "Wisconsin law permits Slate to plead misuse of confidential information alongside trade secret claims to the extent information it alleges as a trade secret might not ultimately qualify as such." *Id.* at 22. In support of this contention, Slate cites *Radiator Express Warehouse, Inc. v. Shier*, in which the court denied a motion to dismiss claims for tortious interference with a prospective contract, intentional misrepresentation, civil theft, conversion, and conspiracy, combined with trade secret

misappropriation, because "discovery could prove that the information at issue in the plaintiff's [misappropriation of trade secret claim] falls short of the statutory definition of 'trade secret' within the meaning of the WUTSA, forcing the plaintiffs to try to recover other civil tort claims not grounded in trade secret." 708 F. Supp. 2d 762, 770 (E.D. Wis. 2010).

Essentially, Defendants' position is that all of the "Confidential Information" the FAC alleges they misappropriated fits the WUTSA's definition of trade secret and also forms the basis of the Counts they claim are therefore preempted. Slate's position is that some of the "Confidential Information" Defendants misappropriated might not fall within the WUTSA definition of trade secret and thus claims premised on those facts might not be preempted.

The court is satisfied that the allegations of the FAC are sufficient to allege claims based on misuse of confidential information that may not constitute a trade secret. *See, e.g.*, FAC ¶ 32 ("Slate's know-how, instructions, methodologies, and other information that it provided to Defendants . . . are part of the competitive advantage that Slate has for its products. Slate considers all of this information to be confidential and proprietary and certain of this information to be its trade secrets."); *see generally ProClip USA, LLC v. Ebert*, No. 21-CV-163-WMC, 2022 WL 579265, at *4–5 (W.D. Wis. Feb. 25, 2022) (declining to dismiss claims on WUTSA preemption grounds at the pleading stage, despite the plaintiff's specific allegation that the information involved *was* a statutory trade secret, because discovery might reveal otherwise—"what [was] crucial [was] the uncertainty as to whether the [information] truly counts as a trade secret, leaving civil remedies outside of WUTSA available for now."); *Genzyme Corp. v. Bishop*, 460 F. Supp. 2d 939, 953 (W.D. Wis. 2006) (declining to dismiss breach of duty of loyalty, usurpation of corporate opportunity, and conspiracy claims because insufficient factual information existed at the motion to dismiss stage to conclude that the information qualified as a "trade secret").

11

Moreover, even if all the Confidential Information allegedly misappropriated by Defendants is ultimately determined to fall within WUTSA's definition of a trade secret, Slate's tortious interference, unfair competition, unjust enrichment, and civil conspiracy claims all go beyond alleged misappropriation of Confidential Information. These claims are additionally based on allegations that Defendants intentionally bungled product development, delayed Slate's production, released inferior products into the marketplace, and eventually cut in line to usurp Slate's opportunity with Costco, and that in doing so, Defendants interfered with existing and prospective business relationships, engaged in unfair competition, unjustly enriched themselves, and conspired to harm Slate. These claims are not "dependent solely on the existence of a specific class of information statutorily defined as 'trade secrets.'" *Burbank Grease*, 294 Wis. 2d 274, ¶ 33. In short, the court is satisfied at least at this stage of the litigation that Counts VI, VII, VIII, IX, XI, and XII of the FAC are not preempted by the WUTSA and that Defendants' for judgment on the pleadings on preemption grounds should be denied.

## II. Tort and Quasi-Contract Claims

Alternatively, Defendants contend that the FAC's tort and quasi-contract claims (Counts VI through XII) suffer from additional defects that warrant dismissal. The court will address each count separately.

### A. Tortious Interference With Manufacturing Agreement By Trilliant (Count VI)

Count VI alleges that Trilliant interfered with the Manufacturing Agreement between Slate and Horseshoe under which Horseshoe was to manufacture Slate's products. FAC ¶¶ 140–50. The FAC alleges that "Trilliant knowingly and intentionally interfered with Slate's business relationship with Horseshoe and induced Horseshoe's breach of the Manufacturing Agreement when Trilliant received and used Slate's confidential business information from Horseshoe for the

12

purpose of developing Nurri." Dkt. No. 101 ¶ 145. Trilliant argues that this claim should be dismissed because Slate alleges that Horseshoe and Trilliant must be treated as a single entity for purposes of the Agreement and "it is black-letter law that 'one cannot tortiously interfere with one's own contract.'" Dkt. No. 114-1 at 22 (quoting *Westowne Shoes, Inc. v. City Ins. Co.*, 82 F.3d 420 (7th Cir. 1996)). "Because Slate essentially alleges that Trilliant interfered with its own contract," Defendants contend, "Count VI fails as a matter of law as pleaded." *Id.* (citation modified).

Regardless of how Slate and/or Defendants contend Defendants should be treated as to some of Slate's claims against them, Horseshoe and Trilliant are, as a matter of law, two separate businesses. That fact is sufficient at the pleading stage to defeat Defendants' argument that Trilliant could not have tortiously interfered with Slate's contract with Horseshoe. Whether there may exist grounds to "pierce the corporate veil" of these two limited liability companies is a separate issue. In the event the court ultimately finds such grounds exist, Defendants may renew their argument. For now, however, the allegations of the FAC are sufficient to state a claim for tortious interference against Trilliant. Defendants' motion for judgment on the pleadings as to Count VI on this ground is therefore denied.

### B. Tortious Interference With Costco (Count VII)

Count VII alleges tortious interference with potential/prospective contracts with Costco against both Defendants. FAC ¶¶ 151–59. Defendants argue that the claim fails on both legal and factual grounds. First, Defendants contend that there is no legally recognized claim for interference with "business relations." Factually, they argue, the FAC fails to allege any facts to support a certain, concrete, or definite prospective relationship with Costco. Dkt. No. 114-1 at 23 (citing FAC ¶ 152). Defendants contend that the FAC alleges only conclusory impressions that

Slate had of Costco's intent without alleging any manifestations by Costco to be bound by any agreement with Slate for the production of a 30g product. Without more certainty, there can be no tortious interference with a contract.

Slate argues that its allegations are more than enough to support its claim, and that courts have allowed tortious interference claims to go forward in situations like this. The FAC alleges that Costco initiated a conversation with Slate in 2022 expressing an interest in purchasing the 20g product, as well as in Slate developing a 30g product for Costco to sell. FAC ¶¶ 35, 37–38, 47. Costco began selling Slate's 20g product in June 2023. *Id.* ¶ 37. And around August 2023, Slate began developing a 30g product according to Costco's requests. *Id.* ¶ 38. Slate emphasizes that it was Costco that made specific requests regarding details such as flavor and the amount of protein. Dkt. No. 125 at 26–27 (citing FAC ¶¶ 35, 38, 47).

To support a tortious interference claim, a plaintiff must allege that "(1) an actual or prospective contract existed between the plaintiff and a third party; (2) the defendant interfered with that contract or prospective contract; (3) the interference was intentional; (4) the interference caused the plaintiff to sustain damages; and (5) the defendant was not justified or privileged to interfere." *Goodall Oil Co. v. Pilot Corp.*, No. 19-CV-428-JDP, 2019 WL 5218870, at *3 (W.D. Wis. Oct. 16, 2019) (quoting *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)). A plaintiff must demonstrate that the prospective contract is "sufficiently certain, concrete and definite." *Shank*, 192 F.3d at 689. A plaintiff must also allege that the defendant acted with the purpose of interfering with the contract—liability may attach "if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition." *Cox v. Med. Coll. of Wis. Inc.*, 651 F. Supp. 3d 965, 1036

14

(E.D. Wis. 2023) (citing *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 541 N.W.2d 203, 209 (Wis. Ct. App. 1995) and quoting RESTATEMENT (SECOND) OF TORTS § 766, cmt. j). "Although plaintiffs must produce sufficient evidence of a prospective contract at summary judgment or trial, plaintiffs 'must only plausibly allege a prospective contract at the motion to dismiss phase.'" *Goodall Oil Co.*, 2019 WL 5218870, at *3 (quoting *Stucchi USA, Inc. v. Hyquip, Inc.*, No. 09-CV-732, 2010 WL 2990966, at *5 (E.D. Wis. July 28, 2010)).

Here, it appears Slate alleges with sufficient specificity a prospective contract with Costco. The parties were in communication for a year or more—from July 2022 until February 2024—during which time Costco followed through with its initial intention of purchasing Slate's 20g product and reiterated its enthusiasm for Slate's 30g product, a product Costco itself requested be provided, which was still in development. FAC ¶¶ 34–47. Slate alleges that, because Horseshoe intentionally botched producing Slate's products, Slate blew the timeline it originally gave Costco. *Id.* ¶ 57. Defendants, according to Slate, then swooped in and took the deal with the product they had been developing behind the scenes instead of performing under the Agreement. While there are no allegations of extended negotiations for pricing and specific sales volume in the FAC, it appears that Slate has alleged enough for its tortious interference with a prospective contract with Costco claim to survive at the pleadings stage. Defendants' motion must be denied on this claim.

## C. Tortious Interference With Business Relations With MMPA (Count VIII)

Regarding Count VIII, tortious interference with Slate's relationship with MMPA, Defendants argue that Slate fails to allege Defendants acted with the *primary purpose* to interfere with Slate's relationship. Dkt. No. 114-1 at 24. Slate alleges that MMPA was unable to continue supplying Slate with the ultrafiltered milk used in Slate's protein drink because Defendants used Slate's confidential information to target MMPA as its own supplier, causing MMPA to

15

discontinue supplying ultrafiltered milk to Slate.  Defendants argue that this is not enough—that Slate would need to allege that Defendants purchased milk from MMPA *with the primary purpose of interfering* with Slate's milk supply, or even that Defendants knew or should have known that MMPA would be unable to supply Slate after Defendants' purchase.  The FAC fails to allege these facts, Defendants contend, and thus Count VIII must be dismissed.

In response, Slate highlights its specific allegation that Defendants "intentionally interfered with Slate's relationship with MMPA and *Defendants' primary purpose was to cause such interference.*"  FAC ¶ 165 (emphasis added).  Slate also alleges the following facts supporting its assertion: Slate had a long-term and ongoing relationship with MMPA, Defendants were aware that MMPA provided Slate with its ultraprocessed milk, and Defendants passed over closer and cheaper suppliers for its own product and bought MMPA's stock to inhibit Slate's ability to do so.  *Id.* ¶¶ 98, 102–04, 108–10.

The court is satisfied that Slate has alleged sufficient facts to support its tortious interference claim as to its contract with MMPA at this stage.  MMPA provided Slate with ultrafiltered milk according to "a longstanding written and oral agreement, as well as [the] longstanding practice between MMPA and Slate" over several years.  *Id.* ¶ 161.  And the FAC alleges sufficient facts to support the inference that Defendants' primary goal was to disrupt Slate's arrangement and not just to purchase ultrafiltered milk for its own needs.  In the end, the record may show, and a jury may decide, that Defendants' primary goal was simply to develop Nurri, not interrupt Slate's product development.  But there exist sufficient allegations to support an inference that Defendants sought to disrupt Slate's contract with MMPA.  Defendants' motion on this claim must be denied here as well.

## D. Unfair Competition (Count IX)

Count IX is an unfair competition claim against both Defendants. FAC ¶171–83. The elements of a common law claim for unfair competition in Wisconsin are "(1) time, labor, and money expended in the creation of the thing misappropriated; (2) competition; and (3) commercial damage to the plaintiff." *Mercury Record Prods., Inc. v. Econ. Consultants, Inc.*, 64 Wis. 2d 163, 174, 218 N.W.2d 705 (1974). Defendants argue Slate cannot meet all the elements required under Wisconsin law. They assert that Slate alleges only that Defendants misappropriated relationships with suppliers, but relationships are not a "product" and Slate must show that Defendants' use of Slate's product or a copy of the product was unfair. Dkt. No. 114-1 at 25 (citing FAC ¶ 172). Defendants further argue that no statutory ground exists, since WUTSA would preempt it.

Slate responds by arguing that an unfair competition claim may remedy harm caused by "appropriation of intangible trade values including trade secrets" or acts or practices actionable under the Restatement or "federal or state statutes . . . or general principles of common law." Dkt. No. 125 at 30 (quoting *Thermal Design v. Am. Soc. of Heating Refrigerating & Air-Conditioning Engs.*, No. 07–C–765, 2008 WL 1902010, at *7–8 (E.D. Wis. Apr. 25, 2008)). In *Thermal Design*, the court turned to RESTATEMENT (THIRD) OF UNFAIR COMPETITION for guidance as to the elements of an unfair competition claim. RESTATEMENT (THIRD) OF UNFAIR COMPETITION states:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability [for unfair competition] to the other for such harm unless:
>
> (a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:
>
> (1) deceptive marketing . . . ;
>
> (2) infringement of trademark and other indicia of identification . . . ;

17

(3) appropriation of intangible trade values including trade secrets and the right of publicity . . . ;

or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

(b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 (1995). Here, as explained above, Slate has pled with sufficient particularity causes of action arising under other sources of law and may maintain this claim as well. Defendants' motion is therefore denied as to Count IX.

### E. Conversion (Count X)

Count X is a claim for conversion against both Defendants. FAC ¶¶ 184–88. Slate alleges that after its contract with Horseshoe was terminated, Defendants improperly withheld and converted ingredients and equipment that Slate had purchased and transferred to Horseshoe for the manufacture of its product. The equipment consisted of a device that allowed Horseshoe to test the amount of lactose in a beverage. *Id.* ¶ 31. Slate alleges that the device was purchased for Horseshoe subject to the understanding that Horseshoe would use it only in connection with its obligations under the Manufacturing Agreement and for no other purpose. *Id.*

As an initial matter, the allegations are that the property allegedly converted was in Horseshoe's possession. The conclusory allegation that Defendants converted Slate's property is insufficient to state a claim against Trilliant. *Iqbal*, 556 U.S. at 678. As for Horseshoe, Defendants argue this claim is barred by the economic loss doctrine. Wisconsin law states that contracting parties are required to "pursue only their contractual remedies when asserting an economic loss claim," and any tort claims are barred where the risk of economic loss is one that the parties "could have reasonably anticipated and addressed in the contract." Dkt. No. 114-1 at 27 (quoting

18

*Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 34, 262 Wis. 2d 32, 662 N.W.2d 652; *H.A. Friend & Co. v. Pro. Stationery, Inc.*, 2006 WI App 141, ¶ 16, 294 Wis. 2d 754, 720 N.W.2d 96). Defendants contend that Slate's conversion claim is a contractual one, since Defendants were only in possession of Slate's property pursuant to the Agreement.  FAC ¶ 186.

Slate argues that the economic loss doctrine is inapplicable for several reasons.  First, it argues the allegation that Defendants improperly kept Slate's ingredients and equipment has nothing to do with the parties' respective obligations under the Agreement.  Second, Slate argues that it could not have reasonably anticipated Defendants' intentional theft of its ingredients and equipment.

In Wisconsin, the economic loss doctrine precludes "contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Burt v. Chase Auto Fin. Corp.*, No. 19-C-739, 2020 WL 1638379, at *1 (E.D. Wis. Apr. 2, 2020) (quoting *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶ 27, 283 Wis. 2d 555, 699 N.W.2d 205).  A claim for conversion of property that was allegedly improperly retained after a contract between the parties was terminated may implicate the economic loss doctrine when a conversion claim and breach-of-contract claim "rise and fall together."  *Piano Gallery Madison, LLC v. Create Music, LLC*, No. 17-CV-713-JDP, 2018 WL 3475474, at *3 (W.D. Wis. July 19, 2018) (holding that the economic loss doctrine precluded a conversion claim where a selling business retained assets it was obligated to transfer to a buying business under an asset purchase agreement); *see also Burt*, 2020 WL 1638379, at *1–2 (same, where a lender repossessed a man's vehicle and the man alleged unlawful repossession).

Slate's conversion claim with respect to the ingredients it purchased concerns a matter well within the bounds of what the parties should have reasonably anticipated and, in fact, did address

19

in the contract.  The Manufacturing Agreement explicitly provides: "Any loss and/or destruction to Ingredients and Packaging Materials while in the possession of Manufacturer shall be Manufacturer's [Horseshoe's] sole liability unless such loss and/or destruction is attributable to [Slate's] acts or omissions."  Dkt. No. 53-22 at § 7.3.  If Horseshoe has retained for its own use ingredients or packaging material supplied by Slate for manufacture of its product, then Horseshoe is liable to Slate for the loss of that property under the terms of the contract and Slate has no claim for conversion of those items.

The Manufacturing Agreement is silent as to the equipment Slate purchased for Horseshoe.  But the FAC alleges that Slate purchased the equipment "for Horseshoe . . . with the agreement that Horseshoe is to use it only in connection with its obligations under the Manufacturing Agreement (and for no other purpose)."  FAC ¶ 31.  In other words, the FAC alleges that the equipment was subject to a separate agreement or contract.  If, as the FAC alleges, Horseshoe is currently using the equipment for a purpose other than the manufacture of Slate's product, Horseshoe is in breach of that contract and may be lawfully required to return the equipment to Slate.  But the FAC does not even allege that Slate has asked for the return of the equipment.  In any event, the claim against Horseshoe in the event it fails to return the property would be for breach of contract, not conversion.  Accordingly, Defendants' motion will be granted as to Slate's claim for conversion in Count X.

### F.  Unjust Enrichment (Count XI)

In Count XI, Slate asserts a claim for unjust enrichment against both Defendants.  FAC ¶¶ 189–94.  The elements of an unjust enrichment claim are (1) conferral of a benefit (2) with the knowledge of the party benefitted and (3) under circumstances where it is inequitable to permit the party to retain the benefit without payment.  *Ramsey v. Ellis*, 168 Wis. 2d 779, 784–85, 484

N.W.2d 331 (1992). "[U]njust enrichment is an equitable doctrine that is 'grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.'" *Smith v. RecordQuest, LLC*, 989 F.3d 513, 520 (7th Cir. 2021) (quoting *Watts v. Watts*, 137 Wis. 2d 506, 405 N.W.2d 303 (1987)). "In Wisconsin, a claim for unjust enrichment is typically a quasi-contractual claim that provides an equitable remedy when no legal remedy exists." *See Watts*, 137 Wis. 2d at 530 ("Because no express or implied in fact agreement exists between the parties, recovery based upon unjust enrichment is sometimes referred to as 'quasi contract,' or contract 'implied in law' rather than 'implied in fact.' Quasi contracts are obligations created by law to prevent injustice."). "One of the firmly-established rules of equity is that where a court of law can do as full justice to the parties as can be done in equity, a court of equity will not interfere." *Kramer v. Bohlman*, 35 Wis. 2d 58, 65, 150 N.W.2d 357 (1967) (footnote omitted).

Defendants argue that Slate's claim for unjust enrichment should be dismissed because Slate has legal remedies in the form of its claims for breach of contract and misappropriation of trade secrets that can ensure full justice to Slate without resort to equitable remedies. The court also notes that it has denied Defendants' motion as to Slate's claims of interference with actual and prospective contractual relations. With these remedies remaining, Slate has no need to assert an additional claim for unjust enrichment. Count XI will therefore be dismissed.

## G. Civil Conspiracy (Count XII)

Count XII alleges that Horseshoe and Trilliant engaged in a civil conspiracy to injure Slate in its business in violation of Wis. Stat. § 134.01. FAC ¶¶ 195–201. Defendants contend that this claim is barred by the intracorporate conspiracy doctrine. The intracorporate conspiracy doctrine holds that "a parent corporation and its wholly owned subsidiary are unable to engage in a

conspiracy under [Wis. Stat. §] 133.03." *Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 429, 405 N.W.2d 354 (Ct. App. 1987) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). The underlying rationale for the doctrine was explained in *Copperweld* in the context of a Sherman Act anti-trust conspiracy claim:

> the very notion of an "agreement" in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning. A § 1 agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). But in reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

467 U.S. at 771–72. Wisconsin courts have extended the doctrine "not only to Wisconsin's counterpart to the Sherman Act, but also to conspiracy claims with 'an economic basis.'" *Rajaraman v. GEICO Indemnity Co., Gov't Emps. Ins. Co.*, No. 23-CV-425-JPS, 2023 WL 5017181, at *4 (E.D. Wis. Aug. 7, 2023) (citing *Lyons*, 405 N.W.2d at 366–68; and *Gerol v. Arena*, 127 Wis. 2d 1, 377 N.W.2d 618 (Ct. App. 1985)).

Defendants argue that this doctrine fully applies here and that Slate's civil conspiracy claim is therefore barred. Defendants note that the FAC alleges that Defendants had a "unity of interest" in acting together to create Nurri and are sister companies that share resources and employees; senior executives, ultimate owners, and employees; and the same principal place of business. FAC ¶¶ 12, 61, 199–200. Entities this closely aligned, Defendants contend, cannot conspire with each other. Dkt. No. 114-1 at 30.

In *Brew City Redevelopment Group, LLC v. Ferchill Group*, the Wisconsin Supreme Court rejected the defendant's argument that the intracorporate conspiracy doctrine barred Brew City's conspiracy claims where there was nothing from the facts alleged in Brew City's complaint that

suggested a complete unity of interests among the defendants of the sort in *Copperweld* and *Ford Motor Company.* 2006 WI 128, ¶ 50, 297 Wis. 2d 606, 724 N.W.2d 879. The court noted that in *Lyons* and in *Copperweld*, the defendants were a parent corporation and its wholly owned subsidiary. In the *Lyons* court's determination that the defendants were unable to conspire under Wis. Stat. § 134.01, the court of appeals emphasized that, as in *Copperweld*, the defendants had a complete unity of interests, and that the parent company had the ability to exercise complete control over the subsidiary.

Slate argues that because Trilliant and Horseshoe are described as "sister companies" in the FAC but do not appear to share a parent and wholly-owned-subsidiary relationship, the intracorporate conspiracy doctrine does not apply. Slate further argues that while the fact that Slate and Horseshoe are corporate affiliates and that certain individuals work for both entities, including certain "apex" employees, may ultimately warrant a finding that they are essentially one and the same entity, it is premature to conclude its conspiracy claim is barred by the intracorporate doctrine on the facts alleged in the FAC.

But the intracorporate conspiracy doctrine is not limited to parent/subsidiary relationships. In *Travis v. Gary Community Mental Health Center, Inc.*, the court held that corporate employees of the same firm acting to pursue the business of the firm could not be treated as conspirators. 921 F.2d 108, 110 (7th Cir. 1990). Here, while the corporate employees of Horseshoe and Trilliant who were responsible for the decisions Slate claims caused it harm may be the same, it is not clear that the two Defendants had such a unity of interests, apart from the alleged conspiracy, that they should be considered a single entity. In sum, the court agrees with Slate that it is premature to so rule at this stage of the proceedings. Defendants' motion will therefore be denied as to Count XII.

## III. Breach of Contract Claims (Counts III, IV, XIV, XV, XVI, and XVIII)

### A. Breach of Confidentiality Provision by Horseshoe (Count III)

Count III alleges that Horseshoe breached the Manufacturing Agreement with Slate by violating the Agreement's confidentiality provision. FAC ¶¶ 124–28. "Confidential Information" is defined in the Agreement as:

> all information and materials regarding the business of either Party that are identified in writing by the Party to be confidential information or which a party should reasonably believe to be confidential information of a Party, including contracts (including this Agreement), the Formula or other recipes, Packaged Beverage Specifications or other technical specifications, business plans, formulas, know-how, financial information, historical financial statements, financial projections and budgets, historical and projected sales, pricing strategies and other pricing information, marketing plans, research and consumer insights, capital spending budgets and plans, the names and backgrounds of key personnel, personnel policies, plans, training techniques and materials, organizational strategies and plans, employment or consulting agreement information, Customer agreements and information (including for distributors or retailers), names and terms of arrangements with vendors or suppliers, or other similar information.

Dkt. No. 53-22 at § 21.1. The Agreement also provides, however, that "'Confidential Information' does not include information which (a) is or becomes generally available to the public other than as a result of a breach by the receiving Party or its affiliates of its obligations of confidentiality and non-use set forth herein or (b) was available to the receiving Party or its affiliates on a nonconfidential basis prior to disclosure by the disclosing Party." *Id.* Horseshoe's obligation under the Agreement was not only to avoid unnecessary disclosure of "Confidential Information" but also to "not use 'Confidential Information' of the Disclosing Party for any purpose other than in connection with the performance of the obligations and exercise and enforcement of the rights of the Receiving Party hereunder." *Id.* at § 21.2(b).

Defendants argue that to the extent Count III depends upon Horseshoe sharing information with Trilliant, the count should be dismissed because such sharing is expressly allowed under the

Agreement.  Defendants also argue that "the Confidential Information Slate identifies generally fits within both of Section 21.1's exceptions to the definition of 'Confidential Information'" in that it was generally available to the public or available to Horseshoe on a nonconfidential basis prior to disclosure by Slate.  Dkt. No. 114-2 at 31.

Defendants' argument is unconvincing.  The Agreement only allowed disclosure to "affiliates . . . who are actively and directly participating in the performance of the obligations and exercise of the rights of the Receiving Party under this Agreement" and further provided that Horseshoe would be responsible for any breach of the Agreement by its affiliates.  *Id.* at § 21.2(a). The FAC alleges that Horseshoe shared confidential information with its affiliate, Trilliant, so that Defendants could steal Slate's business opportunity and develop Nurri—a purpose wholly outside of Horseshoe's contractual duty/obligation to share information only "for use in performance under the Agreement."  FAC ¶ 127.  If true, this would constitute a clear violation of the Agreement.  As for Defendants' assertion that the information disclosed falls within the exceptions to the Agreement's definition of "Confidential Information," this is clearly an issue of fact that cannot be resolved on a motion for judgment on the pleadings.  Defendants' motion will therefore be denied as to Count III.

### B.  Horseshoe's Defective Performance (Count IV)

Count IV alleges that Horseshoe breached the Manufacturing Agreement by failing to fulfill its "obligations with respect to manufacturing, packaging, and distributing Slate's beverages to be of merchantable quality and free of defects."  FAC ¶ 131.  The FAC alleges that the defects in Horseshoe's performance "include, but are not limited to, significant damage to the aluminum cans packaged with Slate's products, including silver streaks and black scarring across the entire design, and Horseshoe's failure to produce agreed-upon quantities of product."  *Id.*

Defendants argue that Count IV should be dismissed because the FAC fails to point to any provision of the Manufacturing Agreement that was breached. Defendants contend that under the terms of the Agreement "Slate, not Defendants, [was] responsible for furnishing packaging materials" and for quality assurance. Dkt. No. 114-2 at 31 (citing Dkt. No. 53-22, § 7.1).

This argument is also unconvincing. The FAC alleges that the Agreement provides that Horseshoe is to "monitor the production and packaging of Slate's products in accordance with the terms of [the] Agreement and that the products must be of merchantable quality and be consistently free from material defects." FAC ¶ 75. The Agreement itself, which the court can consider in deciding a motion for judgment on the pleadings, expressly provides that Horseshoe warrants that "each Packaged Beverage shall be of merchantable quality" and "of a consistent quality, free from material defects." Dkt. No. 53-22 at §§ 13.1.2, 13.1.6. Whether the scarred and streaked cans that Horseshoe allegedly manufactured were of "merchantable quality" and "free from material defects" is a question of fact that cannot be resolved on the pleadings. *See Taterka v. Ford Motor Co.*, 86 Wis. 2d 140, 146, 271 N.W.2d 653 (1978) ("The issue of merchantability presents a question of fact."). And while Slate was responsible for furnishing the packaging materials, the FAC alleges that the defects resulted from Horseshoe's defective production, not from the packaging materials. FAC ¶¶ 74–96. Whether this is true is also a factual question that cannot be decided on a motion for judgment on the pleadings. Defendants' motion will therefore be denied as to Count IV.

### C. Breach of Contract Claims Against Trilliant (Counts XIV, XV, XVI, and XVII)

Defendants argue Slate's breach of contract claims against Trilliant fail as a matter of law because Trilliant was not a party to the Manufacturing Agreement; the Agreement was between Slate and Horseshoe. "It is hornbook law that a non-signatory to a contract cannot be named as a

defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Crabtree v. Tristar Automotive Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991). Since Trilliant did not sign the Agreement, Defendants contend it cannot be liable for any breach of the Agreement. Slate argues, however, that Trilliant may be held liable for breach of contract if it is found to be the alter ego of Horseshoe. Slate alleges in the FAC that Horseshoe and Trilliant are "sister companies" that have "shared resources and employees" across both entities, including single "apex" employees such as the Chief Executive Officer and the Chief Financial Officer, and acted in concert at times. FAC ¶ 12. These allegations, Slate argues, could support a finding that Trilliant is itself a party to the Agreement and/or is liable for damages resulting from Horseshoe's alleged breach.

Wisconsin follows the general rule "that a corporation is treated as a legal entity distinct from its members and is not liable for the personal debts of a shareholder." *Wiebke v. Richardson & Sons, Inc.*, 83 Wis. 2d 359, 363, 265 N.W.2d 571 (1978). Under the alter ego theory, however, the corporate veil may be pierced and liability may be imposed on the shareholders or equitable owners of the corporate entity if the corporation is deemed to be merely their alter ego. The "alter ego" doctrine requires proof of the following elements:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

27

*Consumer's Co-op. of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 485, 419 N.W.2d 211 (1988). But the principle of separateness is not to be disregarded lightly. *Id.* at 474. And although both Horseshoe and Trilliant are limited liability companies (LLCs), the same principles for disregarding corporate entity apply. *Bich v. WW3 LLC*, No. 20-C-1016-WCG, 2022 WL 18025219, at *11 (E.D. Wis. Dec. 30, 2022).

In Counts XIV through XVII of the FAC, Slate seeks to use this doctrine to impose contractual obligations on Trilliant, a sister company that shares resources and employees. But at most, the alter ego doctrine would impose the liability of Horseshoe for its breach of the Agreement upon Trilliant; it would not make Trilliant a signatory to the Agreement. In other words, if Trilliant was found to be the alter ego of Horseshoe, then Slate would be able to recover the damages caused by Horseshoe's breach of the Agreement from either Horseshoe or Trilliant. But that is not what the FAC alleges. It seeks to impose contractual liability directly on Trilliant. Because Trilliant is not a signatory to the Agreement, it is not bound by its terms, and Slate's claims for breach of contract must be dismissed.

Even as a basis for imposing Horseshoe's alleged liability on Trilliant, Slate's claim fails, at least based on the allegations in the FAC. Although the FAC alleges that Trilliant and Horseshoe share executives and resources, this is not enough to impose Horseshoe's liability on Trilliant. *See Knox v. Am. Family Ins. Co.*, No. 23-cv-790-wmc, 2025 WL 1137222, *5–6 (W.D. Wis. Apr. 10, 2025) (holding that allegations that companies shared all their directors and officers and the parents assumed all the subsidiary's losses and expenses insufficient to plausibly allege alter ego status). The FAC in this case, as in *Knox*, alleges no impropriety or disregard of the LLCs' form. *See Olen v. Phelps*, 200 Wis. 2d 155, 163, 546 N.W.2d 176 (Ct. App. 1996) (explaining a party seeking to pierce the corporate veil must be able to point to evidence establishing relevant factors, which

28

include "failure to observe corporate formalities, nonpayment of dividends, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, and the absence of corporate records").

Moreover, in this case, as in *Knox*, the plaintiff fails to demonstrate that it lacks an adequate remedy at law in the form of a breach of contract claim against Horseshoe, such that the equitable remedy of piercing the corporate veil is appropriate. 2025 WL 1137222, at *6 (citing *Benjamin Plumbing, Inc. v. Barnes*, 156 Wis. 2d 276, 283, 456 N.W.2d 628 (Ct. App. 1990) ("The rule permitting piercing of the corporate veil . . . is grounded in equity and, as such, reaches wrongful actions for which no adequate remedy at law exists."); *see also Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 74 (7th Cir. 1992) (concluding that dismissal was appropriate where there was "no indication that [a defendant's] presence in the suit was required to avoid any possible fraud").

For these reasons, Defendants' motion will be granted as to Slate's breach of contract claims against Trilliant. Counts XIV through XVII will be dismissed.

## IV. Damage Cap

Finally, Defendants argue that the court should dismiss Slate's claims for contract damages to the extent they exceed the contractual damages cap. The Manufacturing Agreement limits Horseshoe's "entire aggregate liability" for a breach to "amounts paid by [Slate] to [Horseshoe]" under the contract "during the twelve (12) month period preceding the event giving rise to such liability." Dkt. No. 53-22 at § 15.3. Defendants argue that the contractual limitation of liability is enforceable under Wisconsin law and is ripe for decision of the court.

Citing *Wassenaar v. Panos*, 111 Wis. 2d 518, 525, 331 N.W.2d 357 (1983), and similar cases, Slate argues in response that deciding the enforceability of a stipulated damage provision is a fact-intensive inquiry and would be improper to decide at this stage. In *Wassenaar*, the

29

Wisconsin Supreme Court held that "[t]he overall single test of validity is whether the clause is reasonable under the totality of circumstances." *Id.* at 526. The court listed several questions to be asked in deciding whether a stipulated damage provision of a contract was reasonable: "(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?" *Id.* at 529–30. Slate argues that the answers to these questions depend on disputed facts and circumstances and cannot be determined from the pleadings. It argues that the court need not—and indeed cannot—resolve that question at this stage of the proceedings.

Slate is correct that the issue cannot be determined on the present state of the record, but it is not clear that *Wassenaar* provides the rule for deciding whether the contractual limitation on damages is valid. *Wassenaar* concerned stipulated or liquidated damage provisions. In *Wassenaar*, the defendant employer challenged the damage clause in an employment contract that provided that, in the event of wrongful discharge, the employee would be paid a sum equal to his salary for the unexpired term of the contract. The Wisconsin Supreme Court granted a petition for review to decide "whether the clause in the employment contract stipulating damages is a valid and enforceable liquidated damages provision or is, as a matter of public policy, an unenforceable penalty." *Id.* at 520–21. The employer had terminated the contract 21 months prior to its expiration date and argued that the plaintiff had failed to mitigate his damages by seeking other employment. *Id.* at 522. The trial court had ruled inadmissible the employer's evidence that the plaintiff had failed to mitigate his damages. The Wisconsin Supreme Court concluded that the trial court had not erred in refusing to allow the defendant to present evidence of the plaintiff's

failure to mitigate his damages since the defendant failed to meet his burden in proving the stipulated damage clause unreasonable. *Id.* at 526, 540–41.

In this case, by contrast, the disputed clause is not a stipulated or liquidated damage provision. It is instead a contractual limitation of damages. It provides that Horseshoe's liability under the contract cannot exceed the amount Slate paid over the 12-month period preceding the event giving rise to liability. The test for determining the enforceability of a contractual limitation on damages would seem to be whether the provision is unconscionable. *See Rainbow Country Rentals & Retail, Inc. v. Ameritech Publ'g, Inc.*, 2005 WI 153, ¶¶ 38–43, 286 Wis. 2d 170, 706 N.W.2d 95 (applying unconscionability standards in upholding similar provision); *see also Buddy's Plant Plus Corp. v. Viking Masek Global Packaging Techs., LLC*, 2025 WI App 46, ¶¶ 33, 41, 417 Wis. 2d 723, 25 N.W.3d 613 (holding contractual limitation of recovery to amount paid not unconscionable). In any event, the determination of whether such a clause is valid cannot be made in this case on the pleadings. Defendants' motion will therefore be denied as to this issue.

## CONCLUSION

For the reasons set forth above, Defendants' motion for judgment on the pleadings (Dkt. No. 114) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Count X (conversion), Count XI (unjust enrichment), and Counts XIV through XVII (breach of contract claims against Trilliant) but **DENIED** as to all other counts.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2026.

_____
William C. Griesbach
United States District Judge